IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NB GATHERING IX PREF, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CASE NO. 3:20-cv-03491-K |
| v. | § | |
| | § | |
| PATRICK NELSON, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S APPENDIX IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT BASED ON BREACH OF CONTRACT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Pursuant to NDTX Local Rule 56.6, Plaintiff NB Gathering IX Pref, LLC, by and through its counsel of record, files this Appendix to its Brief in Support of its Motion for Summary Judgment. This Appendix is filed contemporaneously with Plaintiff's Motion for Summary Judgment Based on Breach of Contract, and Plaintiff's Brief in Support of said Motion.

Respectfully submitted,

*/s/ Robert A. Hawkins*
Michael S. Forshey
State Bar No. 07264250
Robert A. Hawkins
State Bar No. 00796726
SQUIRE PATTON BOGGS (US) LLP
2000 McKinney Avenue, Suite 1700
Dallas, Texas 75201
Ph:     (214) 758-1500
Fax:    (214) 758-1550
Email:  michael.forshey@squirepb.com
        robert.hawkins@squirepb.com

ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of this document was served upon all counsel of record in this matter on August 23, 2021 via the Clerk's CM/ECF electronic filing system.


*/s/ Robert A. Hawkins*
Robert A. Hawkins

# APPENDIX

Page

**Exhibit A**: Declaration of Chuck Crouch..................................................................................1

**Exhibit A-1**: Operating Agreement of NB Gathering JV, LLC by and among NP Equity, LLC and Plaintiff ............................................................................................................5

**Exhibit A-2**: Guaranty Agreement by Defendant, as Guarantor, for the benefit of Plaintiff.....83

**Exhibit  A-3**: Forbearance Agreement by and among NP Equity, LLC, Defendant, and Plaintiff .......................................................................................................96

**Exhibit A-4**: First Amended Forbearance Agreement by and among NP Equity LLC, Defendant, and Plaintiff .....................................................................................120

**Exhibit A-5**: Investment Ledger for Limited Partnership Investment, NB Gathering JV, LLC..............................................................................................................129

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NB GATHERING IX PREF, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CASE NO. 3:20-cv-03491-K |
| v. | § | |
| | § | |
| PATRICK NELSON, | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF CHUCK CROUCH

I, Chuck Crouch, hereby declare under penalty of perjury in accordance with 28 U.S.C.

§ 1746 that the following is true and correct:

1.  I am over 21 years of age, have never been convicted of a felony or a crime involving moral turpitude, and have never been adjudged incompetent. I am competent and qualified in all respects to make this Declaration. The statements contained in this Declaration are within my personal knowledge are are true and correct.

2.  I am a representative of Plaintiff, NB Gathering IX Pref, LLC, and I serve as a custodian of the records for Plaintiff.

3.  Attached to this affidavit are five (5) documents, which include the following:

    a) Operating Agreement of NB Gathering JV, LLC by and among NP Equity, LLC and NB Gathering IX Pref, LLC (*Exhibit A-1*);
    b) Guaranty Agreement by Patrick Nelson, as Guarantor, for the benefit of NB Gathering IX Pref, LLC, the Guarantee (*Exhibit A-2*);
    c) Forbearance Agreement by and among NP Equity, LLC, Patrick Nelson, and NB Gathering IX Pref, LLC (*Exhibit A-3*);
    d) First Amended Forbearance Agreement by and among NP Equity, LLC, Patrick Nelson, and NB Gathering IX Pref, LLC (*Exhibit A-4*); and
    e) Investment ledger for Limited Partnership Investment, NB Gathering JV, LLC (*Exhibit A-5*).

4.  The above listed documents are each business records of Plaintiff NB Gathering IX Pref, LLC. These records are and have been kept by Plaintiff in the regular course of its business. Also, it was the regular course of business of Plaintiff for an employee or representative of Plaintiff, with knowledge of the act, event, or condition to make the records or to transmit information of the occurrence to be included in the records. The

1

EXHIBIT A

attached records were made at, near, or reasonably soon after the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowlegdge of those matters. The attached records are the original records or exact duplicates of the original records.

5.    On behalf of the Plaintiff, I am familiar with the transaction giving rise to this lawsuit and the payment history related to the redemption of Plaintiff's investment as described below. I also participated in negotiations with Defendant in regard to the redemption of Plaintiff's investment. In that regard, the investment ledger attached as *Exhibit A-5* was prepared at my direction, and I have reviewed the ledger to ensure its accuracy. As a result of my involvement, I have personal knowledge of the following acts, events, or omissions in relation to the allegations in this suit.

6.    As of June 22, 2018, Plaintiff entered into an Operating Agreement as the preferred member of NB Gathering JV, LLC (the "NB Joint Venture"). The only other member of the NB Joint Venture is the sponsor member, NP Equity, LLC ("NP Equity"), which is controlled by Defendant. A true and correct copy of the Operating Agreement is attached to this Declaration as *Exhibit A-1.*

7.    Plaintiff's initial equity investment in the NB Joint Venture was \$12.5 million but the investment grew to over \$13 million. *See Exhibit A-5.*

8.    The NB Joint Venture is the indirect owner of certain real property and improvements located at 910 North Forest Street, Bellingham, Washington 98225 (the "Property"). The NB Joint Venture and its affiliates own the Property through a Delaware Statutory Trust ("DST"). The redemption of Plaintiff's investment in the NB Joint Venture was to be funded by the sale of DST interests to investors seeking to employ funds from Section 1031 tax exchanges under the Internal Revenue Code.

9.    The NB Joint Venture and its affiliates were contractually required to disburse all or part of the proceeds from the sales of DST interests to Plaintiff on a monthly basis (the "Redemption Payments").

10.   In exchange for Plaintiff's agreement to invest in the NB Joint Venture, Defendant was required to execute the Guaranty Agreement, a true and correct copy of which is attached to this Declaration as *Exhibit A-2.*

11.   Between June 22, 2018 and June 22, 2019, the NB Joint Venture made some but not all of the monthly Redemption Payments to Plaintiff. In fact, as of June 22, 2019, the NB Joint Venture owed Plaintiff in excess of \$10 million. *See Exhibit A-5.*

12.   On or about June 26, 2019, Plaintiff notified NP Equity and Defendant of NB Joint Venture's failure to disburse the Redemption Payments and Defendant's failure to pay the guranteed amount in the Guaranty Agreement by the June 22, 2019 deadline, and that the failure constituted a default of their obligations. Hence, Plaintiff demanded that NP

Equity and Defendant pay in full all amounts then due and payable under the Operating Agreement and the Guaranty Agreement.

13. Effective as of August 29, 2019, Plaintiff, NP Equity and Defendant entered into a Forbearance Agreement (the "Forbearance Agreement") in which, among other things, NP Equity and Defendant acknowledged and confirmed that they were obligated to make the Redemption Payments and to pay the Guaranteed Amount in full by June 22, 2019, and that they were in default on those obligations under the Operating Agreement and the Guaranty Agreement, respectively. A true and correct copy of the Forbearance Agreement is attached to this Declaration as *Exhibit A-3*.

14. By August 29, 2019, the total amount owed and payable to Plaintiff for the redemption of its investment in the NB Joint Venture and other costs exceeded $10.2 million. *See Exhibit A-5*. Under the Forbearance Agreement, Plaintiff agreed to extend the deadline for NP Equity and Defendant to pay this amount until November 22, 2019, while also reserving all of its rights and legal remedies under the Operating Agreement and the Guaranty Agreement.

15. NP Equity and Defendant defaulted on their obligations under the Forbearance Agreement, although by December 2019, they had reduced the outstanding sum owed to Plaintiff. Hence, Plaintiff agreed to amend the Forbearance Agreement and extend its payment terms until March 6, 2020 (the "Amended Forbearance Agreement"), while continuing to reserve its rights and legal remedies. As part of the extension, NP Equity and Defendant again acknowledged and confirmed that they had defaulted on their obligations to make the required payments to Plaintiff. A true and correct copy of the Amended Forbearance Agreement is attached to this Declaration as *Exhibit A-4*.

16. Despite Plaintiff's agreement to extend the terms of the Forbearance Agreement, NP Equity and Defendant failed to pay the outstanding sum by March 6, 2020. Extensive negotiations between Plaintiff and Defendant continued thereafter, but no acceptable resolution could be reached.

17. As noted above, the investment ledger attached as *Exhibit A-5* was prepared at my direction, and I have reviewed and confirmed the accuracy of the information in *Exhibit A-5*. This investment ledger reflects in part, on a monthly basis, the principal balance of Plaintiff's capital investment in the NB Joint Venture, the accrual of allowable interest on the principal sum, and payments received and credited by Plaintiff. The ledger also shows a "Total Payoff" amount as of the date of this Motion for the total sum owed by Defendant to Plaintiff, which includes the current principal balance, total deferred interest, total current plus default interest, and other allowable fees and costs. The Total Payoff is $5,237,365.25.

I declare under penalty of perjury that the above statements are true and correct.

Executed in Dallas County, Texas, on August 23, 2021.

3

Chuck Crouch, Declarant

4

**OPERATING AGREEMENT**

**OF**

**NB GATHERING JV, LLC**

EXHIBIT A-1

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS ................................................................................................ 1

ARTICLE II. ORGANIZATION ........................................................................................ 11

    2.1     Formation ................................................................................................ 11
    2.2     Name ........................................................................................................ 11
    2.3     Principal Place of Business; Registered Office; Registered Agent ...................... 11

ARTICLE III. PURPOSE ................................................................................................ 11

    3.1     Formation ................................................................................................ 11

ARTICLE IV. TERM ...................................................................................................... 12

ARTICLE V. CONTRIBUTIONS TO CAPITAL; STATUS OF MEMBERS .......................... 12

    5.1     Capital Contributions ................................................................................ 12
    5.2     Additional Contributions of Necessary Funds .............................................. 12
    5.3     Return of Capital Contributions .................................................................. 13
    5.4     Limited Liability ...................................................................................... 13

ARTICLE VI. DISTRIBUTIONS; ALLOCATION OF PROFITS AND LOSSES .................... 14

    6.1     Distributions and Payments to Preferred Member .......................................... 14
    6.2     Payments or Distributions of Remaining Distributable Cash to Members ........... 18
    6.3     Distribution of Proceeds from Dissolution .................................................... 19
    6.4     Tax Reporting .......................................................................................... 19

ARTICLE VII. TRIGGER EVENTS; REMEDIES .............................................................. 19

    7.1     Trigger Events .......................................................................................... 19
    7.2     Remedies ................................................................................................ 22
    7.3     Intentionally Deleted ................................................................................ 22
    7.4     Forced Sale .............................................................................................. 22
    7.5     Remedies Cumulative ................................................................................ 24

ARTICLE VIII. MANAGEMENT; RIGHTS, POWERS,  AND OBLIGATIONS OF
THE MEMBERS ............................................................................................ 24

    8.1     Management and Control of the Company .................................................... 24
    8.2     Meetings of the Members .......................................................................... 24
    8.3     Manager and Officers ................................................................................ 25
    8.4     Actions Requiring Consent of Preferred Member .......................................... 27
    8.5     Member Approvals of Mortgage Loan and Other Actions ................................ 31
    8.6     Authority to Bind the Company .................................................................. 32
    8.7     Independent Activities ................................................................................ 32
    8.8     Private Debts ............................................................................................ 32
    8.9     Indemnification; Exculpation; Insurance ...................................................... 33

i

8.10    Holding of Assets................................................................................. 36
8.11    Business Plan; Pre-Development Budget; Use of Initial PM Capital
        Contribution ....................................................................................... 36
8.12    Uses of Preferred Member's Capital Contribution ............................. 38
8.13    Notices to and From the Lender........................................................... 38

ARTICLE IX. TRANSFER OF INTERESTS IN THE COMPANY ........................................... 38

9.1     Transfer of Member's Interest; Withdrawal of Members..................... 38
9.2     Substitution of Members...................................................................... 39
9.3     Withdrawal........................................................................................... 39
9.4     Compliance with Securities Laws........................................................ 40
9.5     Other Prohibited Transfers .................................................................. 40
9.6     Effect of Withdrawal of Manager or Transfer of Its Interest............... 40

ARTICLE X. DISSOLUTION AND WINDING UP OF THE COMPANY ................................. 41

10.1    Dissolution ........................................................................................... 41
10.2    Winding Up/Liquidation ...................................................................... 41

ARTICLE XI. BOOKS AND RECORDS, ACCOUNTING, REPORTS, TAX
          MATTERS MEMBER MEETINGS, FISCAL YEAR, BANKING ................................ 42

11.1    Books and Records .............................................................................. 42
11.2    Reports ................................................................................................. 42
11.3    Fiscal Year ........................................................................................... 42
11.4    Company Funds .................................................................................... 42
11.5    No Classification as a Corporation ...................................................... 44

ARTICLE XII. REPRESENTATIONS ............................................................................. 44

12.1    Representations by Sponsor Parties ..................................................... 44
12.2    Representations Regarding Brokerage Commissions ........................... 45

ARTICLE XIII. MISCELLANEOUS ............................................................................... 46

13.1    Agreement for Further Execution ........................................................ 46
13.2    Amendments......................................................................................... 46
13.3    Notices ................................................................................................. 46
13.4    Governing Law ..................................................................................... 47
13.5    Binding Nature of Agreement.............................................................. 47
13.6    Validity ................................................................................................. 47
13.7    Entire Agreement ................................................................................. 48
13.8    Indulgences, Etc ................................................................................... 48
13.9    Execution in Counterparts; Electronic Execution and Delivery .......... 48
13.10   Headings ............................................................................................... 48
13.11   Construction ......................................................................................... 48
13.12   Number of Days ................................................................................... 48
13.13   Third Party Beneficiaries ..................................................................... 48
13.14   WAIVER OF JURY TRIAL................................................................ 49

# OPERATING AGREEMENT

## OF

## NB GATHERING JV, LLC

THIS OPERATING AGREEMENT (this "Agreement") of NB GATHERING JV, LLC, a Delaware limited liability company (the "Company") is entered into as of the 22nd day of June, 2018 by and among NP Equity, LLC, a Delaware limited liability company ("Sponsor Member"), as a Member and the initial Manager (hereinafter defined), and NB GATHERING IX PREF, LLC, a Delaware limited liability company ("Preferred Member"), as Preferred Member, and such other Persons (hereinafter defined) as may be admitted as Members (hereinafter defined) hereof from time to time in accordance with the terms of this Agreement.

## ARTICLE I.  DEFINITIONS

Capitalized terms used in this Agreement and not defined elsewhere herein shall have the following meanings:

"Accountants" means Allan Youngerg of Nelson Partners, LLC or any independent certified public accounting firm selected by the Manager and approved by Preferred Member pursuant to Section 8.4.

"Accrued Preferred Return" means any portion of Unpaid Preferred Return (including both Monthly Current Preferred Return and Monthly Accrual Preferred Return) which is not paid at the time the same becomes due under this Agreement (it being understood that including any past due Preferred Return in this definition shall in no way constitute a waiver by Preferred Member of the Company's obligation to pay any Unpaid Preferred Return at the times such payments become due under this Agreement).

"Act" means the Delaware Limited Liability Company Act (6 Del. C. Section 18-101 et seq.), as the same may be amended from time to time.

"Additional Capital Contribution" means the amount of any additional capital contribution made by Sponsor Member pursuant to Section 5.2(a) hereof.

"Affiliate" (whether or not capitalized) as to any specified Person means (i) any Person directly or indirectly controlling, controlled by or in common control with the specified Person; (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting or beneficial interests of the specified Person; (iii) any officer, member, partner or trustee of such specified Person; and/or (iv) if the specified Person is an officer, member, partner or trustee of a Person, the Person for which such specified Person acts in such capacity.

"Agreement" means this Operating Agreement, as amended from time to time.

"Annual Business Plan" has the meaning set forth in Section 8.11 of this Agreement.

"Annual Operating Budget" has the meaning set forth in Section 8.11 of this Agreement.

"Bankruptcy Event" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy." A "Voluntary Bankruptcy" means, with respect to any Person, an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; the filing of any petition or answer by such Person seeking to adjudicate it as bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, colluding with, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian, or other similar official for such Person or for any substantial part of its property, or corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order (not subject to appeal) for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or other similar relief under any present or future bankruptcy, insolvency or similar statute, law, or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within sixty (60) days, or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver, or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within sixty (60) days.

"Beneficial Interests" shall have the meaning set forth in the Property Owner Trust Agreement.

"Beneficial Owners" shall have the meaning set forth in the Property Owner Trust Agreement.

"BI Net Sales Proceeds" shall mean, with respect to any BI Unit Sales, the positive difference between (a) the gross proceeds of such sale, minus (b) all reasonable and customary transaction costs approved by Preferred Member in its reasonable discretion, including commissions paid to broker-dealers and their representative, including representatives affiliated with Sponsor Member, but exclusive of any commissions paid to Persons who are not broker-dealers or their representatives, or any other amounts that would otherwise be payable to Property Owner, IB Subsidiary, Guarantor, any Sponsor Party or any of their respective Affiliates in connection with the applicable sale; provided that, in no event, shall the amount described in clause (b) be greater than the amount set forth in any private offering memorandum regarding the sale of the Beneficial Interests by Property Owner for any line item of deal costs on a pro-rata basis, based on the percentage of Beneficial Interests being sold.

"BI Unit Sales" shall mean any sales of Beneficial Interests made by Property Owner or any Subsidiary.

"BI Unit Sales Certification" shall have the meaning set forth in Section 11.2.

"Budgets" means any and all of the Initial Operating Budget and the Annual Operating Budget, in each case only as and to the extent approved by Preferred Member pursuant to Section 8.4 hereof or deemed approved or authorized pursuant to Section 8.11(b) hereof.

"Business Day" means a day of the year on which banks are not required or authorized to close in the State of New York or the state in which the Property is located.

"Capital Contribution" means, with respect to any Member, the amount of money or fair market value of other property contributed to the Company by such Member pursuant to Section 5.1 or Section 5.2 of this Agreement and shall include any Additional Capital Contributions.

"Capital Transaction" means (i) a transaction pursuant to which the Company or any Subsidiary finances or refinances mortgage indebtedness; (ii) a sale, condemnation, exchange or a casualty not followed by reconstruction, or other disposition, whether by foreclosure or otherwise, of all or substantially all of the assets owned by the Company or any Subsidiary; or (iii) an insurance recovery or any other transaction with respect to the Company or any Subsidiary which, in accordance with GAAP, is considered capital in nature.

"Cause" shall have the meaning set forth in Section 8.3(c).

"Code" means the Internal Revenue Code of 1986, as amended. All references herein to Code sections shall include corresponding provisions of future federal tax statutes.

"Collection Costs" shall have the meaning set forth in Section 6.1(h).

"Company Operating Account" shall have the meaning set forth in Section 11.4(c).

"Default Rate" means the lesser of 18% per annum or the maximum rate permitted under the usury laws of the State of Delaware.

"Distributable Cash" means, for any period, the amount of Rents of the Property during such period from all sources (including any funds released from reserves previously established by the Lender and disbursed to Property Owner or any other Subsidiary during such period (but excluding amounts received during such period by the Company as Capital Contributions or Additional Capital Contributions, to be applied pursuant to the terms of this Agreement)), in each case which the Company shall be obligated to cause each Subsidiary to distribute to the Company each month after payment of (a) debt service payments, any reserves or escrows or other amounts due and payable to the Lender during such period, (b) the Operating Expenses of the Property, Property Owner and Master Lessee Subsidiary payable during such period pursuant to the Annual Budget or otherwise approved by Preferred Member, and (c) any amounts otherwise set aside by the Manager with the approval of Preferred Member pursuant to Section 8.4, for the creation, restoration or increase of commercially reasonable reserves.

"EF Payment Date" has the meaning set forth in Section 6.1(e).

"Environmental Indemnity Agreement" means that certain Environmental Indemnity Agreement, dated as of the date hereof, given by Guarantor, and Sponsor Member, jointly and severally, in favor of Preferred Member.

"Exit Fee" has the meaning set forth in Section 6.1(e).

"Fiscal Year" The Company's fiscal year, which shall be the calendar year.

"<u>Forced Sale</u>" shall have the meaning set forth in Section 7.4(a).

"<u>GAAP</u>" means generally accepted accounting principles, consistently applied.

"<u>Governmental Authority</u>" shall mean any court, board, agency, commission, office, central bank or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city, country or otherwise) or quasi-governmental unit whether now or hereafter in existence.

"<u>Guarantor</u>" means Patrick Nelson, an individual, whose principal residence is 104 Via Almodovar, San Clemente, California  92672, and who is a principal and owner (directly or indirectly)of one hundred percent (100%) of the issued and outstanding limited liability company membership interests in Nelson Partners, LLC, a Utah limited liability company and sole member of the Sponsor Member.

"<u>Guaranty</u>" means that certain Guaranty, dated as of the date hereof, given by Guarantor in favor of Preferred Member.

"<u>IB Subsidiary Interest</u>" shall have the meaning set forth in Section 3.1.

"<u>IB Subsidiary</u>" means NB Gathering IB, LLC, a Delaware limited liability company which is (i) wholly owned by the Company, and (ii) the owner of the Owner Interest as of the date hereof.

"<u>IB Subsidiary Operating Agreement</u>" means that certain Limited Liability Company Agreement of IB Subsidiary, dated as of the date hereof, as the same may be amended, to the extent permitted under this Agreement.

"<u>Initial Operating Budget</u>" has the meaning set forth in Section 8.11(a).

"<u>Initial PM Capital Contribution</u>" means the amount of Preferred Member's initial Capital Contribution to the Company, being the sum of $12,500,000.00.

"<u>Insurance Premiums</u>" shall mean all premiums payable under the insurance policies covering the Property, Master Lessee Subsidiary and/or Property Owner (including all such policies required to be maintained by Property Owner and Master Lessee Subsidiary pursuant to the Mortgage Loan Documents and by Property Owner, Master Lessee Subsidiary and/or the Company under this Agreement).

"<u>Interest</u>" means a Member's economic rights and all other rights, obligations, powers and interest in the Company as a Member as provided in this Agreement.

"<u>Lease</u>" shall have the meaning set forth in the Mortgage.

"<u>Legal Requirements</u>" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Property Owner, Master Lessee Subsidiary or the Property or any part thereof, or the zoning, construction, use, alteration, occupancy or

operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Sponsor Member, at any time in force affecting the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"Lender" means Arbor Commercial Funding I, LLC, a Delaware limited liability company ("Arbor") initially, provided that following Arbor's assignment of its interest in the Mortgage Loan to Federal National Mortgage Association, a corporation chartered by the U.S. Congress ("Fannie Mae"), "Lender" shall mean Fannie Mae, together with its successors and assigns.

"LIBOR" means the interest rate per annum determined by Preferred Member by (the resulting quotient rounded upwards, if necessary, to the nearest 1/100th of 1% per annum) which shall equal the rate which appears on the Bloomberg Page BTMM (or on such other substitute Bloomberg page that displays rates at which US dollar deposits are offered by leading banks in the London interbank deposit market) at approximately 11:00 a.m., London time, on the first (1st) calendar day of the month and if the first (1st) calendar day of the month falls on a weekend or holiday, the immediately preceding Business Day prior to the first (1st) calendar day as the London interbank offered rate for U.S. Dollars for a comparable amount having a borrowing date and one (1) month maturity comparable (or if at any time, for any reason, a Bloomberg Page BTMM (or any substitute page); provided, however, that if such rate is not available on Bloomberg's BTTM page, either at that time or generally (or such other page that may replace that page on that service or a successor service), or such rate has been replaced or is not widely accepted within the financial services industry (as reasonably determined by the Preferred Member), then such offered rate shall be otherwise independently determined by Preferred Member from an alternate, substantially similar independent source available to Preferred Member or shall be calculated by Preferred Member by a substantially similar methodology as that theretofore used to determine such offered rate; provided that if LIBOR, as determined under the foregoing. is less than 1.90% for any period, then it shall be deemed to be 1.90% for such period.

"Mandatory Partial Redemption" shall have the meaning set forth in Section 6.1(b)(ii).

"Manager" means Sponsor Member initially, or (i) such Person appointed to replace Sponsor Member by Preferred Member pursuant to Section 8.3(b) hereof, or any permitted successor thereto admitted as the Manager of the Company in accordance with the terms of this Agreement, (ii) if, during the continuance of any Trigger Period, Preferred Member exercises its rights under Section 7.4, the Special Managing Member with respect to the Special Managing Member Authority only.

"Master Lease" shall mean that certain Master Lease, dated as of the date hereof, made by and between Property Owner, as master lessor, and Master Lessee Subsidiary as master lessee, with respect to the Property, as the same may be modified or amended from time to time.

"Master Lease Operating Account" shall have the meaning set forth in Section 11.4(b).

"Master Lessee Subsidiary" means NB Gathering LeaseCo, LLC, a Delaware limited liability company, which is (i) wholly owned by the Company, and (ii) the lessee under the Master Lease.

"Master Lessee Subsidiary Interest" shall have the meaning set forth in Section 3.1.

"Master Lessee Subsidiary Operating Agreement" means that certain Limited Liability Company Agreement of Master Lessee, dated as of the date hereof, as the same may be amended, to the extent permitted under this Agreement.

"Member Loan" has the meaning set forth in Section 5.2(a) of this Agreement.

"Members" means all of the Persons listed on Exhibit A and all other Persons admitted as Members pursuant to this Agreement, each in its capacity as a member of the Company.

"Minimum BI Unit Sales Price" shall mean $50,000.00 per Beneficial Interest, provided that Sponsor Member may elect to reduce the Minimum BI Unit Sale Price, provided that the Minimum Net Sales Amount for each 1% of the total Beneficial Interest sold shall not be reduced without the written consent of Preferred Member.

"Minimum Interest Amount" means $1,000,000 less the aggregate amount of Preferred Return actually paid to Preferred Member.  For purposes of clarification, sums paid in respect of the Transaction Fee, the Exit Fee, or interest paid at the Default Rate (in excess of Preferred Return) shall not be included for purposes of determining whether the Minimum Interest Amount has been received.

"Minimum Net Sales Amount" shall mean $200,000 per each 1.0% of the total Beneficial Interests sold.

"Monthly Accrual Preferred Return" means, for any period, the portion of the Preferred Return equal to 7.0% per annum on the Preferred Member's Unreturned Capital Contribution outstanding from time to time during such period, in each case compounding monthly and computed based on the actual number of days in each monthly payment period and a 360-day year, and shall be added to the Preferred Member's Unreturned Capital Contribution as of such Payment Date and shall accrue Preferred Return from and after such Payment Date.

"Monthly Current Preferred Return" means, for any period, the portion of the Preferred Return equal to LIBOR plus 6.0% per annum on the Preferred Member's Unreturned Capital Contribution outstanding from time to time during such period, in each case compounding monthly and computed based on the actual number of days in each monthly payment period and a 360-day year, which is payable to the Preferred Member pursuant to Section 6.1 on each Payment Date.

"Mortgage" means that certain Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of the date hereof, given by Property Owner to and for the benefit of Lender, covering the Property.

"Mortgage Loan" means that certain loan in the principal amount of $31,000,000.00, made by the Lender to Property Owner on the date hereof, which loan is secured by, among other things, the Mortgage of Property Owner's interest in the Property.

"Mortgage Loan Agreement" means that certain Multifamily Loan and Security Agreement (Non-Recourse) (Master Lease), dated as of the date hereof, made by and between Property Owner, as borrower, and Lender, as lender in connection with the Mortgage Loan.

"Mortgage Loan Default" has the meaning set forth in Section 7.1(i).

"Mortgage Loan Documents" means those documents set forth on Exhibit D annexed hereto, executed and delivered by Property Owner and certain Affiliates of Property Owner which evidence, secure and/or otherwise govern the terms and conditions of the Mortgage Loan.

"Necessary Funds" has the meaning set forth in Section 5.2(b) of this Agreement.

"Operating Expenses" for any period means the following, as determined on a cash accounting basis, in accordance with GAAP: all cash expenditures of the Company or any Subsidiary for such period, including, without limitation, Taxes, Insurance Premiums, payments under service contracts, due diligence costs, expenditures for property management, salaries, accounting, bookkeeping, computer or accounting equipment use, travel properly chargeable to Property Owner or the Company, telephone, or other fees paid by the Company or any Subsidiary. Notwithstanding the foregoing, Operating Expenses shall not include: (i) Property or asset management fees to the extent that they exceed four percent (4%) of the aggregate gross rental revenue of the Property; (ii) any overhead expense of Manager or any Property Owner Controlling Party, or salaries paid by any of them to its respective officers, partners, members, or employees or its or their Affiliates (except as otherwise as agreed by Preferred Member); (iii) any cash or capital expenditures expended up to the whole of the accumulated cash reserve of the Company not otherwise allocated for specific purposes (any capital expenditures in excess of accumulated cash reserves shall be deemed an Operating Expense); and (iv) non-cash items such as depreciation and amortization.

"Owner Interest" shall mean the Beneficial Interests in Property Owner which are owned by IB Subsidiary from time to time.

"Payment Date" has the meaning set forth in Section 6.1(a)(ii) of this Agreement.

"Permitted Transfer" means any transfer of an Interest permitted pursuant to Section 9.1(a) without the prior written consent of all of the non-transferring Members.

"Permitted Transferee" means any direct or indirect owner of an Interest acquired from a Member in a Permitted Transfer or series of Permitted Transfers (whether or not such Interest owner has been admitted as a substitute Member of the Company).

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, non-incorporated organization or government or any agency or political subdivision thereof.

APP014

"Preferred Member" means NB Gathering IX Pref, LLC, a Delaware limited liability company, and its successors and assigns.

"Preferred Member Capital Contribution" means the amount of Preferred Member's Capital Contributions to the Company, being on the date hereof, an amount equal to the Initial PM Capital Contribution.

"Preferred Member's Unreturned Capital Contribution" means, as to Preferred Member, and as of any date, Preferred Member's Capital Contribution plus any Unpaid Accrued Preferred Return, reduced by the amount of all payments made prior to such date pursuant to Sections 6.1(b) after giving effect to Section 6.1(i).

"Preferred Return" means, as to Preferred Member, for any period, a return at the rate of of LIBOR plus 13.0% per annum on Preferred Member's Unreturned Capital Contribution outstanding from time to time during such period, in each case compounding monthly and computed based on the actual number of days in each monthly payment period and a 360-day year; provided that the Monthly Current Preferred Return shall be paid on each Payment Date and the Monthly Accrual Preferred Return shall be added to the Preferred Member's Unreturned Capital Contribution as of such Payment Date.  The Preferred Return is subject to fluctuation based upon LIBOR in effect from time to time and shall be re-established and will become effective on the first day of each calendar month.  Preferred Member's determination of the Preferred Return shall be, absent manifest error, conclusive and binding on the Company and its Members.

"Property Manager" shall mean Nelson Brothers Property Management, Inc. a California corporation, or any successor property manager of the Property approved by Preferred Member pursuant to the terms of this Agreement.

"Property" shall mean, that certain real property and improvements known as Gathering Bellingham, known by the street address of 900 North Forest Street, Bellingham, Washington 98225(the "Property") and more fully described on Schedule 1 annexed hereto, and which is owned in fee simple absolute by Property Owner, together with all appurtenances thereto and all improvements, fixtures and equipment located thereon and owned by Property Owner. References herein to "the Property or any portion thereof" and words of similar import shall be deemed to refer, as applicable, to any portion of the Property taken as a whole (including any individual Property) and any portion of any individual Property.

"Property Operating Account" shall have the meaning set forth in Section 11.4(a).

"Property Owner" means NB Gathering, DST, a Delaware statutory trust.

"Property Owner Controlling Party" means the Manager, ST Subsidiary, the Company and/or any other Person who directly or indirectly controls Property Owner, directs the management and/or day-to-day affairs of the Property Owner, or otherwise has the ability to cause or prevent the Property Owner from acting, other than Preferred Member.

APP015

"Property Owner Trust Agreement" means that certain Trust Agreement of Property Owner, dated as of the date hereof, as the same may be amended, to the extent permitted under this Agreement.

"Refinancing" means a loan secured by or otherwise made with respect to the Property or any direct or indirect interest therein (including the Property and interests in the Company or any one or more of the Subsidiary Interests), including any sale/leaseback transaction or other transaction that, although not documented as a loan, is the financial equivalent thereof.

"Regulations" means the regulations promulgated under the Code, as the same may be amended or supplemented from time to time.

"Rents" means all rents, rent equivalents, lease termination payments, moneys payable as damages (including payments by reason of the rejection of a lease in a bankruptcy proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including earnest money, security, utility and other deposits which Property Owner or Master Lessee Subsidiary is entitled to retain pursuant to the terms of applicable leases or contracts, but not such deposits which are merely being held by or on behalf of Property Owner or Master Lessee Subsidiary pursuant to a lease), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of the Company, any Subsidiary or Manager or any of their agents or employees from any and all sources, in each case arising from or attributable to the Property, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property, or rendering of services by the Company, any Subsidiary, Manager or any of their respective agents or employees and proceeds, if any, from business interruption or other loss of income insurance, but in all cases expressly excluding: (i) any proceeds of the Mortgage Loan or any other loan to the Company or any Subsidiary (including any proceeds of any Member Loans), (ii) any proceeds of Additional Capital Contributions, (iii) any net casualty or condemnation proceeds received with respect to the Property, (other than business interruption or other loss of income insurance), (iv) security or other deposits, to the extent the same are held for the benefit of, or required to be returned to, tenants of the Property, (v) any allowance or compensation for any free rent concessions or credits against rent for costs paid by tenants, (vi) sums collected through litigation or paid to the Company or any Subsidiary pursuant to any indemnification provision, or (vii) payments for lease cancellations.

"Required PM Payments" shall have the meaning set forth in Section 6.1(b).

"Required Redemption Date" has the meaning set forth in Section 6.1(b).

"Sale" means the sale, transfer or conveyance of (including any lease for all or substantially all of) the Property or an interest therein, or any sale, transfer or conveyance of any direct or indirect interests in any Subsidiary, in each case other than BI Unit Sales made in accordance with the Property Owner Trust Agreement.

"Sale Agreement" shall mean a bona fide written agreement for the Sale, which has been approved by Preferred Member (such approval not to be unreasonably withheld).

"Sources and Uses Schedule" means the schedule of sources and uses of the Initial Capital Contributions of each of the Members as shown on Exhibit F attached hereto.

"Special Managing Member" shall have the meaning set forth in Section 7.4(a).

"Special Managing Member Authority" shall have the meaning set forth in Section 7.4(a).

"Sponsor Member" has the meaning set forth in the introductory paragraph.

"Sponsor Party" shall mean any one or more of Sponsor Member and each Property Owner Controlling Party which is an entity and/or an Affiliate (or, in the case of an individual, an immediate family member) of Nelson Partners, LLC and/or Patrick Nelson.

"ST Subsidiary" means NB Gathering ST, LLC, a Delaware limited liability company which is (i) wholly owned by the Company, and (ii) the Signatory Trustee of Property Owner.

"ST Subsidiary Interest" shall have the meaning set forth in Section 3.1.

"ST Subsidiary Operating Agreement" means that certain Limited Liability Company Agreement of ST Subsidiary, dated as of the date hereof, as the same may be amended, to the extent permitted under this Agreement.

"Subsidiary" shall mean, individually or collectively as the context requires, IB Subsidiary, Master Lessee Subsidiary, ST Subsidiary and Property Owner.

"Subsidiary Governing Agreement" shall mean, individually or collectively as the context requires, the IB Subsidiary Operating Agreement, the Master Lessee Subsidiary Operating Agreement, the ST Subsidiary Operating Agreement and the Property Owner Trust Agreement.

"Subsidiary Interest" shall mean, individually or collectively as the context requires, the IB Subsidiary Interest, the Master Lessee Subsidiary Interest, the ST Subsidiary Interest and the Owner Interest.

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.

"Transaction Documents" shall mean this Agreement, the Guaranty, the Environmental Indemnity and any other documents or agreements made by and/or among Preferred Member, Sponsor Member, any Sponsor Party, the Company or any of their respective Affiliates in connection with Preferred Member's investment in the Company and the Property.

"Transaction Fee" has the meaning set forth in Section 6.1(c).

"Trigger Event" has the meaning set forth in Section 7.1.

"Unpaid Accrued Preferred Return" means, as to Preferred Member and as of any date, the cumulative Accrued Preferred Return from the date hereof until such date reduced by the amount of all payments made prior to such date pursuant to Section 6.1(p) after giving effect to Section 6.1(i).

"Unpaid Monthly Current Preferred Return" means, as to Preferred Member and as of any date, the cumulative Monthly Current Preferred Return, not paid when due on a Payment Date, from the date hereof until such date reduced by the amount of all payments made prior to such date pursuant to Section 6.1(a), together with interest thereon at the Preferred Return.

"Unpaid Preferred Return" means, as to Preferred Member and as of any date, the cumulative Preferred Return from the date hereof until such date reduced by the amount of all payments made prior to such date pursuant to Section 6.1 after giving effect to Section 6.1(i).

"Unreturned Capital Contributions" means at any time with respect to each Member other than Preferred Member, an amount equal to the sum of the Capital Contributions made by such Member pursuant to Section 5.1 and Section 5.2 of this Agreement, reduced (but not below zero) by the sum of distributions made to such Member pursuant to Section 6.3 of this Agreement.

## ARTICLE II.  ORGANIZATION

2.1     Formation. The Company was formed by the filing of its Certificate of Formation with the Secretary's Office on February 26, 2018 under and pursuant to the Act.

2.2     Name. The name of the Company is "NB Gathering JV, LLC".

2.3     Principal Place of Business; Registered Office; Registered Agent. The principal place of business of the Company shall be at c/o Nelson Partners, LLC, 16B Journey, Suite 200, Aliso Viejo, California 92656. The Company may establish one or more other places of business within or without the State of Delaware as determined by the Manager. The address of the registered office and registered agent of the Company in the State of Delaware shall be c/o Corporate Services Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

## ARTICLE III.  PURPOSE

3.1     Formation. The purpose of the Company is limited solely to acquiring, owning, financing, refinancing, operating, managing, transferring and otherwise dealing with each of (i) a one hundred percent (100%) limited liability company membership interest in ST Subsidiary (the "ST Subsidiary Interest"), (ii) a one hundred percent (100%) limited liability company membership interest in Master Lessee Subsidiary (the "Master Lessee Subsidiary Interest"), and (iii) a one hundred percent (100%) limited liability company membership interest in IB Subsidiary (the "IB Subsidiary Interest"), which is the "Depositor" under the Property Owner Trust Agreement, and, as of the date hereof, owns all of the Beneficial Interests in Property Owner and will own the Owner Interest. The Company shall not engage in any business or activity other than as permitted in this Article III. The Company is hereby authorized to cause Property Owner (or to cause ST Subsidiary and/or IB Subsidiary to cause Property Owner) to

execute, deliver and perform, the Mortgage Loan Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any other Person notwithstanding any other provision of this Agreement. The foregoing authorization shall not be deemed a restriction on the powers of the Manager to enter into other agreements on behalf of the Company.

## ARTICLE IV.  TERM

The term of the Company commenced on the date of filing its Certificate of Formation with the Secretary's Office and shall continue thereafter until dissolved in accordance with the provisions of this Agreement or the Act.

## ARTICLE V.  CONTRIBUTIONS TO CAPITAL; STATUS OF MEMBERS

5.1     Capital Contributions. On the date hereof, Nelson Brothers Professional Real Estate, LLC, a California limited liability company ("Purchaser"), has assigned to Property Owner all of its right, title and interest in and to the Property under that certain Purchase and Sale Agreement for Real Property and Escrow Instructions, dated as of February 13, 2018, as amended (the "Purchase Agreement"), made by and between RDC Bellingham Investments, LLC, a Delaware limited liability company ("Seller"), as seller, and Purchaser, as purchaser. Property Owner has purchased the Property pursuant to the Assignment of Purchase Agreement, dated as of June 22, 2018, by and between Purchaser, as assignor, and Property Owner, as assignee using proceeds of the Mortgage Loan and the Members' cash capital contributions. As of the date hereof, each Member has made the Capital Contribution to the Company in the amount set forth opposite such Member's name on Exhibit "A" attached hereto.

5.2     Additional Contributions of Necessary Funds.

(a)     If, at any time and from time to time the Manager shall determine that the Company requires Necessary Funds (as defined in Section 5.2(b)), then the Manager shall promptly give written notice to Sponsor Member of the need for Necessary Funds and Sponsor Member shall have the right, but not the obligation, to make an additional capital contribution in the amount of the Necessary Funds within thirty (30) days after having received written notice thereof or, alternatively fund all or any portion of such amount as a loan to the Company (a "Member Loan"). Notwithstanding anything in this Agreement to the contrary, no payment shall be made upon any Member Loan unless, as of the date such payment is made, all payments then due and payable to Preferred Member pursuant to Section 6.1 have been made to Preferred Member. If Sponsor Member fails to contribute all of the Necessary Funds within the time prescribed for such contribution, then the Manager shall send an additional notice to Preferred Member setting forth the fact of such failure and the amount unpaid, and Preferred Member shall have the right, but not the obligation, to fund all or any portion of such unfunded Necessary Funds. Any such amounts loaned by Preferred Member shall be treated as a loan to the Company bearing interest at the Default Rate, payable as provided in Section 6 hereof and required to be paid in full before any distributions or repayments of other Member Loans are made to Sponsor Member or any other Member (other than Preferred Member) or any of their affiliates (a "Preferred Member Loan").

(b)     As used in this Section 5.2, the term "Necessary Funds" means any and all funds needed by the Company which are in excess of the Company's net operating revenues and reserves for one or more of the following purposes: (i) to pay Operating Expenses; (ii) to pay the respective costs of performing Property Owner's or Master Lessee Subsidiary's agreements under any Leases, contracts, agreements, commitments or other instruments to which the Company or any Subsidiary is or shall become a party or whereby it or its assets are or shall become bound (other than mortgage loans); (iii) to pay, when due, Taxes and Insurance Premiums for the Property; (iv) to comply with all Legal Requirements and insurance requirements now or hereafter applicable to the Property and the operation and management thereof; (v) to restore the Property in the event of a fire or other casualty, if a determination is made by the Members to perform such restoration or if the Company is contractually obligated to restore such damage; (vi) to pay, when due, amounts owed by the Company or any Subsidiary to their respective trade and other creditors; (vii) to fund any item set forth on the then applicable Budget, including reserves; and (viii) to pay any and all other liabilities of the Company and/or any Subsidiary, including, without limit thereto, debt service on third party indebtedness owed by the Company and/or any Subsidiary and secured by the Company's and/or any Subsidiary's assets or the Property (e.g., the Mortgage Loan).

(c)     For the avoidance of doubt, in no event shall Preferred Member be required to make any Additional Capital Contribution, make any Preferred Member Loans or to otherwise contribute any Necessary Funds.

(d)     In the event that on any Payment Date, the amount of Distributable Cash and any BI Net Sales Proceeds paid to Preferred Member are insufficient to pay the Unpaid Preferred Return payable on such Payment Date pursuant to Section 6.1(a), the Exit Fee payable to Preferred Member pursuant to Section 6.1(e) or any Collection Costs payable to Preferred Member pursuant to Section 6.1(h), then Sponsor Member shall have the right (but not the obligation) to make an Additional Capital Contribution or Member Loan to be applied towards payment of the shortfall, provided that in no event shall any such Additional Capital Contribution or Member Loan be repaid to Sponsor Member by the Company unless and until all amounts due and payable to Preferred Member under Section 6.1 have been paid in full.

5.3     Return of Capital Contributions. Except as specifically provided in this Agreement or in any other Transaction Document (a) no Member shall be entitled to demand or receive the return of its Capital Contributions, and (b) upon dissolution and liquidation of the Company, the Members shall look solely to the Company assets for the return of their Capital Contributions, and no Member shall be liable for such return, even if such Company assets are insufficient to return the full amount of such Capital Contributions.

5.4     Limited Liability. Except as specifically provided in this Agreement or in any other Transaction Document or with the Lender or any other third party, the liability of each of the Members to the Company and for the debts and obligations of the Company shall be limited to the amount of Capital Contributions that such Member shall have made to the Company and the amount of distributions hereunder, if any, that are received in violation of the Act.

## ARTICLE VI.  DISTRIBUTIONS; ALLOCATION OF PROFITS AND LOSSES

6.1     <u>Distributions and Payments to Preferred Member</u>.

(a)     <u>Payments of Unpaid Monthly Current Preferred Return</u>.

(i)     At any time Property Owner or IB Subsidiary sells any Beneficial Interest and receives BI Net Sales Proceeds, Manager (A) shall cause the Company to cause Property Owner, ST Subsidiary and/or IB Subsidiary (as applicable) to immediately distribute such BI Net Sales Proceeds to the Company, and (B) shall cause the Company to distribute such BI Net Sales Proceeds to Preferred Member to pay any Unpaid Monthly Current Preferred Return until the Unpaid Monthly Current Preferred Return has been reduced to zero.  At any time the Unpaid Monthly Current Preferred Return is zero, ninety-five percent (95%) of the BI Net Sales Proceeds shall be paid to Preferred Member as a Mandatory Partial Redemption pursuant to Section 6.1(b)(ii).

(ii)     On the first (1st) day of each calendar month (each, a "<u>Payment Date</u>"), the Company shall make a distribution from Distributable Cash to Preferred Member in the amount of the Monthly Current Preferred Return for the immediately preceding month or applicable portion thereof during which any portion of Preferred Member's Unreturned Capital Contribution was outstanding and any Unpaid Monthly Current Preferred Return which was not paid pursuant to Section 6.1(a)(i).  Each month, on each Payment Date, the Manager shall cause each Subsidiary to distribute to the Company all Distributable Cash, and thereupon the Manager shall cause the Company to make the monthly distribution to Preferred Member of Monthly Current Preferred Return and Unpaid Monthly Current Preferred Return required pursuant to this Section 6.1.

(iii)     Notwithstanding the foregoing, in the event that on any Payment Date, the amount of Distributable Cash and any BI Net Sales Proceeds paid to Preferred Member is insufficient to pay the Monthly Current Preferred Return due on such Payment Date, the Company shall distribute all Distributable Cash to Preferred Member to be applied towards Unpaid Monthly Current Preferred Return, and (unless Sponsor Member elects to make an Additional Capital Contribution or Member Loan to pay the shortfall), the balance of such Unpaid Monthly Current Preferred Return for each monthly period described herein shall become Accrued Preferred Return, and all Accrued Preferred Return for such period shall be added to Preferred Member's Unreturned Capital Contribution as of the applicable Payment Date and shall accrue Preferred Return from and after such Payment Date.  Nothing contained in the preceding sentence shall be deemed to modify or limit the Company's obligation under this Section 6.1(a) to make the Monthly Current Preferred Return due and owing to Preferred Member as and when the same become due.

(b)     <u>Redemption of Preferred Member's Unreturned Capital Contribution</u>.

(i)    Upon the earliest to occur of (A) June 22, 2019, (B) the date the entire Preferred Member's Unreturned Capital Contribution becomes immediately due and payable in accordance with Section 7.2 following a Trigger Event, (C) the occurrence of any Capital Transaction (other than a Capital Transaction described in item (iii) of the definition of Capital Transaction in which the proceeds recovered by the Company are less than the amount of the Required PM Payments, but subject to the last sentence of this Section 6.1(b)), or (D) the dissolution of the Company pursuant to Article X or by operation of law (the earliest of (A), (B), (C) or (D)), the "Required Redemption Date"), the Company shall pay to Preferred Member (1) the entire outstanding balance of Preferred Member's Unreturned Capital Contribution, together with (2) any Unpaid Preferred Return (which, for the avoidance of doubt, includes any Unpaid Accrued Preferred Return), (3) the Exit Fee, (4) the repayment in full of any outstanding Preferred Member Loans, (5) any unpaid Collection Costs, (6) the Minimum Interest Amount and (7) any other amounts which are or become payable to Preferred Member pursuant to this Agreement, the Guaranty, the Environmental Indemnity and/or any other Transaction Documents (all of the foregoing obligations described in items (1) through (6) preceding, collectively, the "Required PM Payments".) Subject to payment of all Required PM Payments, the Company may redeem and pay in whole (but not in part, except as provided in the last sentence of this Section 6.1(b) or as part of a Mandatory Partial Redemption pursuant to Section 6.1(b)(ii)) Preferred Member's Unreturned Capital Contribution at any time. Upon the occurrence of any Capital Transaction described in item (iii) of the definition of "Capital Transaction" in which the proceeds recovered by the Company are less than the amount of the Required PM Payment, the Company shall pay the amount of such recovery to Preferred Member, and shall be applied in the order of priority set forth in Section 6.1(i).

(ii)    At any time any Subsidiary receives any BI Net Sales Proceeds at a time when the Unpaid Monthly Current Preferred Return is zero, Manager shall cause (A) ninety-five percent (95%) of such BI Net Sales Proceeds to be paid to Preferred Member, which proceeds shall be applied to make partial redemption of Preferred Member's Unreturned Capital Contribution (a "Mandatory Partial Redemption"), together with a pro rata portion of the Exit Fee, and (B) the remaining five percent (5%) of such BI Net Sales Proceeds to be distributed to Sponsor Member.

(c)    Transaction Fee. At the time that Preferred Member makes the Initial PM Capital Contribution, the Company shall pay Preferred Member a fee of $125,000.00 (the "Transaction Fee"), which amount constitutes one percent (1.0%) of Preferred Member's Initial Capital Contribution.

(d)    Intentionally Omitted.

(e)    Exit Fee. Upon any redemption and payment in full of Preferred Member's Unreturned Capital Contribution, the Company shall pay to Preferred Member a fee (the "Exit Fee") in the amount of $125,000.00 which amount constitutes one percent

(1.0%)] of Preferred Member's Initial Capital Contribution. In connection with any Mandatory Partial Redemption, a pro rata portion of the Exit Fee shall be paid by application of BI Net Sales Proceeds. Notwithstanding the foregoing, in the event that on any date that all or any portion of the Exit Fee shall become due (such date, an "EF Payment Date"), the amount of Capital Transaction proceeds, Distributable Cash and/or any BI Net Sales Proceeds paid to Preferred Member is insufficient to pay the Exit Fee or portion thereof then due, then (unless Sponsor Member elects to make an Additional Capital Contribution or Member Loan to pay the shortfall) the unpaid balance of the Exit Fee shall accrue and be added to Preferred Member's Unreturned Capital Contribution as of such date, and the same shall accrue Preferred Return from and after such EF Payment Date. Nothing contained in the preceding sentence shall be deemed to modify or limit the Company's obligation under this Section 6.1(e) to pay the Exit Fee to Preferred Member as and when the same become due.

(f)     Book Treatment. Distributions of Unpaid Preferred Return and payments of the Transaction Fee and Exit Fee shall be treated as made to a Person who is not a Member.

(g)     Payment Date. If any distribution or payment required to be made pursuant to this Section 6.1 shall become due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

(h)     Collection Costs. The Company shall be liable for any and all reasonable out-of-pocket costs (including reasonable attorneys' fees and court costs) actually incurred by Preferred Member in connection with Preferred Member's enforcement of, or collection of amounts owed by the Company under this Agreement, the Guaranty, the Environmental Indemnity and any other Transaction Documents, including reasonable costs incurred by Preferred Member effectuating a Forced Sale (any and all such sums, "Collection Costs"). Notwithstanding the foregoing, in the event that on any date that Collection Costs become due and payable pursuant to this Agreement, the amount of Capital Transaction proceeds, Distributable Cash and/or any BI Net Sales Proceeds paid to Preferred Member is insufficient to pay the full amount of such Collection Costs then due, then (unless Sponsor Member elects to make an Additional Capital Contribution or Member Loan to pay the shortfall) the unpaid balance of such Collection Costs shall accrue and be added to Preferred Member's Unreturned Capital Contribution as of such date, and the same shall accrue Preferred Return from and after such date. Nothing contained in the preceding sentence shall be deemed to modify or limit the Company's obligation under this Section 6.1(h) to pay Collection Costs to Preferred Member as and when the same become due.

(i)     Application of Payments. Except as otherwise expressly provided in this Agreement, any amounts received by Preferred Member in respect of amounts owed pursuant to this Section 6.1 shall be applied against the obligations of the Company under this Article 6 as follows: (i) first to Collection Costs; (ii) second, to any Unpaid Monthly Current Preferred Return; (iii) third, to the Exit Fee, and (iv) lastly in reduction of Preferred Member's Unreturned Capital Contribution.

(j)     Payments in Cash; Obligations Absolute. All payments or distributions required to be made to Preferred Member under this Section 6.1 shall be made in cash in United States currency, unless otherwise agreed to in writing by Preferred Member. The obligations of the Company under this Section 6.1 shall be absolute and unconditional under any and all circumstances and irrespective of the occurrence of any default or Trigger Event, or any condition precedent whatsoever, or any setoff, counterclaim or defense to payment which the Company may have or have had against Preferred Member or any of its Affiliates.

(k)     [Intentionally Omitted.]

(l)     Effect of Payments Under Guaranties or Indemnities. Each of Sponsor Member and Guarantor hereby agrees, on behalf of itself and its respective Affiliates that, in the event that any payment is made by any of them or any of their respective Affiliates under or pursuant to a guaranty or indemnity agreement to or in favor of the Lender, any other lender to the Company or any other party to an agreement with the Company, then (i) the Person making such payment shall not be subrogated to the position of such creditor (until such time as all payments due and owing to Preferred Member under this Section 6.1 and/or otherwise under this Agreement, the Guaranty, the Environmental Indemnity Agreement, and the other Transaction Documents have been indefeasibly paid in full), and (ii) any right to repayment or reimbursement from the Company for any such payment shall at all times be subordinate to the prior payment by the Company of all payments due and owing to Preferred Member under this Section 6.1 and/or otherwise under this Agreement, the Guaranty, the Environmental Indemnity Agreement, and the other Transaction Documents.

(m)     Repayment of Preferred Member Loans. Subject to the provisions of Section 6.1(b) of this Agreement, after making all payments required pursuant to Section 6.1 of this Agreement (to the extent then due and payable) the Company shall apply all remaining Distributable Cash to Preferred Member to the payment of the outstanding amounts of any Preferred Member Loans, prior to making any distributions or payments of any such funds to any other Member or to any Affiliate of any other Member, until the entire amount of all Preferred Member Loans has been paid in full. Payments pursuant to this Section 6(m) shall be made monthly within five (5) business days of the beginning of each month. Payments pursuant to this Section 6.1(m) shall be applied first to Collection Costs, if any, relating to enforcement or collection by Preferred Member of amounts due and payable under this Section 6(m), then to accrued and unpaid interest, and finally to reduction of principal.

(n)     Withdrawal of Preferred Member. From and after the date on which Preferred Member has indefeasibly received payment or distribution, in full, of all amounts required to be paid pursuant to this Section 6.1, including without limitation the indefeasible payment in full of all Required PM Payments, (i) Preferred Member shall be deemed to have withdrawn from the Company and shall cease to have any further right, title or interest in or to the Company, or its assets, business or distributions; and (ii) Preferred Member shall execute any documents reasonably requested by the Company and/or the Manager evidencing the withdrawal of Preferred Member from the Company.

(o)    Maximum Payments. This Agreement, the Guaranty, the Environmental Indemnity, and the other Transactions, are in all cases subject to the express condition that at no time shall the Company (or any Member, Manager, Property Owner, or Guarantor making any payment on behalf of the Company) be obligated or required to make any payment to Preferred Member as a Preferred Return or other payment or charge (whether by any prepayment or acceleration of any payments due under this Agreement or otherwise) at a rate which could subject Preferred Member to either civil or criminal liability as a result of being in excess of the maximum rate which the Company is permitted by law to contract or agree to pay. If by the terms of this Agreement, the Company is at any time required or obligated to make any payment to Preferred Member (whether as a Preferred Return or other payment or charge) at a rate in excess of such maximum rate, the rate on which such Preferred Return or other payment or charge is calculated shall be deemed to be immediately reduced to such maximum rate, and all amounts payable hereunder shall be computed at such maximum rate, and the portion of all prior payments in excess of such maximum rate shall be applied, and shall be deemed to have been payments in reduction of, Preferred Member's Unreturned Capital Contribution.

(p)    Payment of the Unpaid Accrued Preferred Return. The Company shall pay the outstanding balance of the Unpaid Accrued Preferred Return (i) in connection with any Mandatory Partial Redemption (to the extent of the Mandatory Partial Redemption), and (ii) at any time the Company makes, or is required under this Agreement to make, any payment of Preferred Member's Unreturned Capital Contribution (including upon any Capital Transaction and/or any Required Redemption Date). Preferred Member shall be entitled to a Preferred Return on all Unpaid Accrued Preferred Return.

6.2    Payments or Distributions of Remaining Distributable Cash to Members. Notwithstanding any other provision of this Agreement, no distributions or loans shall be made by the Company to the Members other than Preferred Member, unless and until all amounts then due and payable to Preferred Member pursuant to Section 6.1 hereof have been paid in full, except that provided no Trigger Event has occurred and is continuing, and all amounts then due and payable to Preferred Member pursuant to Section 6.1 have been paid in full and there are no unpaid but due and payable payments or distributions outstanding required to be made to Preferred Member.  All Distributable Cash from Operations shall be applied in the following order of priority:

First, towards the payment to Preferred Member of all Unpaid Monthly Current Preferred Return pursuant to Section 6.1(a), and other amounts which are then currently due and payable to Preferred Member pursuant to Section 6.1, until such amounts have been paid in full, and

Lastly, provided no Trigger Event is then continuing, fifty percent (50%) of remaining Distributable Cash to repay any Member Loans to Sponsor Member and make distributions to Sponsor Member and fifty percent (50%) of such remaining Distributable Cash to the Preferred Member which shall be applied first towards payment of the Unpaid Preferred Return and second towards payment of the Preferred Member's Unreturned Capital Contribution.

18

APP025

Once the Preferred Member has withdrawn from the Company pursuant to Section 6.1(n), one hundred percent (100%) of the Distributable Cash shall be distributed to Sponsor Member.

6.3     Distribution of Proceeds from Dissolution. In the event of the dissolution and liquidation of the Company pursuant to Article X of this Agreement, the net cash proceeds and/or other assets of the Company available for distribution shall be distributed among the Members first entirely to Preferred Member in accordance with Section 6.1 until all amounts which are or become due and payable thereunder (including the Required PM Payments and any other amounts which become due or payable to Preferred Member on a Required Redemption Date) have been paid in full, second in repayment of Member Loans and other debts and obligations to the Members other than Preferred Member and such Members' Affiliates, and finally, one hundred percent (100%) to Sponsor Member. If any of the assets of the Company are to be distributed in kind, the fair market value of such assets shall be determined as of the time of such distribution (or at such other day reasonably close to the day of such distribution as the Manager shall determine, but subject to the prior consent of Preferred Member). There shall be allocated among the Members, in accordance with Section 6.4 of this Agreement, the amount of Profit or Loss, if any, which would have been realized by the Company if such assets had been sold by the Company for prices equal to their respective fair market values as so determined.

6.4     Tax Reporting. The parties agree and acknowledge that for as long as the Preferred Member is a member of the Company, for all U.S. federal, state and local foreign income tax purposes, (i) the Company shall not be treated as a "partnership," (ii) the Preferred Member shall not be treated as a partner , and (iii) all Company income, gain, loss, deduction and expense (and any item thereof) for each Fiscal Year shall be allocated solely to Sponsor Member. Solely for U.S. federal, state and local and foreign income tax purposes, the Company and each Member agree to treat the investment made by Preferred Member in the Company hereunder as a debt of the Company. Accordingly, notwithstanding any other provision of this Agreement, the Company will not file any tax returns as a partnership or maintain a capital account for Preferred Member and will instead treat any amounts transferred by the Preferred member to the Company as a loan, and treat all payments made by the Company to the Preferred Member as a payment of interest or principal with respect to such loan.  Accordingly, the Company will issue an IRS Form 1099-INT to the Preferred Member and not a Schedule K-1 and the Preferred Return and Minimum Interest Amount, if any, will be treated as interest income for tax purposes. Each Member will report in accordance with Section 6.4 for all U.S. federal, state and local and foreign income tax purposes at all times.

## ARTICLE VII.  TRIGGER EVENTS; REMEDIES

7.1     Trigger Events. Any one of the following will constitute a "Trigger Event" hereunder:

(a)     The failure of the Company to pay any amounts required to be paid under Section 6.1(a), which amount is not paid within three (3) business days of the Payment Date when such amount is due; or

(b)     The failure of the Company (i) to pay any amounts required to be paid under Sections 6.1(b) and/or 6.1(m) (if applicable) on the Required Redemption Date, (ii) to pay all amounts payable under Section 6.1(b)(ii) and make the Mandatory Partial Redemption immediately upon the Company's or any Subsidiary's receipt of BI Net Sales Proceeds, or (iii) to pay any Unpaid Accrued Preferred Return pursuant to Section 6.1(p); or

(c)     The failure of the Company to pay any other amount required to be paid under Section 6.1 within ten (10) Business Days after receipt of notice thereof from Preferred Member; or

(d)     Any event, act or omission, which constitutes "Cause" for removal of the Manager pursuant to Section 8.3(c) hereof (subject to any notice and cure periods provided in said Section 8.3(c));

(e)     Any breach of Section 8.4 hereof (relating to actions requiring the consent of Preferred Member), provided that in the case of the acts or omissions described in subsections (c), (e), (h), (i), (j), (l), (m), (n), (p), (q), (r), (u) and (v) only, such breach remains uncured for a period of ten (10) Business Days following Preferred Member's delivery of notice of such breach to Manager; or

(f)     Any other breach of this Agreement (not specified in any other subparagraph of this Section 7.1) by the Company, any Subsidiary, any Property Owner Controlling Party, Sponsor Member or any Sponsor Party, unless the same is reasonably susceptible of cure and is cured to the reasonable satisfaction of Preferred Member within twenty (20) Business Days after Preferred Member has notified the Manager of such breach, provided that if such breach is not reasonably susceptible to cure within such twenty (20) Business Day period, then such period shall be extended for up to ninety (90) days, provided the Company, Property Owner, any Subsidiary, any Property Owner Controlling Party, Sponsor Member or Sponsor Party (as applicable) has promptly commenced, and is diligently prosecuting such cure, but in all cases provided that if such breach also constitutes a default under the Mortgage Loan, then such breach shall constitute a Trigger Event unless such breach is cured within any shorter period prescribed in the Mortgage Loan Documents; or

(g)     The sale, pledge, hypothecation, encumbrance, assignment, or other transfer (either in one transaction or a series of related transactions), directly or indirectly, in each case without Preferred Member's prior written approval, of all or any portion of the Property or any Subsidiary Interest, in each case other than BI Unit Sales made pursuant to the Property Owner Trust Agreement; or

(h)     The sale, pledge, hypothecation, assignment or other transfer of any the Interests of any Member of the Company (other than Preferred Member or as part of a Permitted Transfer), including the sale, pledge, hypothecation, assignment or other transfer of any direct or indirect interests in Sponsor Member in breach of Section 9.1, directly or indirectly, in one transaction or a series of related transactions, or the

resignation or replacement of the Manager, in all cases without Preferred Member's prior written consent; or

(i)	(A) if the Manager fails to notify Preferred Member of the occurrence of any default under any of the Mortgage Loan Documents or any other documents relating to a loan secured in whole or in part by the Property within one (1) Business Day following Manager's receiving actual knowledge thereof, or (B) the occurrence of any "Event of Default" under any of the Mortgage Loan Documents or any other documents relating to a loan secured in whole or in part by the Property (as such term is defined in such document(s)) that continues beyond any applicable cure period provided in such documents, as applicable, or the occurrence of any other event which either automatically results in the acceleration, or gives the Lender the right to immediately accelerate, of all indebtedness due under any such loans (any such event described in this Section 7.1(i), a "Mortgage Loan Default"); for the avoidance of doubt, if any other default or Trigger Event under this Agreement is also a Mortgage Loan Default, then any notice or cure period provided for herein with respect to such default or Trigger Event shall not apply; or

(j)	If custody or control of any substantial part of the Property, Property Owner, any Subsidiary, any Property Owner Controlling Party or of the Company shall be assumed by any governmental agency or any court of competent jurisdiction at the instance of any governmental agency or if the Property be subject to any foreclosure proceeding; or

(k)	The occurrence of a Bankruptcy Event with respect to any of the Company, Property Owner, any other Subsidiary, Sponsor Member or Guarantor, other than any Bankruptcy Event resulting from filings or motions made by Preferred Member; or

(l)	without Preferred Member's prior written consent (A) the Company or Sponsor Member ceases to manage and control (directly or indirectly) any Subsidiary, or (B) Sponsor Member ceases to be managed and controlled by Patrick Nelson; or

(m)	if (i) any organizational documents of any Subsidiary are modified, or (ii) any Subsidiary Governing Agreement is modified, (iii) the Master Lease is terminated or modified, or (iv) if any action is taken or omitted by any Subsidiary, any Property Owner Controlling Party, Sponsor Member or any Sponsor Party, in each case which has the effect of eliminating, abridging or in any way limiting the right and ability of the Manager of the Company to control (through control of one or more of the other Subsidiaries) the management of Master Lessee Subsidiary or Property Owner or to otherwise control the day-to-day operation of the Property; or (v) Property Owner is terminated, including pursuant to Article IX of the Property Owner Trust Agreement, unless concurrently with such termination Property Owner is converted to be a limited liability company pursuant to the express terms of the Property Owner Trust Agreement; or

(n)    Any breach of the provisions of Section 8.13 by the Company, Sponsor Member, or any Subsidiary; or

(o)    If any representation or warranty contained in Article XII of this Agreement or if any information contained in any BI Unit Sales Certification, in either case shall be false or misleading in any material respect; or

(p)    (A) Any "Event of Default" under any of the Guaranty, the Environmental Indemnity or any default under any other Transaction Document which continues beyond the expiration of all applicable notice, grace or cure periods, or (B) any act, omission or event which, pursuant to the terms of the Guaranty, results in Guarantor becoming liable for the payment due from the Guarantor under the Guaranty and/or the Required PM Payments; or

(q)    If any payment becomes due and payable under any guaranty or indemnity agreement provided by any Guarantor, or any other Person to the Lender with respect to the Property and is not paid within the earlier of (i) the time period prescribed in the applicable guaranty or indemnity agreement, or (ii) ten (10) Business Days from the date the same becomes due; or

(r)    If Master Lessee Subsidiary fails to make any rent payments due Property Owner under the Master Lessee to the extent there are Property cash flows to do so or if Master Lessee Subsidiary otherwise defaults under the Master Lease which default remains uncured beyond the expiration of all applicable notice, grace and cure periods.

7.2    Remedies. Upon the occurrence of any Trigger Event described in clauses (a) through (j) and (l) through (r) of Section 7.1, all Required PM Payments shall, at the option of Preferred Member exercised by written notice thereof to the Company and Manager, become due and payable immediately. Upon the occurrence of any Trigger Event described in Section 7.1(k), all Required PM Payments plus all other sums due and payable pursuant to Section 6.1 shall automatically become due and payable immediately. Preferred Member shall also have the right to exercise any and all other remedies available to Preferred Member under the Transaction Documents or at law and/or in equity as a result of such Trigger Event, including without limitation, (i) the right to effectuate the Forced Sale pursuant to Section 7.4, and (ii) provided the Mortgage Lender consents thereto, the right to remove and replace the Manager pursuant to Section 8.3(b). During the continuance of a Trigger Event, Preferred Member may apply any amounts received by Preferred Member on account of any fees, payments, reimbursements or other amounts payable to Preferred Member under this Agreement in such order and in such amounts as Preferred Member may determine, in its sole discretion

7.3    Intentionally Deleted.

7.4    Forced Sale.

(a)    At any time following the occurrence and during the continuance of a Trigger Event, Preferred Member may give written notice to Sponsor Member (a "Forced Sale Notice"), and effective as of the date the Forced Sale Notice is given, Preferred Member shall immediately become a special managing member of the Company (the

"Special Managing Member") having the authority and power specified in this Section 7.4 without the necessity of any further action by the Company or the Members. Effective upon the date that the Forced Sale Notice is given, (i) the Special Managing Member shall have the exclusive right, authority and power of a sole manager or managing member of the Company with respect to (A) the sale or other disposition of the Property (other than leasing in the ordinary course of business), (B) the refinancing of the Mortgage Loan and/or any other mortgage indebtedness on the Property and (C) any other action that is necessary, convenient incidental or appropriate to effect such sale, disposition or refinancing (such authority described in clauses (A) through (C) being herein referred to as the "Special Managing Member Authority"; and any transaction described in said clauses, a "Forced Sale"), and (ii) Sponsor Member shall cease to have any authority or power with respect to such actions and decisions, but shall retain all other authority over the Company's affairs, except as otherwise provided in this Agreement. From and after the date that the Forced Sale Notice is given, only the Special Managing Member shall have the right, power and authority to execute and deliver documents, agreements and instruments on behalf of the Company within the Special Managing Member Authority. The Special Managing Member shall have access to all books and records of the Company including, but not limited to, any and all Property reports, detailed rent rolls, management reports, audited and unaudited financial statements and contact information for the Company. The Special Managing Member shall not have any fiduciary duty to the Company or any other Member, and Sponsor Member hereby waives any right to make a claim for breach of fiduciary duty in connection with the exercise of Special Managing Member Authority by Special Managing Member (or by the Company or any Subsidiary at the direction of Special Managing Member.

(b)     Without limiting the foregoing provisions of this Section 7.4, the Special Managing Member may cause the Company to (a) list the Property for sale with unrelated, third party commercial broker(s) selected by the Special Managing Member on terms and conditions acceptable to the Special Managing Member in its sole discretion, conduct the sale process, cause the Company to cause Property Owner and any Subsidiary to enter into a contract of sale and to consummate such sale, and (b) engage a mortgage broker to obtain refinancing of the Mortgage Loan or any other mortgage loan(s) on the Property, take any and all other commercially reasonable steps to refinance the mortgage(s), cause the Company and any Subsidiary to cause Property Owner enter into any commitments with mortgage lenders and to execute and deliver loan documents, and cause the Company to cause Property Owner and any Subsidiary to disburse any net proceeds from any such transactions. From time to time the Special Managing Member shall advise Sponsor Member of the status of the Special Managing Member's activities and, upon the request of Sponsor Member, provide Sponsor Member with copies of any sales offers, proposed loans, or documents relating to the proposed sale of the Property, the refinancing of mortgages on the Property or other extraordinary actions being taken or considered by the Special Managing Member, but no consent or approval of Sponsor Member (or any other Member) shall be required for the Special Managing Member to take any action within the scope of the Special Managing Member Authority. Sponsor Member shall cooperate with reasonable requests made by the Special Managing Member in connection with the exercise by the Special Member of its Special Managing

Member Authority. All reasonable out-of-pocket expenses incurred by the Special Managing Member (including reasonable attorney's fees and disbursements) in connection with seeking, negotiating and/or consummating a Forced Sale shall be "Collection Costs" under Section 6.1 of this Agreement.

7.5     <u>Remedies Cumulative</u>. The rights, powers and remedies of the Members under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which the Members may have against any of the Company, Guarantor and/or any Sponsor Party or any other Member pursuant to this Agreement or the other documents executed and delivered in connection herewith, or existing at law or in equity or otherwise. A Member's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as such Member may determine in such Member's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon a Trigger Event shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one default or Trigger Event with respect to any of the Company, Guarantor and/or any Sponsor Party shall not be construed to be a waiver of any subsequent default or Trigger Event by any of the Company, Guarantor and/or any Sponsor Party or to impair any remedy, right or power consequent thereon.

## ARTICLE VIII.  MANAGEMENT; RIGHTS, POWERS, AND OBLIGATIONS OF THE MEMBERS

8.1     <u>Management and Control of the Company</u>. The Manager, the Members and Preferred Member shall have the rights provided in this Article VIII with respect to the management and control of the business and the affairs of the Company.

8.2     <u>Meetings of the Members</u>.

        (a)     <u>Annual Meeting</u>. The Manager may call an annual meeting of all Members to review the status of the Company. Such meeting, if held, shall be held on the date and at the time and place designated by the Manager in a written notice given to all Members not less than ten (10) days before the meeting.

        (b)     <u>Regular Meetings</u>. The Manager may also call regular meetings of the Members in the same manner as the annual meeting is called.

        (c)     <u>Special Meetings</u>. Special meetings of the Members may be called by any of the Members or the Manager and shall be held at such place, on such date and at such time as it or they shall fix. Notice of the place, date and time of each such special meeting shall be given to the Manager and to each of the Members by sending written notice not less than ten (10) business days before the meeting. Unless otherwise indicated in the notice thereof, any and all business may be transacted at a special meeting. The requirement for such notice of a special meeting may be waived by the Manager or any Member and shall be deemed waived by any such Person that participates in the meeting.

        (d)     <u>Action or Consent by the Members</u>. At any meeting of the Members, the Manager and Members shall have only the rights provided in this Agreement and not additional or different rights. For the avoidance of doubt, the Members shall not have the

power at any such meetings to take any action or make any decisions reserved under this Agreement for either the Manager or Preferred Member, but shall continue to have only those approval and other rights specifically provided herein. Each item for which approval, consent or determination by the Members is specifically required by any provision of this Agreement, shall require either (i) the affirmative vote of the Members at a duly held meeting at which a quorum is established, or (ii) the written consent of the Members without a meeting if a copy of the form of such written consent has previously been delivered to the Members pursuant to the provisions of Section 13.3. Each item for which approval, consent or determination of Preferred Member is specifically required by any provision of this Agreement (including, without limitation, any actions described in Section 8.4), shall require either (x) the affirmative vote of Preferred Member at a duly held meeting at which a quorum is established, or (y) the written consent of Preferred Member without a meeting if a copy of the request of such written consent has previously been delivered to Preferred Member pursuant to the provisions of Section 13.3.

(e)     Quorum. At any meeting of the Members, Preferred Member and Sponsor Member must be present to constitute a quorum for all purposes. If a quorum shall have been established at a meeting, then, notwithstanding any loss of a quorum, a majority of the Members present may adjourn the meeting to another place, date or time, without further notice or waiver thereof.

(f)     Participation by Telephone. The Manager or any Member may, at its request, participate in any meeting of the Members held by telephone conference or similar communications equipment.

8.3     Manager and Officers.

(a)     Manager. The initial Manager of the Company is Sponsor Member. The Manager shall manage the affairs of the Company and its business, subject to the terms and conditions hereof, including, but not limited, to Section 7.4 and Section 8.4. The Manager, as such, shall have only the authority, powers and rights specifically set forth for a Manager in this Agreement. The Manager shall make all decisions for the Company that are not specifically reserved to any of the other Members pursuant to this Agreement.

(b)     Successor Manager. The Manager cannot be removed except either (x) by affirmative vote of all the Members, or (y) by Preferred Member for Cause, subject to the conditions set forth in this Section 8.3(b). Preferred Member may remove the Manager for Cause (and thereupon remove any manger or managing member of any Subsidiary) upon the delivery of written notice thereof (such notice, a "Notice of Removal") to the Manager and the Members, or at such later date as is specified in such Notice of Removal, in all cases provided that, if the Mortgage Loan or any portion thereof remains outstanding a time, then in all cases such removal shall not be effective unless and until the Lender has provided its written consent thereto. Simultaneously with its execution and delivery of this Agreement, Sponsor Member has provided its written resignation as Manager in the form attached as Exhibit C hereto, to be effective as specified upon the delivery of and as specified in such Notice of Removal. Upon the Manager's receipt of a Notice of Removal, Sponsor Member shall fully cooperate (and

shall cause each Subsidiary and any Property Owner Controlling Party to fully cooperate) with Preferred Member in complying with any requirements imposed by the Lender and/or the Mortgage Loan Documents with respect to the replacement of the Manager (and, if Preferred Member elects, replacement of the Property Manager), including, without limitation, promptly executing and delivering any documents, agreements, affidavits or certificates which either the Lender or Preferred Member may require and providing such information and documentation as the Lender or Preferred Member may reasonably request. All out-of-pocket expenses incurred by Preferred Member (including reasonable attorney's fees and disbursements) in connection with effectuating the replacement of the Manager (and, if Preferred Member so elects, the Property Manager) and complying with the requirements imposed by the Lender and/or the Mortgage Loan Documents shall be "Collection Costs" under Section 6.1 of this Agreement. Subject to obtaining the prior consent of the Lender, Preferred Member shall have the exclusive right to appoint the successor Manager upon removal of a Manager for Cause, by delivery of notice to all Members (other than itself) of the successor Manager, which successor Manager shall automatically succeed to all powers of the Manager under this Agreement effective upon its appointment by Preferred Member. Neither any delay by Preferred Member in exercising a right of removal pursuant to Section 8.3(b), nor any delay in effectuating such removal caused or necessitated by compliance with the requirements imposed by the Lender or the Mortgage Loan Documents shall constitute a waiver of Preferred Member's right to remove the Manager or any waiver of Preferred Member's rights under Section 7.4. Upon removal of Sponsor Member (or any Sponsor Party which succeeds Sponsor Member) as Manager pursuant to this Section 8.3(b), Sponsor Member (and/or any such successor) shall cease to act as a Manager of the Company, but such removal shall not otherwise affect Sponsor Member's Interest in the Company, except that effective immediately upon Sponsor Member's removal as Manager, (I) Sponsor Member shall no longer have any approval or consent rights as a Member under Article VIII or otherwise under this Agreement, (II) the replacement Manager appointed by Preferred Member shall not have any fiduciary duty to the Company or any other Member, and Sponsor Member hereby waives any right to make a claim for breach of fiduciary duty in connection with any action taken by such replacement Manger or by the Company at the direction of such replacement Manager. (except that Sponsor Member shall have the right to consent (which consent shall not be unreasonably withheld, conditioned or delayed) to the matters set forth in Section 8.4(l) (with references to Sponsor Member being read as references to Preferred Member) and Section 8.4(aa). Any vacancy occurring in the position of Manager for any reason other than Cause may only be filled by a successor appointed by Preferred Member and the Members.

(c)    Cause for Removal. "Cause" shall mean any of the following:

(i)    The occurrence or continuation of any Trigger Event including, without limitation, performance of any action for which the prior consent of Preferred Member is required under this Agreement without first obtaining such consent (whether or not specified in Section 8.4 hereof), but subject to any applicable notice and cure periods provided in Section 7.1 or elsewhere in this Agreement;

(ii)     The Manager's, Sponsor Member's, any Subsidiary's or any Property Owner Controlling Party's commission of any act of fraud, negligence, willful misconduct or misappropriation relating to the management or operations of the Company and/or Property Owner; or

(iii)     The Manager's knowing, willful and gross neglect of its duties hereunder; or

(iv)     The occurrence of a Bankruptcy Event with respect to any of Property Owner, any other Subsidiary, Sponsor Member, or Guarantor.

(d)     <u>Officers</u>. The Manager may appoint such officers and assistant officers of the Manager as it may from time to time deem necessary, including, without limitation, a President, Treasurer, Secretary, and one or more Vice-Presidents, with such duties as shall be approved by the Manager and Preferred Member. All officers of the Manager shall report directly to the Manager. Any two (2) or more offices may be held by the same person, but no officer shall execute, acknowledge or verify any instrument in more than one capacity if such instrument is required to be executed, acknowledged or verified by two or more officers. The Manager (or Preferred Member, following a "<u>Cause</u>" event which permits Preferred Member to remove the Manager pursuant to the terms of this Agreement) may remove any officer of the Manager at any time upon delivery of written notice, with or without cause, at any time, but without prejudice to the contract rights, if any, of such officer.

8.4     <u>Actions Requiring Consent of Preferred Member</u>. Subject to Section 8.5, neither the Manager nor any other Member (or anyone acting on behalf of any of them), nor any Property Owner Controlling Party shall, without the prior written consent of Preferred Member, do any of the following, or cause, permit or suffer the Company or any Subsidiary to do any of the following:

(a)     <u>Acquisition or Sale of Property</u>. (i) subject to the provisions of Section 8.5(b) and Section 7.4 of this Agreement, Sell, exchange or otherwise transfer, convey or grant (including, without limitation, the tender of any deed-in-lieu of foreclosure or similar transfer to the Lender) all or any portion of (A) the Property, (B) any Subsidiary Interests (other than BI Unit Sales made pursuant to the Property Owner Trust Agreement), and/or (C) any fixtures or personal property owned by Property Owner with a value of greater than $40,000.00, or (ii) cause the Company or any Subsidiary to acquire any additional real or personal property or any interest therein, or enter into an agreement for any of the foregoing or any option, right of first offer or right of first refusal for any of the foregoing; provided, however, that without any such prior written approval (but subject to any other limitations set forth in this Section 8.4), the Manager or any Property Owner Controlling Party may cause Property Owner or Master Lessee Subsidiary to make incidental purchases, sales, exchanges, conveyances or transfers of tangible personalty or fixtures (in the ordinary course of Property Owner's or Master Lessee Subsidiary's business and in accordance with the Annual Business Plan);

(b)     Encumbrances. To grant a mortgage, lien, hypothecation or other security interest in the Property or any direct or indirect interest therein, or to allow an encumbrance to exist on any of the Company, any Interest in the Company, any Subsidiary Interest or any property of any Subsidiary (including the Property and/or the Master Lease), except (i) for any liens on the Property required by terms of the Mortgage Loan and any Permitted Encumbrances (as defined in the Mortgage Loan Documents), (ii) for liens on the Property arising by operation of law, such as tax liens, provided that liability for any such liens shall be paid or discharged when due unless and except to the extent being contested in good faith in accordance with and to the extent permitted by the Mortgage Loan Documents, (iii) for mechanic's liens against the Property (excluding any mechanic's lien caused by an intentional breach of any construction contract by the Manager or any Subsidiary), provided such liens are removed or bonded within the time and in the manner required under the Mortgage Loan Documents, and (iv) as permitted pursuant to Section 8.5 hereof. If any mechanic's lien arises, the Manager shall use diligent efforts to cause Property Owner and/or Master Lessee Subsidiary to resolve the dispute.

(c)     Condominium or Cooperative Ownership Regime. Submit any part of the Property to condominium, planned unit or other cooperative ownership regime, or declaration of cross-easements or restrictions with any abutting property;

(d)     Borrowings. Subject to the provisions of Section 8.5(b) and 8.5(c) hereof, incur or issue any borrowing, debt, guaranty or the like, except for (i) the Mortgage Loan, (ii) customary trade payables incurred by the Property Owner and Master Lessee in the ordinary course of business (but not in excess of any limitations thereon contained in the Mortgage Loan Documents), provided such payables or borrowings are specifically approved in an applicable Budget and within the parameters for such borrowing established in such Budget;

(e)     Reserves Under Loan Documents. To modify, release or apply any reserves, holdbacks or escrows pursuant to the Mortgage Loan or other financings for any purposes other than their stated purpose pursuant to such financing or except in accordance with the applicable Budget;

(f)     Prepayments; Extension of Term. Except in connection with a Sale or Refinance entered into in accordance with Section 8.5(b) or 8.5(c) hereof, (i) make any prepayment of the Mortgage Loan or other financing by the Company or any Subsidiary; or (ii) extend, shorten or otherwise modify the term of any such financing (whether or not pursuant to an option granted in the applicable loan documents);

(g)     Loan Modifications. Except in connection with a Sale or Refinance entered into in accordance with Section 8.5(b) or 8.5(c) hereof, to make or agree to make any modification or amendment to any documents governing or evidencing the Mortgage Loan or any other financing loan agreements by the Company or any Subsidiary;

(h)     Budgets. Adopt, or modify any Annual Business Plan or Budget, to re-allocate costs from one or more line items in a Budget to other line items in a Budget, or

incur costs or obligations in excess of amounts provided for in an applicable Budget, in all cases except as permitted by Section 8.11 hereof;

(i)  <u>Changes to Plans and Specifications</u>. Any material modifications to any plans and specifications for any construction of any capital improvements at the Property which require the approval of the Lender;

(j)  <u>Construction Contract</u>. Entry into or modification of any contract or subcontract for construction or renovation of the Property, or any change order thereunder the cost of which exceeds $40,000.00;

(k)  <u>Leases & Service Contracts</u>. (i) any modification, amendment or termination of the Master Lease, other than as required by Lender; (ii) entry into or modification of any Lease (including any renewals or extensions of any Leases) of the Property or any portion thereof except for apartment leases made in the ordinary course of Property Owner's and/or Master Lessee Subsidiary's business on the standard form of Lease for the Property previously approved by Preferred Member, at rents and other terms consistent with prevailing local markets, or (iii) entry into or modification of any contract for services or supplies to the Property except as contemplated by the Budget and/or Annual Business Plan or except to the extent such new contract or modification does not materially increase any monetary obligations of the Company and/or any Subsidiary under such contract or constitute an agreement with an Affiliate for which Preferred Member's consent is required hereunder;

(l)  <u>Dealing with Members and Affiliates</u>. To make any loans, payments or advances or arrangements with or to any partners, shareholders, members or Affiliates of any Sponsor Parties other than as expressly permitted by this Agreement, or enter into any loan, agreement or arrangement with any partner, shareholder, member or Affiliate of a Sponsor Party, or to modify, terminate or waive any right the Company or Property Owner has under any contract, agreement or other arrangement with any Sponsor Party or Affiliate of any Sponsor Party;

(m)  <u>Property Management and Brokerage Agreements</u>. To enter into any property management, leasing, sales or brokerage agreement with respect to the Property, or to modify or terminate any such agreement;

(n)  <u>Compensation</u>. To pay, determine or modify the amount of management fees, bonuses and compensation payable to the Manager, any Member, any Property Owner Controlling Party or executive officers or directors of any such entities or to Property Owner for services rendered to the Company or any partner, member, officer or director for services rendered to any Subsidiary, in each case, except as expressly contemplated in any Budget, contract or agreement approved by Preferred Member;

(o)  <u>Granting Interests in the Company or any Subsidiary</u>. Other than BI Unit Sales made pursuant to the Property Owner Trust Agreement to (i) sell, grant, issue or enter into an option or other agreement to grant or issue, any partnership, membership or other beneficial interest in any of the Company or any Subsidiary, (ii) issue any interest

in any of the Company's or any Subsidiary's revenues, capital, profits, or losses, or (iii) admit any Person as a partner or member of any of the Company or any Subsidiary other than a Permitted Transfer pursuant to Article IX;

(p)     Acquire Securities. To acquire any securities of, or any equity or beneficial ownership interest (directly or indirectly) in, any other Person (excluding the Subsidiary Interests);

(q)     Distributions. To cause or permit the Company to make any distributions to any Member (including making any in-kind distributions to any Member) other than as expressly permitted under this Agreement, or to cause or permit any Subsidiary to make any in-kind distribution to the Company or any distributions other than (i) distributions to the Company as expressly contemplated under this Agreement and the Subsidiary Governing Agreements, and (ii) distributions made to Beneficial Owners of Property Owner pursuant to the Property Owner Trust Agreement;

(r)     Cancel Debt. To cancel or otherwise forgive or release any material claim or indebtedness owed to the Company or any Subsidiary by any Person, except for amounts owed to Property Owner or Master Lessee Subsidiary not exceeding $25,000.00 per creditor or group of related clams in the ordinary course of business;

(s)     Bankruptcy. To cause, suffer or take any action which would constitute a Voluntary Bankruptcy, or to cause or acquiesce or collude in any Involuntary Bankruptcy, in each case with respect to any of the Company, any Subsidiary, and/or Sponsor Member;

(t)     Confession of Judgment; Legal Proceedings. To confess a judgment against any of the Company or any Subsidiary or to institute or settle any legal proceeding, litigation or claim involving any of the Company, any Subsidiary, any Subsidiary Interest or the Property which requires or is contemplated to require a payment by any of the Company or any Subsidiary in excess of $25,000.00;

(u)     Accounts. Except as expressly preapproved herein, the selection of banks or other financial institutions with which the Company or any Subsidiary shall keep or maintain any of their respective account;

(v)     Alteration of the Property. To make any alterations or modifications to the Property other than physical alterations to the Property, (A) the cost of which do not exceed $40,000.00 in the aggregate or (B) which are contemplated by the Annual Business Plan or the Mortgage Loan Documents including any reserve or escrow agreement with the Lender.

(w)     Insurance and Condemnation Claims and Awards. To settle, adjust or compromise any claim or payment of proceeds under any policy insuring the Property or any interest therein, or any condemnation proceeding or award.

(x)     Subsidiary Governing Agreements. To (i) amend, modify or terminate any Subsidiary Governing Agreement, (ii) appoint, remove or change any officer or director

of any Subsidiary or otherwise delegate any managerial rights or responsibility with respect to any Subsidiary or to any Person who is not a Property Owner Controlling Party on the date hereof, (iii) cause any Subsidiary to make any capital call, (iv) take any action or omission in violation or contravention of any provision of the Property Owner Trust Agreement or any other Subsidiary Governing Agreement (including Section 1.02(b) of the Master Lessee Subsidiary Operating Agreement or the ST Subsidiary Operating Agreement), or (v) cause the Company or any Subsidiary to take any action under any of Sections 2.05(a) and 9.02 and Article VIII of the Property Owner Trust Agreement (including any termination of Property Owner) or Sections 3.09 of the IB Subsidiary Operating Agreement or Sections 3.08, 5.01 of any of the Master Lessee Subsidiary Operating Agreement or the ST Subsidiary Operating Agreement.

(y)     <u>Sale or Refinance Agreement</u>. To modify or terminate any Sale Agreement or any commitment letter or term sheet for any Refinance, which, in the case of a commitment letter or term sheet for a Refinance either results in, or could reasonably be expected to result in any of a decrease in the anticipated Net Refinance Proceeds to an amount less an amount sufficient to repay all sums due under the Mortgage Loan and all Required PM Payments to redeem Preferred Member's Interest in the Company (with respect to any Refinance approved pursuant to Section 8.5(b)).

(z)     <u>Land Use</u>. To approve any change in the zoning, access or use of the Property, or to modify, amend or terminate any easements, covenants or restrictions affecting the Property.

(aa)    <u>Other</u>.

(i)     Enter into any joint venture, or to engage in any merger or consolidation or form any subsidiary of the Company (other than the Subsidiaries) or form any subsidiary of any Subsidiary not in existence as of the date hereof; or

(ii)    Do any act which would make it impossible to carry on the ordinary business of the Company, the Manager or any Subsidiary.

(bb)    to modify, cancel or terminate the Master Lease (including shortening the term of the Master Lease), to take any action which could result in a default under or the termination of the Master Lease, or to deliver any notice of default under the Master Lease (either to Property Owner as landlord or Master Lessee Subsidiary, as tenant).

(cc)    <u>BI Unit</u> Sales. To cause or permit Property Owner to sell any Beneficial Interest for a sales price below the Minimum BI Unit Sales Price or which would result in BI Net Sales Proceeds below Minimum Net Sales Amount.

8.5   <u>Member Approvals of Mortgage Loan and Other Actions</u>.

(a)     The Members hereby consent to and approve of the following actions to be taken by the Company and/or any Subsidiary in connection with the Mortgage Loan:

(i)     To entering into the Mortgage Loan;

(ii)    To the execution and/or delivery by any Subsidiary, Guarantor and/or any Sponsor Party of the Mortgage Loan Documents set forth on Exhibit D; and

(iii)    To all actions taken by the Manager on behalf of the Company within the parameters of the Budgets (but not for the incurrence of expenditures in excess of any applicable category or line item in any Budget or re-allocation of expenditures from one line item in the Budget to another except as approved pursuant to Section 8.4 or Section 8.11 or except in the event of an emergency and such expenditure is reasonably required to protect property value or the safety of individuals).

(b)    Subject to the Company's compliance with the provisions of Section 6.1(b) of this Agreement (including making all Required PM Payments), Preferred Member hereby grants its consent to Property Owner's entering into any Sale or Refinance of the Property which will yield net cash proceeds to the Company upon the consummation of such Sale or Refinance in an amount sufficient to pay all amounts which would become due and payable to Preferred Member pursuant to Section 6.1 on a Required Redemption Date, provided that such consent is expressly conditioned upon Manager's and the Company's agreement that neither the Manager, the Company, nor any Subsidiary (or anyone acting on behalf of them) shall, without the prior written consent of Preferred Member, cause, permit or suffer the Company or any Subsidiary to take any action which could result in the Company's or any Subsidiary's default under such Sale or Refinance (including, without limitation, any default under any Sale Agreement) or any action which could result in either a purchaser's claim against the Company or any Subsidiary for specific performance of any Sale, or the forfeiture of any deposit or earnest money paid to any lender in connection with an anticipated Refinancing.

8.6    <u>Authority to Bind the Company</u>. Except as authorized in writing by the Manager, or as expressly provided in this Agreement, none of the Members shall have the right or authority to act for or to bind the Company.

8.7    <u>Independent Activities</u>. Subject to any other agreement among the parties, Members and Affiliates of Members, and Manager and Affiliates of Manager may, notwithstanding the existence of this Agreement, engage in whatever activities they choose, including activities which may be competitive with the business of the Company, without having or incurring any obligation to offer any interest in such activities to the Company or any Member. This Agreement (and each activity undertaken pursuant hereto) shall neither prevent any Member or Affiliate of a Member or Manager or Affiliate of Manager from engaging in any other activity, nor require any Member or Affiliate of a Member or Manager or any Affiliate of Manager to permit participation by the Company or any other Member in any such activity.

8.8    <u>Private Debts</u>. Each Member hereby indemnifies the Company and each other Member from and against all actions, proceedings, costs, claims, liabilities and demands in respect of the indemnifying Member's own separate debts and liabilities unrelated to the

Company or this Agreement, whether existing or future (including, without limitation, Voluntary or Involuntary Bankruptcy proceedings).

8.9     Indemnification; Exculpation; Insurance.

(a)     Indemnified Persons. To the greatest extent not inconsistent with the laws and public policies of the State of Delaware (but subject to the terms and limitations contained in this Agreement), the Company shall indemnify and hold harmless any current or former Member, Manager and officers of the Company (an "Indemnified Person") for any claims, proceedings, expenses and liability of any nature whatsoever, as a matter of right, arising out of or incidental to such Indemnified Person's involvement in the Company or in the management of the Company's affairs; provided that such Indemnified Person has met the standard of conduct for indemnification set forth in Section 8.9(b). The Company shall pay for or reimburse the reasonable expenses incurred by such Indemnified Person in connection with any such proceeding in advance of final disposition thereof if (i) such Indemnified Person furnishes the Company a written affirmation of such Indemnified Person's good faith belief that it has met the standard of conduct for indemnification described in Section 8.9(b), and (ii) such Indemnified Person furnishes the Company a written undertaking to repay the advance if it is ultimately determined that such Indemnified Person did not meet such standard of conduct. The undertaking referred to in clause (ii) above shall be a general obligation of such Indemnified Person, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company shall indemnify an Indemnified Person who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by such Indemnified Person in connection with the proceeding without the requirement of a determination as set forth in Section 8.9(b). Upon demand by an Indemnified Person for indemnification or advancement of expenses, as the case may be, the Company shall expeditiously determine whether such Person is entitled thereto in accordance with this Section 8.9. The indemnification and advancement of expenses provided for under this Section 8.9 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 8.9. The Company shall have the power, but not the obligation, to indemnify any Person who is or was an owner, officer, employee or agent of the Company to the same extent as if such Person were a Member.

(b)     Standard. Indemnification of a Person is permissible under this Section 8.9 only if (i) such Person reasonably believed in good faith that its conduct was in (or at least not opposed to) the Company's best interest and was within the authority delegated to it by or pursuant to this Agreement; (ii) in the case of any criminal proceeding, such Person had no reasonable cause to believe its conduct was unlawful; (iii) such Person is not adjudged in any such proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent to have failed to meet the standard of conduct described in this Section 8.9(b), and (iv) in the case of any act or omission by Sponsor Member, any Sponsor Party or any Affiliate of any Sponsor Party, such act or omission did not constitute Cause for removal of the Manager or otherwise constitute a Trigger

Event, in each case except to the extent such Cause or Trigger Event was not caused by an act or omission of any Sponsor Party.

(c)     Proceedings. An Indemnified Person who is a party to a proceeding may apply for indemnification from the Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

(i)     in a proceeding in which the Indemnified Person is wholly successful, on the merits or otherwise, the Member is entitled to indemnification under this Section 8.9, in which case the court shall order the Company to pay the Member its reasonable expenses incurred to obtain such court ordered indemnification; or

(ii)    the Indemnified Person is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Indemnified Person met the standard of conduct set forth in this Section 8.9.

(d)     Other Indemnifications. Nothing contained in this Section 8.9 shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any Person who is or was a Member of the Company or is or was serving at the Company's request as a director, officer, partner, member, trustee, employee, or agent of another entity. Nothing contained in this Section 8.9 shall limit the ability of the Company to otherwise indemnify or advance expenses to any Person, provided that in no event shall the Company indemnify any Person who does not meet the standard set forth in Section 8.9(b) without Preferred Member's prior written consent. It is the intent of this Section 8.9 to provide indemnification to Indemnified Persons to the fullest extent now or hereafter permitted by the law consistent with the terms or conditions of this Section 8.9. Indemnification shall be provided in accordance with this Section 8.9 irrespective of the nature of the legal or equitable theory upon which a claim is made, including negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, or violation of any other state or federal law or violation of any law of any other jurisdiction.

(e)     Exclusions. Notwithstanding anything to the contrary in this Section 8.9:

(i)     in no event shall the Company be obligated to indemnify any Member or former Member for any losses, liabilities or other obligations arising out of a proceeding between or among Members or former Members of the Company (other than any Collection Costs or other indemnification obligations owed by the Company to Preferred Member pursuant to the terms of this Agreement);

(ii)    in no event shall the Company be obligated to indemnify Sponsor Member, any Sponsor Party or any of their Affiliates with respect to any losses,

liabilities or other obligations arising out of any act or omission which constitutes Cause for removal of the Manager or which otherwise constitutes a Trigger Event, in each case except to the extent such Cause or Trigger Event was not caused by an act or omission of any Sponsor Party; and

(iii)     all rights to indemnification, advances, contribution or other form of payment provided by this Section 8.9 are subordinate to the prior payment or distribution of all amounts due and payable to Preferred Member pursuant to Section 6.1 hereof, and shall not be made or paid without Preferred Member's prior written consent, in its sole and absolute discretion, unless and until all amounts due and payable to Preferred Member have been paid in full.

(f)     <u>Definitions</u>. For purposes of this Section 8.9:

(i)     The term "expenses" includes all reasonable direct and indirect costs (including reasonable counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 8.9, applicable law or otherwise.

(ii)     The term "liability" means the obligation to pay any damages, judgment, settlement, penalty, fine, excise tax or reasonable expenses incurred with respect to a proceeding.

(iii)     The term "party" includes a Person who was, is or is threatened to be made, a named defendant or respondent in a proceeding.

(iv)     The term "proceeding" means any threatened, pending or completed action, cause of action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(g)     <u>Insurance</u>. Sponsor Member shall cause Property Owner and/or Master Lessee Subsidiary to maintain the insurance coverages set forth in <u>Exhibit E</u>. Property Owner and/or Master Lessee Subsidiary may purchase and maintain additional insurance with such limits or coverages as the Manager reasonably deems appropriate or as required by the Mortgage Loan, at the expense of Property Owner and/or Master Lessee Subsidiary (as applicable) and to the extent available, or against any liability which Property Owner, Master Lessee Subsidiary or any Indemnified Person may incur in connection with the conduct of Company affairs, whether or not the Company has the power to indemnify such Indemnified Person against such liability, provided that any expenditure for such additional insurance which is not required by the Lender must be in accordance with the Budget or otherwise be approved by Preferred Member. In addition, with Preferred Members' prior written consent, the Company may purchase and maintain insurance for the protection of any officer, member, partner, employee, consultant or

other agent (collectively, "Insureds") of any other organization in which the Company owns an interest or of which the Company is a creditor against similar liabilities, whether or not the Company has the power to indemnify such Insureds or organization against such liabilities. The Company shall use proceeds of any insurance policy purchased pursuant to this Section 8.9(g) as the Company's first source of funds from which to satisfy any obligation incurred by the Company under Section 8.9.

(h)   Exculpation.

(i)   Subject to the provisions of Section 8.9(h)(iii), no Member and no Affiliate, shareholder, officer, principal, employee, representative or agent of a Member (each, a "Covered Person") shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Operating Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

(ii)   Subject to the provisions of Section 8.9(h)(iii), a Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses or net cash flow or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

(iii)   Notwithstanding anything to the contrary in this Section 8.9(h), in no event shall Sponsor Member, any Sponsor Party or any of their Affiliates, shareholders, officers, principals, employees, representatives or agents constitute a Covered Person until all Required PM Payments to redeem Preferred Member's Interest in the Company have been indefeasibly paid in full to Preferred Member.

8.10   Holding of Assets. All Company property, whether real, personal or mixed, owned by the Company shall be held in the name of the Company.

8.11   Business Plan; Pre-Development Budget; Use of Initial PM Capital Contribution.

(a)   The Members hereby approve the Initial Operating Budget for the first Fiscal Year, attached hereto as Exhibit G. Preferred Member's prior written consent pursuant to Section 8.4 shall be required with respect to (i) any further modification, amendment, replacement or termination of the Initial Operating Budget, or (ii) any Subsidiary's incurring costs or obligations in excess of five percent (5.0%) of any line item or total cost amount provided for in the Initial Operating Budget.

(b)     The Manager shall prepare and submit to the Members for their comment and approval pursuant to Section 8.4, no later than November 1 of each Fiscal Year, the annual business plan for operation of the Property for the next year (the "Annual Business Plan") which shall include the following:

(i)     A narrative description of any activity proposed to be undertaken;

(ii)    An Initial Operating Budget for the first Fiscal Year the Company and the Property as set forth on Exhibit G annexed hereto, and thereafter for each successive Fiscal Year a detailed operating budget ("Annual Operating Budget"), in each case including schedules of projected operating cash flow and projected sources and uses of funds for such Fiscal Year, all projected operating costs and capital expenditures and administrative expenses, and a schedule of projected operating income or deficits, as the case may be;

(iii)   Such other information, including a description of plans, contracts, agreements, governmental approvals and other matters, as may be necessary or reasonably in order to inform the Members of all matters relevant to the development, operation, management and/or sale of the Property or any portion thereof, and to otherwise allow the Members to make an informed decision with respect to the approval of the annual business plan and applicable Budget.

The Manager shall also timely submit any proposed amendments to any previously approved Budget to the Members for their comment and approval pursuant to Section 8.4.

(c)     If either (i) the Members do not approve an Annual Operating Budget for any Fiscal Year or applicable shorter portion thereof prior to the commencement of such Fiscal Year or such applicable shorter period, or (ii) the Manager does not prepare an Annual Operating Budget prior to the commencement of such Fiscal Year or applicable shorter period, then, until the Members shall agree upon an Annual Operating Budget for such Fiscal Year or other applicable shorter period, the previous applicable Budget in effect for the immediately preceding Fiscal Year shall constitute the Annual Operating Budget for such Fiscal Year until such time as the Annual Operating Budget for such year has been approved by the Members in accordance with Section 8.4, except that (i) any items or portions of the Annual Operating Budget for such Fiscal Year upon which the Members agree shall be substituted for the corresponding items in the preceding year's Annual Operating Budget, (ii) with respect to all items of cost and expense that are not within the discretion of the Company (including, for example, debt service on the Mortgage Loan, Taxes, utilities, costs of compliance with governmental requirements, Insurance Premiums and contractually required increases), the actual amount of each such item shall be substituted for the amount of such item set forth in the preceding year's Annual Operating Budget, and (iii) with respect to items of operating costs and expenses that are within the discretion of the Company or otherwise not covered by and which have not been authorized in accordance with the terms of this Agreement, each such item of operating cost or expense shall be not more than one hundred five percent (105%) of the amount of such items set forth in the preceding year's Annual Operating Budget.

8.12    Uses of Preferred Member's Capital Contribution. The Members hereby approve of the payments and disbursements of the Initial PM Capital Contribution, the Mortgage Loan Proceeds and the cash contributed by Sponsor Member at Closing provided on the Sources and Uses Schedule attached hereto as Exhibit F.

8.13    Notices to and From the Lender. Sponsor Member shall cause each Subsidiary to deliver to Preferred Member, (i) copies of any notices from the Lender received by such Subsidiary within twenty-four (24) hours following such Subsidiary's receipt thereof (such delivery to be made by facsimile or e-mail to Preferred Member immediately, with a printed copy provided pursuant to the methods set forth in Section 13.3), and (ii) prior to the delivery of any notice to the Lender, a draft of such notice for Preferred Member's approval. In the event that Preferred Member fails to approve any such proposed notice to be delivered to the Lender on or before the fifth (5th) Business Day after Preferred Member's receipt thereof, then Preferred Member shall be deemed to have approved such notice. In the event that Preferred Member disapproves a proposed notice, then in no event shall the Company or any Subsidiary deliver such notice unless and until the Company has received Preferred Member's written consent thereto, which consent that not be unreasonably withheld or delayed. Any failure by the Company to comply with the procedures set forth in this Section 8.13, shall constitute a "Trigger Event" under this Agreement. For the purposes of this Section 8.13, "notices" to and from the Lender shall mean notices sent to or by the Lender in accordance with the notice provisions of the Mortgage Loan Documents, and shall not refer to general verbal or email correspondence.

## ARTICLE IX.  TRANSFER OF INTERESTS IN THE COMPANY

9.1    Transfer of Member's Interest; Withdrawal of Members.

(a)    Except as otherwise expressly permitted below, (x) no Member may, without the written consent of all of the non-transferring Members, voluntarily or involuntarily, directly or indirectly sell, assign, mortgage, pledge, encumber, hypothecate or otherwise transfer all or any part of its Interest in the Company, and (y) no Member shall permit any Person holding any direct or indirect membership, partnership or beneficial interest in any Member (a "Principal") to voluntarily or involuntarily, directly or indirectly sell, assign, mortgage, pledge, encumber, hypothecate or otherwise transfer all or any part of its interest in such Member without the written consent of all of the non-transferring Members, in each case except as follows (each, a "Permitted Transfer"):

(i)    The Interest of a Principal of Sponsor Member that is a natural individual who is adjudicated incompetent shall vest in his/her personal representative. The Interest of a deceased Member or deceased Principal shall vest in his/her personal representative and, thereafter, in the deceased Member's or deceased Principal's heirs or legatees.

(ii)    Preferred Member may transfer all or any portion of its Interest or otherwise syndicate or participate its Interest to one or more third parties without the prior consent of Manager or any other Member, provided that Preferred Member shall promptly notify the Manager and other Members of any assignment

of all or substantially all of its Interest, and provide the Manager with a copy of the instrument of assignment. The transferee shall automatically be admitted as the new Preferred Member in place of the assigning Preferred Member upon delivery of an instrument agreeing to be bound by the terms and conditions of this Agreement. Preferred Member agrees to comply with any requirements which may be imposed by the Mortgage Loan Documents with respect to transfers contemplated under this Section 9.1(a)(ii).

(iii)   The Interest of Sponsor Member may be transferred to Preferred Member or its designee (provided that, if the Mortgage Loan or any portion thereof remains outstanding a such time, then such transfer shall be subject to obtaining the Lender's approval, if required), and the successor or transferee shall be automatically admitted as a Member with respect to the transferred Interest upon delivery of an instrument agreeing to be bound by the terms and conditions of this Agreement.

9.2   <u>Substitution of Members</u>.

(a)   Any transferee of an Interest in the Company pursuant to Section 9.1(a)(ii) or Section 9.1(a)(iii) shall be admitted as a Member of the Company upon execution of a counterpart of the Agreement pursuant to which the transferee agrees to be bound by the terms and conditions of this Agreement. Except as set forth above in this Article IX, no transferee of all or part of a Member's Interest shall become a substituted Member in the Company with respect to the transferred Interest unless and until the Manager and the Members give their written consent thereto (which written consent may be withheld by any Member in its sole and absolute discretion), and the transferee shall have:

(i)   agreed in writing to perform all of the obligations of the transferor under this Agreement with respect to the transferred Interest accruing from and after the effective date of the transfer;

(ii)   acknowledged in writing to the Members such assumption of liability and that the transferee has read the provisions of this Agreement and intends to be legally bound as a Member by all the terms and conditions of this Agreement and any amendments or modifications thereof;

(iii)   executed a counterpart of the Agreement as then in effect; and

(iv)   paid all reasonable expenses (including, without limitation, reasonable legal and accounting fees) incurred by the Company and Preferred Member in connection with such transfer, including but not limited to the cost of the preparation, filing and publishing of any amendment to the Company's Certificate of Formation and any fictitious name or similar registrations necessary or desirable in connection therewith.

9.3   <u>Withdrawal</u>. Except as otherwise specifically provided in this Agreement, a Member may not withdraw from the Company or have the right to receive Company

distributions, the return of such Member's Capital Contributions or the fair value of such Member's Interest, at any time prior to the dissolution and winding up of the Company.

9.4    Compliance with Securities Laws. The Members acknowledge and confirm that their Interests may constitute securities for purposes of state and federal securities laws and that, as a consequence, the Interests may only be sold pursuant to appropriate registration or exemption from registration. The Interests have not been registered under any federal or state securities laws, and the Company has no plan to register the Interests. No transfer or assignment of all or any part of an Interest (except pursuant to Section 9.1(a)(i) or Article IX hereof), including, without limitation, any transfer of a right to distributions, Profits or Losses to a Person who does not become a Member, shall be effective unless such transfer or assignment (a) may be effected without registration of the interest under the Securities Act of 1933, as amended, and (b) does not, under reasonable prevailing interpretations of such laws, violate any applicable federal or state securities laws (including any investment suitability standards) applicable to the Company or the Members. In no event may any Member sell all or any portion of its Interest in violation of the provisions of applicable securities laws.

9.5    Other Prohibited Transfers. No Member shall sell or otherwise transfer its interest in the Company if such transfer would (i) require the Company or the transferred Interest to be registered under state or federal securities laws, (ii) cause any of the transactions contemplated by this Agreement to be a "prohibited transaction" within the meaning of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA") or the Code, (iii) cause any Member to become a "fiduciary" within the meaning of ERISA or the Code, (iv) cause the Company to be in breach of or default under any mortgage, deed of trust or other security agreement encumbering the Property or other Company assets, or (vi) cause the Company to be classified as other than a "disregarded entity" or a "partnership" for federal income tax purposes. Prior to effecting any transfer of an Interest, the transferor shall provide reasonable assurances to the Company the proposed transfer would be permitted under this Section 9.5 and that the transferring Member or the transferee shall pay any transfer taxes resulting from the transfer. In the event a proposed transferee is subject to withholding under Code Sections 1445 or 1446, or any applicable successor laws, or similar state income tax laws, the transfer shall not be permitted unless the transferee agrees to cause such withheld amounts to be remitted to the applicable government authority. Further provided, if the transferor of an Interest in the Company is subject to Code Sections 1445 or 1446, or any applicable successor laws, or similar state income tax laws, such transfer of an Interest shall not be permitted hereunder unless the transferor complies with the withholding and filing requirements of such laws

9.6    Effect of Withdrawal of Manager or Transfer of Its Interest. No withdrawal, assignment, pledge or encumbrance of a Manager's interest as Manager of the Company, even if it results in the substation of the assignee as a Manager or the admission of a new Manager, shall release the withdrawing or transferring Manager from any liability to the Company for obligations incurred prior to, or relating to events, actions or omissions occurring prior to, such withdrawal or transfer, and the withdrawing or transferring Manager shall remain liable to the Company and/or to the other Members as applicable with respect to all such liabilities and obligations. Any such new Manager shall be liable only for obligations of the Company that are

incurred and relate to events, activities or omissions that occur after the date of such new Manager's admission to the Company.

## ARTICLE X.  DISSOLUTION AND WINDING UP OF THE COMPANY

10.1    <u>Dissolution</u>.

(a)    The Company shall be dissolved and its affairs wound up upon the happening of any of the following events:

(i)    The sale or other disposition (not including an exchange) of all or substantially all of the Company's assets, except under circumstances where all or a portion of the purchase price is payable after the closing of the sale or disposition;

(ii)    The written consent of Preferred Member and the Members to dissolve the Company

(iii)    the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act; or

(iv)    the entry of a decree of judicial dissolution under Section 18 802 of the Act.

(b)    After dissolution of the Company, the Company shall not terminate until the Company's Certificate of Formation shall have been canceled and the assets of the Company shall have been distributed as provided in Section 10.2 below. Notwithstanding the dissolution of the Company, prior to the termination of the Company as aforesaid, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement.

10.2    <u>Winding Up/Liquidation</u>. Upon dissolution of the Company, except as otherwise provided in this Agreement, the Manager shall liquidate the assets of the Company, apply and distribute the proceeds thereof in accordance with this Section 10.2, and cause cancellation of the Company's Certificate of Formation. As soon as possible after the dissolution event, the Company's independent accountants shall take a full account of the assets and liabilities of the Company and shall prepare a statement setting forth such assets and liabilities. A copy of such statement shall be furnished to each of the Members within ninety (90) days after the dissolution event. Thereafter, the Company shall liquidate its assets as promptly as shall be consistent with obtaining the fair value thereof and as shall be necessary to make the payments and distributions described below in a timely manner. The proceeds of sale of the Company's assets, to the extent thereof, shall be applied and distributed with the following priority:

(a)    <u>First</u>, to the payment of the expenses of liquidation;

(b)     Second, to the payment of the liabilities of the Company other than Member Loans or other debts or obligations of the Company to any Members or any such Member's Affiliates; and

(c)     Finally, the balance, as provided in Section 6.3.

## ARTICLE XI.  BOOKS AND RECORDS, ACCOUNTING, REPORTS, TAX MATTERS MEMBER MEETINGS, FISCAL YEAR, BANKING

11.1     Books and Records. The Manager shall cause to be kept full and accurate books of the Company. All books and records of the Company shall be kept at the principal office of the Property Manager and shall be available at reasonable times upon prior notice for inspection and copying by the Members or their duly authorized representatives. The books of the Company shall be kept in accordance with generally accepted accounting principles, or such other accounting methodology utilized in the financial statements of Sponsor Parties delivered to Preferred Member in connection with the closing of the Mortgage Loan and the Parties' entering into this Agreement.

11.2     Reports. The Manager shall deliver to Preferred Member: (i) copies of all reports and financial statements required to be submitted to the Lender or any other third-party lender, contemporaneously with delivery of such reports and statements to the Lender or such third party lender; (ii) copies of any notices of default from the Lender or any third party lender promptly following receipt thereof; (iii) any written notice related to a material violation of any Legal Requirements and of the commencement by any governmental authority of any proceedings or investigations which relate to compliance with Legal Requirements promptly following receipt thereof; (iv) notice of any material damage or destruction of the Property (in whole or any material part thereof) by fire or other casualty immediately following the occurrence thereof, (v) notice of the commencement of, or the threatened commencement of, any proceeding for the expropriation or condemnation of any Property promptly following the commencement or threat thereof, (vi) notice of any litigation or governmental proceedings pending or, to the extent of it has received written notice thereof, threatened (in writing) against the Company, Property Owner, any other Subsidiary and/or affecting the Property, (vii) any notice of default received from any tenant of the Property, (viii) the reports and information required pursuant to the Asset Management Reporting Form set forth on Exhibit H annexed hereto; (ix) and monthly certifications regarding the status of BI Unit Sales in the form set forth on Exhibit I annexed hereto (the "BI Unit Sales Certification"); and (x) copies of the final closing settlement statement from any BI Unit Sales.

11.3     Fiscal Year. The Fiscal Year of the Company shall be the calendar year.

11.4     Company Funds.

(a)     Property Owner has established an account at Wells Fargo with an account number ending 9698 (the "Property Operating Account"). Property Owner shall deposit or cause to be deposited into the Property Operating Account all rents and other payments under the Master Lease received by or on behalf of Property Owner and any other Rents or payments received by Property Owner. To the extent such obligations and expenses

are not paid by Lender directly from Mortgage Loan reserves, Property Owner shall pay from funds in the Property Operating Account all debt service and escrows and required reserves payable by Property Owner to the Lender pursuant to the Mortgage Loan Documents. By no later than the fifth (5th) day of each calendar month, Property Owner shall make all distributions due owners of Beneficial Interests under the Property Owner Trust Agreement and distribute all remaining funds in the Property Operating Account to IB Subsidiary and IB Subsidiary shall distribute all such funds to the Company by depositing such funds into the Company Operating Account. The funds in the Property Operating Account shall be used solely for the business of Property Owner, and shall be segregated from any other funds. In no event shall Property Owner keep or maintain any accounts other than the Property Operating Account.

(b)     Master Lessee Subsidiary has established an account at Wells Fargo, with an account number ending 5542 (the "Master Lease Operating Account"). Master Lessee Subsidiary shall deposit or cause to be deposited into the Master Lease Operating Account all Rents of the Property received by or on behalf of Master Lessee Subsidiary. Master Lessee Subsidiary shall pay from funds in the Master Lease Operating Account all Operating Expenses of the Property and rents and other payments due Property Owner under the Master Lease. The funds in the Master Lease Operating Account shall be used solely for the business of the Property and Master Lessee Subsidiary, and shall be segregated from any other funds.

(c)     The Company may establish an account (the "Company Operating Account"), which Company Account shall be under the sole dominion and control of Preferred Member. All (i) distributions from any Subsidiary to the Company (including amounts required to be paid and distributed pursuant to Sections 11.4(a) and (b) above), (ii) BI Net Sales Proceeds received by any Subsidiary, (iii) disbursements by Lender from any lockbox or cash management account established by Lender, and (iv) Additional Capital Contributions received by the Company, in each case shall be deposited into the Company Operating Account. Funds in the Company Operating Account shall be used to pay all Preferred Return payments and other amounts due and payable to Preferred Member pursuant to Section 6.1, to hold amounts required to be set aside during such period as reserves pursuant to this Agreement or any other agreements of the Company (approved, where required, by Preferred Member pursuant to Section 8.4), and to hold such other amounts set aside by the Manager (with the approval of Preferred Member pursuant to Section 8.4) for the creation, restoration or increase of commercially reasonable reserves. The funds in the Company Operating Account shall be used solely for the business of the Company and segregated from any other funds. Until the Company establishes the Company Operating Account, all amounts required to be paid to Preferred Member as described in clauses (i), (ii) and (iii) shall be paid directly to Preferred Member (and the Manager shall cause the applicable Subsidiary to make direct payments to Preferred Member). Notwithstanding the foregoing, the Preferred Member shall have the right its sole discretion to require that the Company establish a Company Operating Account.

(d)     In no event shall the Company keep or maintain any accounts other than the Company Operating Account without Preferred Member's prior consent, and in no

event shall any of IB Subsidiary, ST Subsidiary or Master Lessee Subsidiary keep or maintain any bank accounts without Preferred Member's prior written approval.

11.5   No Classification as a Corporation. Neither the Company nor any Member shall file a Form 8832, "Entity Classification Election" or take any other action that would cause the Company to be treated as a "corporation" for federal income tax purposes.

## ARTICLE XII.   REPRESENTATIONS

12.1   Representations by Sponsor Parties. Sponsor Member hereby represents and warrants to Preferred Member that as of the date hereof:

(a)     Except as otherwise disclosed to Preferred Member in writing, there are no actions, causes of action, claims, suits, proceedings, orders, writs, injunctions or decrees pending or threatened against or affecting any Sponsor Party or any Subsidiary, at law or in equity, or before or by any court or any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign that could reasonably be expected to have a material adverse effect upon the Sponsor Party or any Subsidiary, individually, or in the aggregate. No Sponsor Party or Subsidiary is in default with respect to any order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign. To the knowledge of Sponsor Member, each Sponsor Party and each Subsidiary is in compliance in all material respects with all laws applicable to it and its assets.

(b)     Each Subsidiary and each Sponsor Party which is an entity (i) is duly organized, validly existing and in good standing under the laws of the State of its formation and any other jurisdiction in which it is required to register to do business, and (ii) has delivered to Preferred Member complete and correct copies of its organizational documents, current operating agreement or partnership agreement (as applicable) and any other corporate, entity or formation documents.

(c)     Sponsor Member's and each Sponsor Party's consummation of the transactions contemplated in this Agreement and the other Transaction Documents, compliance by it with the terms of the this Agreement and the execution and delivery of the Transaction Documents do not, and will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under or result in the creation of any encumbrance of any kind upon any of its assets under any provision of (i) its organizational documents or operating agreement (with respect to any Sponsor Party which is an entity), (ii) any note, bond, mortgage, indenture, deed of trust, license, lease, contract, commitment or loan or other agreement to which it is a party or by which any of its properties or assets are bound, or (iii) to its knowledge, any statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction applicable to it.

(d)     Preferred Member has been provided a true and complete copy of each of (i) the fully executed Mortgage Loan Documents, (ii) the title insurance policies insuring

Property Owner's title to the Property and the liens of the mortgages which secures the Mortgage Loan, (iii) a current survey of the Property, (iv) any and all environmental and property condition reports obtained by the Company, any Subsidiary or any Sponsor Party, (v) the Subsidiary Governing Agreements and the operating agreement of Sponsor Member, and (vi) the Master Lease.

(e)     A true, correct and complete organizational chart of Property Owner is set forth on Exhibit J attached hereto.

(f)     The proceeds of Preferred Member's Capital Contribution shall be utilized solely for business or investment purposes.

(g)     A true, correct and complete copy of this Agreement has been delivered to the Lender, and the Lender has made the Mortgage Loan with knowledge of this Agreement.

(h)     No Mortgage Loan Default has occurred and is continuing, and there exists no condition which, with the passage of time and/or the giving of notice, could reasonably be expected to result in any Mortgage Loan Default. Property Owner is not in default in any material respects under any construction, architect's, engineer's or other agreement entered into in connection with the Project.

(i)     Exhibit D, sets forth a true, correct and complete list of the Mortgage Loan Documents, and Exhibit G sets forth a true, correct and complete copy of the Initial Operating Budget as of the date of this Agreement.

(j)     None of the Company, Sponsor Member or any Subsidiary nor the assets of any such Persons, are or will become "plan assets" as defined under 29 C.F.R. § 2510.3-101 (as amended by Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended).

12.2     Representations Regarding Brokerage Commissions. Each Member (a) represents and warrants to each other Member that neither it nor its Affiliates have dealt with any brokers, investment bankers, consultants or other third parties who are entitled to receive a commission or compensation in connection with obtaining or arranging Preferred Member's equity investment in the Company or the negotiation or completion of this Agreement and the other transactions described in this Agreement, in all cases except for Triad Real Estate Partners ("Broker"), and (b) subject to the last sentence of this Section 12.2, agrees to indemnify, defend and hold the Company, Property Owner and each other Member harmless from and against any losses for or relating to any claims for commissions or any other fees due in connection with the transactions described in this Agreement and arising or resulting from such Member's actions. Sponsor Member hereby represents and warrant to Preferred Member that Broker will be paid all commissions due and owing with respect to the transactions contemplated by this Agreement out of the proceeds from the Initial PM Capital Contribution pursuant to the Sources and Uses Schedule or as otherwise approved by Preferred Member. Sponsor Member hereby indemnifies and holds harmless each of the Company and Preferred Member from and against any losses,

liabilities, claims or damages resulting from any breach of its representations and warranties set forth in the preceding sentence.

## ARTICLE XIII.  MISCELLANEOUS

13.1    <u>Agreement for Further Execution</u>. The Members agree to sign, swear or acknowledge any certificates or filings required by the laws of the State of Delaware or any other state, to sign, swear or acknowledge any amendment or cancellation of such certificate or filings whether or not such amendment or cancellation is required by law; to sign, swear or acknowledge such other certificates, filings, documents or affidavits of assumed name, trade name or the like (and any amendments or cancellations thereof that may be required for conduct of the Company's business), and to cause the filing of any of the same for record, wherever such filing shall be required by law. This Section 13.1 shall not prejudice or affect the rights of the Members to approve certain amendments to this Agreement as herein provided.

13.2    <u>Amendments</u>. No alteration, modification or amendment of this Agreement shall be made unless in writing and signed (in counterpart or otherwise) by all Members.

13.3    <u>Notices</u>.

(a)    Any notice to be given under this Agreement shall be made in writing and sent by personal delivery, reputable overnight courier or e-mail, addressed as set forth below:

If to Sponsor Member:

NB Equity, LLC
c/o Nelson Partners, LLC
16B Journey
Aliso Viejo, California 92656
Attention: Patrick Nelson
E-Mail: Patrick@nelsonpartners.com

With a copy to:

Nelson Partners, LLC
16B Journey
Aliso Viejo, California 92656
Attention: Legal Department

And with a copy to:

Paul E Mosley, Esq.
620 Newport Center Drive
Suite 1100
Newport Beach, CA 92660
E-mail: pmosley@mosleyllp.com

If to Preferred Member:

>  NB Gathering IX Pref, LLC
>  c/o ORIX RE Holdings, LLC
>  1717 Main Street, Suite 1100
>  Dallas, Texas  75201
>  Attn: Allison Austin
>  E-Mail: Allison.austin@orix.com
>
>  Attn: Stephanie Gause Culpepper
>
>  E-Mail: Stephanie.culpepper@orix.com

With a copy to:

>  Ballard Spahr LLP
>  1735 Market Street, 51st Floor
>  Philadelphia, PA  19103
>  Attention: Jere G. Thompson, Esq.
>  Telephone No.: (215) 864-8501
>  E-Mail: thompsonj@ballardspahr.com

(b)     Any such notice shall be deemed to be delivered, given and received for all purposes (i) as of the date delivered or delivery is rejected, in either case if delivered by personal delivery or by a nationally recognized overnight delivery service, (ii) if sent by e-mail, as of the date of receipt of electronic confirmation of sending, if such confirmation is received prior to 5:30 p.m. Eastern Time on any Business Day, and if received after 5:30 p.m. or on any day other than a Business Day, then as of the next Business Day immediately following. Any delivery by e-mail shall only be deemed effective if an additional copy of such notice is sent by commercial delivery service on the date of e-mail delivery.

(c)     Any Member may change its notice address hereunder by giving notice of such change to the Company and other Members in conformity with this Section 13.3.

13.4     <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware as interpreted by the courts of said State, notwithstanding any rules regarding choice of law to the contrary.

13.5     <u>Binding Nature of Agreement</u>. This Agreement shall be binding upon and inure to the benefit of the Manager, the Members, and their permitted successors and assigns. Notwithstanding the foregoing, except as specifically permitted by this Agreement, neither the Manager nor any Member may delegate to any other Person any right or power to make any decision or to take any action on behalf of, or with respect to, the Company.

13.6     <u>Validity</u>. In the event that all or any portion of any provision of this Agreement shall be held to be invalid, the same shall not affect in any respect whatsoever the validity of the remainder of this Agreement.

13.7    Entire Agreement. This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written.

13.8    Indulgences, Etc. Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and signed by the party asserted to have granted such waiver.

13.9    Execution in Counterparts; Electronic Execution and Delivery. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of such shall together constitute one and the same instrument. An executed signature page of this Agreement delivered by facsimile or as a pdf or similar attachment to an e-mail shall constitute effective delivery of this Agreement with the same force and effect as delivery of an original executed signature page.

13.10    Headings. The section and paragraph headings in this Agreement are for convenience only. They form no part of this Agreement and shall not affect its interpretation.

13.11    Construction. All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires. With respect to terms defined by cross-reference to the Mortgage Loan Documents, such defined terms shall have the definitions set forth in the Mortgage Loan Documents as of the date hereof, and no modifications to the Mortgage Loan Documents shall have the effect of changing such definitions for the purpose of this Agreement unless the Members expressly agree that such definitions as used in this Agreement have been revised or the Members consents to the modification documents in accordance with this Agreement.

13.12    Number of Days. In computing the number of days for the purpose of this Agreement, all days shall be counted, including days which are not Business Days, provided, however, that if the final day of any time period falls on a day which is not a Business Day, then such final day shall be deemed to be the next day which is a Business Day.

13.13    Third Party Beneficiaries. Except as expressly provided in Section 8.9, no provision of this Agreement is intended to benefit any party other than the Members, the Manager, and their permitted successors and assigns in the Company; and no provision hereof shall be enforceable by any other party.

**13.14** <u>WAIVER OF JURY TRIAL</u>. ALL OF THE PARTIES HERETO, UPON ADVICE OF THEIR RESPECTIVE COUNSEL, HEREBY KNOWINGLY, INTENTIONALLY, VOLUNTARILY, EXPRESSLY AND MUTUALLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS AGREEMENT; OR (B) IN ANY WAY CONNECTED WITH OR RELATED TO OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO, IN EACH CASH WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE, AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS PROVISION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO A TRIAL BY JURY.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned have set their hands and seals as of the day and year first above written.

**SPONSOR MEMBER**:

**NP EQUITY, LLC**
a Delaware limited liability company

By:   Nelson Partners, LLC,
     a Utah limited liability company,
     its sole member

By:_____
Name:_____
Title:

**PREFERRED MEMBER**:

**NB GATHERING IX PREF, LLC,**
a Delaware limited liability company

By: ORIX RE Holdings, LLC, its sole member

By:_____
     Name:
     Title:

IN WITNESS WHEREOF, the undersigned have set their hands and seals as of the day and year first above written.

**SPONSOR MEMBER:**

**NP EQUITY, LLC**
a Delaware limited liability company

By: Nelson Partners, LLC,
    a Utah limited liability company,
    its sole member

By:_____

Name:_____

Title:

**PREFERRED MEMBER:**

**NB GATHERING IX PREF, LLC,**
a Delaware limited liability company

By: ORIX RE Holdings, LLC, its sole member

By:_____

Name: James Dunn

Title: President

## SCHEDULE 1

LEGAL DESCRIPTION


**PARCEL A:**

LOTS 1 THROUGH 10, BLOCK 3, FOREST PARK, NOW A PART OF THE CONSOLIDATED CITY OF BELLINGHAM, WHATCOM COUNTY, WASHINGTON AS PER THE MAP THEREOF RECORDED IN BOOK 6 OF PLATS, PAGE 14, IN THE AUDITOR'S OFFICE OF SAID COUNTY AND STATE. TOGETHER WITH THE SOUTHWEST HALF OF VACATED ROSE STREET ABUTTING AS VACATED BY CITY OF BELLINGHAM ORDINANCE 5234. EXCEPT THAT PORTION TO THE CITY OF BELLINGHAM AS DESCRIBED IN WHATCOM COUNTY SUPERIOR COURT CASE 80-2-00898-2.

SITUATE IN WHATCOM COUNTY, WASHINGTON.

**PARCEL B:**
LOT 5, BLOCK 81, ACCORDING TO THE MAP OF THE TOWN OF NEW WHATCOM, NOW A PART OF THE CONSOLIDATED CITY OF BELLINGHAM, RECORDED IN VOLUME 1 OF PLATS, PAGE 24, AS FILED FOR RECORD IN THE OFFICE OF THE AUDITOR OF WHATCOM COUNTY, WASHINGTON.

TOGETHER WITH VACATED NORTHEASTERLY 1/2 OF ROSE STREET ABUTTING THERETO AS VACATED IN ORDINANCE NO. 5234.

SITUATE IN THE COUNTY OF WHATCOM, STATE OF WASHINGTON.

APN: 380331 111457 0000/PID# 76904
APN: 380331 134474 0000/PID# 76960

APN: 380331 111457 0000/PID# 76904 and 380331 134474 0000/PID# 76960

## <u>EXHIBIT A</u>

### NAMES AND ADDRESSES OF MEMBERS, CAPITAL CONTRIBUTIONS
### (as of June 22, 2018)

<u>Name and Address:</u>                                                    <u>Capital Contributions:</u>

**SPONSOR MEMBER:**                                          $5,700,000.00
NP Equity, LLC
c/o Nelson Partners, LLC
16B Journey
Aliso Viejo, California 92656

**PREFERRED MEMBER:**                                       $12,500,000.00
NB Gathering IX Pref, LLC
c/o ORIX RE Holdings, LLC
1717 Main Street, Suite 1100
Dallas, TX  75201
Attn: Allison Austin and Stephanie Culpepper

APP060

# **EXHIBIT B**

[Intentionally Omitted.]

## **<u>EXHIBIT C</u>**

[Follows this page.]

C-1

## INITIAL MANAGER RESIGNATION

**NP EQUITY, LLC**
c/o Nelson Partners, LLC
16B Journey
Aliso Viejo, California 92656

_____ _____, 20__

NB Gathering IX Pref, LLC
c/o ORIX RE Holdings, LLC
1717 Main Street, Suite 1100

Dallas , TX  75201

      Re:    NB Gathering JV, LLC, a Delaware limited liability company (the "Company")

Ladies and Gentlemen:

Capitalized terms used, but not otherwise defined herein, shall have the respective meanings ascribed to such terms in that certain Operating Agreement of the Company, dated as of June 22, 2018 (the "Operating Agreement").

In accordance with Section 8.3(b) of the Operating Agreement, the undersigned, NP Equity, LLC, a Delaware limited liability company, being the Manager of the Company, does hereby tender its resignation as the Manager of the Company upon the effective date (the "Effective Date") to be inserted at the top of this letter. Said resignation may not be rescinded or revoked by the undersigned for so long as you are the holder of any Interest in the Company. Said resignation shall be held by you in escrow, and you shall be authorized to insert the Effective Date and release this resignation from escrow without notice to the undersigned, at any time following your delivery to the undersigned and the Members of a Notice of Removal removing the undersigned as Manager for "Cause" in accordance with Section 8.3(b) of the Company Agreement.

      Very truly yours,

      NP Equity, LLC, a Delaware limited liability company

      By: Nelson Partners, LLC, a Utah limited liability company, its sole member

      By: _____
          Name:
          Title:

## EXHIBIT D

### LIST OF MORTGAGE LOAN DOCUMENTS

All documents are dated as of June 22, 2018, unless otherwise specified:

1.      Mortgage Loan Agreement

2.      Mortgage

3.      Multifamily Note, made by Property Owner in favor of Lender

4.      Tenant/Landlord Subordination and Assignment Agreement (Master Lease), made by and between Master Lessee Subsidiary and Property Owner

5.      Guaranty of Recourse Obligations, made by Guarantor in favor of Lender

6.      Environmental Indemnity Agreement, made by Property Owner in favor of Lender;

7.      Master Lessee Estoppel Certificate, made by Master Lessee Subsidiary in favor of Lender;

8.      Assignment of Management Agreement made by and among Property Owner, Master Lessee Subsidiary and Property Manager;

9.      Compliance Agreement for Asbestos Operations and Maintenance Plan, made by Property Owner in favor of Lender;

10.     Compliance Agreement for Lead-Based Paint Operations and Maintenance Plan, made by Property Owner in favor of Lender;

11.     Compliance Agreement for Mold Operations and Maintenance Plan, made by Property Owner in favor of Lender;

12.     UCC-1 Financing Statement, naming Property Owner as debtor, and Lender, as secured party, to be filed in the County in which the Property is located;

13.     UCC-1 Financing Statement, naming Property Owner as debtor, and Lender, as secured party, to be filed with the Secretary of State of Delaware

14.     UCC-1 Financing Statement, naming Master Lessee Subsidiary, as debtor, and Lender, as secured party, to be filed in the County in which the Property is located;

15.     UCC-1 Financing Statement, naming Master Lessee Subsidiary, as debtor, and Lender, as secured party, to be filed with the Secretary of State of Delaware

APP064

# **EXHIBIT E**

## **REQUIRED INSURANCE**

[Follows this Page.]

APP065

**ACORD**™   **EVIDENCE OF COMMERCIAL PROPERTY INSURANCE**

NELSOBRO2

| DATE (MM/DD/YYYY) |
|---|
| 06/05/2018 |

THIS EVIDENCE OF COMMERCIAL PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS EVIDENCE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE ADDITIONAL INTEREST.

| PRODUCER NAME, CONTACT PERSON AND ADDRESS | PHONE (A/C, No, Ext): 801 713-4550 | COMPANY NAME AND ADDRESS | NAIC NO: 25666 |
|---|---|---|---|
| USI Ins Svcs C/L Salt Lake Cty<br>1100 E. 6600 S., Suite 280<br>Salt Lake City, UT  84121 | | Travelers Indemnity Co. of America<br><br>., TX | |

| FAX (A/C, No): 866 729-7172 | E-MAIL ADDRESS: April.Stoker@usi.com | IF MULTIPLE COMPANIES, COMPLETE SEPARATE FORM FOR EACH |
|---|---|---|

| CODE: | SUB CODE: | POLICY TYPE |
|---|---|---|
| AGENCY CUSTOMER ID #:  1422368 | | |

| NAMED INSURED Nelson Brothers Professional Real Estate<br>NB Gathering, DST<br>130 Vantis #160<br>Aliso Viejo, CA 92656 | LOAN NUMBER | POLICY NUMBER KTJCMB9K44464A18 |
|---|---|---|
| | EFFECTIVE DATE 05/30/2018 | EXPIRATION DATE 05/30/2019 | CONTINUED UNTIL TERMINATED IF CHECKED |
| ADDITIONAL NAMED INSURED(S) | THIS REPLACES PRIOR EVIDENCE DATED: |

**PROPERTY INFORMATION (ACORD 101 may be attached if more space is required)**   ☒ BUILDING OR ☐ BUSINESS PERSONAL PROPERTY

LOCATION/DESCRIPTION
900 N Forest Street  Bellingham, WA  98225

**Gather Bellingham Apartments**

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| COVERAGE INFORMATION | PERILS INSURED | BASIC | BROAD | X | SPECIAL | X | **Special** |
|---|---|---|---|---|---|---|---|

COMMERCIAL PROPERTY COVERAGE AMOUNT OF INSURANCE:  $ 453,671,294     **Building**     DED: **$10,000**

| | YES | NO | N/A | | | |
|---|---|---|---|---|---|---|
| ☒ BUSINESS INCOME  ☐ RENTAL VALUE | X | | | If YES, LIMIT: **See Remarks** | Actual Loss Sustained; # of months | |
| BLANKET COVERAGE  **Blanket Bldg, BPP, B** | X | | | If YES, indicate value(s) reported on property identified above: $ **41,200,000** | | |
| TERRORISM COVERAGE | X | | | Attach Disclosure Notice / DEC | | |
|    IS THERE A TERRORISM-SPECIFIC EXCLUSION? | | X | | | | |
|    IS DOMESTIC TERRORISM EXCLUDED? | | X | | | | |
| LIMITED FUNGUS COVERAGE | X | | | If YES, LIMIT: **25,000** | DED: **10,000** | |
| FUNGUS EXCLUSION (IF "YES", specify organization's form used) | X | | | | | |
| REPLACEMENT COST | X | | | | | |
| AGREED VALUE | | X | | | | |
| COINSURANCE | | X | | If YES,    % | | |
| EQUIPMENT BREAKDOWN (If Applicable) | X | | | If YES, LIMIT: **453,671,294** | DED: **10,000** | |
| ORDINANCE OR LAW  - Coverage for loss to undamaged portion of bldg | X | | | If YES, LIMIT: **Included** | DED: **10,000** | |
|    - Demolition Costs | X | | | If YES, LIMIT: **See Remarks** | DED: **10,000** | |
|    - Incr. Cost of Construction | X | | | If YES, LIMIT: **SEEREMARKS** | DED: **10,000** | |
| EARTH MOVEMENT (If Applicable) | X | | | If YES, LIMIT: **5000000** | DED: **See Remark** | |
| FLOOD (If Applicable) | X | | | If YES, LIMIT: **5000000** | DED: **See Remark** | |
| WIND/HAIL INCL  ☐ YES  ☐ NO  Subject to Different Provisions | X | | | If YES, LIMIT: **5000000** | DED: **See Remark** | |
| NAMED STORM INCL  ☐ YES  ☐ NO  Subject to Different Provisions | X | | | If YES, LIMIT: **Included** | DED: **See Remark** | |
| PERMISSION TO WAIVE SUBROGATION IN FAVOR OF MORTGAGE HOLDER PRIOR TO LOSS | X<br>X | | | **Included** | | |

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

**ADDITIONAL INTEREST**

| ☐ CONTRACT OF SALE   ☐ LENDER'S LOSS PAYABLE   ☐ LOSS PAYEE | LENDER SERVICING AGENT NAME AND ADDRESS |
|---|---|
| ☐ MORTGAGEE  X  See Remarks | |
| NAME AND ADDRESS<br>ORIX RE Holdings, LLC<br>1717 Main Street 10th floor<br>Dallas, TX 75201 | |
| | AUTHORIZED REPRESENTATIVE |

S 211877    Page 1 of  3    © 2003-2015 ACORD CORPORATION. All rights reserved.

ACORD 28 (2016/03)    The ACORD name and logo are registered marks of ACORD    AXSBF

ATF060

EVIDENCE OF COMMERCIAL PROPERTY INSURANCE REMARKS – Including Special Conditions (Use only if more space is required)

**Ordinance or Law Coverage:**
**Loss to the Undamaged Portion in any one occurrence Included**
**Demolition in any one occurrence $1,000,000**
**Increased Cost of Construction, in any one occurrence $1,000,000**

**Deductibles:**
**All Other Perils Deductible, per occurrence EXCEPT for the following: $10,000**

**To Business Income Coverage and Rental Value Coverage for which no other deductible is stated, in**
**any one occurrence: 24 Hours**

**By Earthquake, Volcanic Eruption, Landslide and Mine Subsidence:**
**Occurring in California, in any one occurrence: 5% $250,000 Percentage applies per Unit**
**Except at the following locations, in any one occurrence: Percentage applies per Unit 10% $250,000**
**Tropicana, 1256 W 29th St, Los Angeles, CA 90007 and Chateau Sera, 2343 Scarff St, Los Angeles, CA 90007**
**Occurring in High Hazard Earthquake, Volcanic Eruption, Landslide and Mine Subsidence Areas as per MS C6**
**09, in any one occurrence 5% $250,000 Percentage applies per Unit**
**Occurring in Moderate Earthquake, Volcanic Eruption, Landslide and Mine Subsidence Areas as per MS C6 09,**
**in any one occurrence 2% $150,000 Percentage applies per Unit**
**Occurring anywhere else in the Policy Territory where Earthquake, Volcanic Eruption, Landslide and Mine**
**Subsidence coverage applies, in any one occurrence $100,000**

**By Flood:**
**Occurring at Insured Premises within Flood Zone A or Zones prefixed A, as classified under the National**
**Flood Insurance Program, the deductible for each building or structure and its contents separately, will be**
**the amount recoverable under the National Flood Insurance Program when the maximum amount of insurance**
**permitted by the National Flood Insurance Program applies, whether or not the coverage is purchased or**
**maintained. In addition, the following deductible will apply to property not eligible and coverages not**
**available under the National Flood Insurance Program that are covered under this policy and any difference**
**in the valuation between the policies, in any one occurrence $250,000**
**Occurring anywhere else in the Policy Territory where Flood coverage applies, in any one occurrence**
**$100,000**

**By Windstorm:**
**As per MS C223 in any one occurrence occurring in High Hazard Wind area 5% $250,000 Percentage applies per**
**Unit**
**Outside High Hazard Wind area 2% $250,000 Percentage applies per Unit in Texas**
**Occurring in the following States in any one occurrence Colorado & Mississippi 1% $100,000 percentage**
**applies per Unit**
**Occurring at all other premises, in any one occurrence $100,000**

**Extended Business Income or Rental Value at 60 days revised to 365 days**
**Civil Authority 30 days**

**\*\*\* Commercial Property Location Specific Coverages \*\*\***

**Amount of Insurance: 41,200,000**
**Subject of Insurance: Building**
**Valuation: Replacement Cost**
**Deductible: $10,000**

**Amount of Insurance: 400,000**
**Subject of Insurance: Business Personal Property**
**Blanket Limit: 453,671,294**
**Blanket #: 1**
**Blanket Coverage: Blanket Bldg, BPP, BI & EE, Stock**
**Incl. In Blk No. 1**
**Valuation: Replacement Cost**

**EVIDENCE OF COMMERCIAL PROPERTY INSURANCE REMARKS – Including Special Conditions (Use only if more space is required)**

**Replacement Cost: Yes**
**Cause of Loss: Special**
**Deductible: $10,000**

**Amount of Insurance: 3,831,240**
**Subject of Insurance: Business Income**
**Blanket Limit: 453,671,294**
**Blanket #: 1**
**Blanket Coverage: Blanket Bldg, BPP, BI & EE, Stock**
**Incl. In   Blk No. 1**
**Valuation: Replacement Cost**
**Replacement Cost: Yes**
**Cause of Loss: Special**
**Deductible: $10,000**

**\*\*\*\*\*\* Additional Interests \*\*\*\*\*\***
 **Additional Interest# 65**
 **ORIX RE Holdings, LLC**
 **1717 Main Street 10th floor**
 **Dallas, TX 75201**
 **Interest Nature: 3A - Lenders Loss Payee, Mortgagee, & Additional Insured**

This page has been left blank intentionally.

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
6/13/2018

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer any rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: April Stoker | |
|---|---|---|
| USI Ins Svcs C/L Salt Lake Cty 1100 E. 6600 S., Suite 280 Salt Lake City, UT 84121 801 713-4550 | PHONE (A/C, No, Ext): 801 713-4523 | FAX (A/C, No): 866 729-7172 |
| | E-MAIL ADDRESS: april.stoker@usi.com | |
| | INSURER(S) AFFORDING COVERAGE | NAIC # |
| | INSURER A : Liberty Surplus Insurance Corporation | 10725 |
| INSURED Nelson Brothers Professional Real Estate NB Gathering, DST 16-B Journey #200 Aliso Viejo, CA 92656 | INSURER B : | |
| | INSURER C : | |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **COMMERCIAL GENERAL LIABILITY** CLAIMS-MADE [X] OCCUR | X | X | 100029562701 | 05/30/2018 | 05/30/2019 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $100,000 |
| | | | | | | | MED EXP (Any one person) | $5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: POLICY [ ] PRO-JECT [ ] [X] LOC OTHER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $1,000,000 |
| | | | | | | | **Deductib** | $0 |
| | **AUTOMOBILE LIABILITY** ANY AUTO OWNED AUTOS ONLY HIRED AUTOS ONLY SCHEDULED AUTOS NON-OWNED AUTOS ONLY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| A | **UMBRELLA LIAB** [X] OCCUR [X] EXCESS LIAB CLAIMS-MADE | X | | 100024531902 | 05/30/2018 | 05/30/2019 | EACH OCCURRENCE | $5,000,000 |
| | | | | | | | AGGREGATE | $5,000,000 |
| | DED [X] RETENTION $0 | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | N/A | | | | | PER STATUTE OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Certificate holder is listed as additional insured and lenders loss payable for both the General Liability and Umbrella. Waiver of Subrogation applies to General liability and Excess. 30 day notice of cancellation, 10 Days for Non-Payment. Terrorism Included.

Location: Bellingham Student Housing 900 N. Forest Street, Bellingham WA 98225.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| ORIX RE Holdings, LLC 1717 Main Street 10th Floor Dallas, TX 75201 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)    1 of 1    The ACORD name and logo are registered marks of ACORD    APP070
#S23270444/M23203773    AXSBF

This page has been left blank intentionally.

## <u>EXHIBIT F</u>

## SOURCES AND USES SCHEDULE

[Follows this Page.]

APP072

## SOURCES & USES

| SOURCES | | $ Amount | $ / Unit | $ / SF | % Total |
|---|---|---|---|---|---|
| Senior Loan | | 32,280,000 | 242,707 | 675 | 57.3% |
| Equity | | 24,092,000 | 181,143 | 504 | 42.7% |
| Total Sources | | 56,372,000 | 423,850 | 1,179 | 100.0% |

| USES | | $ Amount | $ / Unit | $ / SF | % Total |
|---|---|---|---|---|---|
| Purchase Price | | 48,500,000 | 364,662 | 1,014 | 86.0% |
| Broker Commission | 3.00% | 1,455,000 | 10,940 | 30 | 2.6% |
| Total Acquisition Price | | 49,955,000 | 375,602 | 1,045 | 88.6% |
| Transfer taxes | | 891,000 | 6,699 | 19 | 1.6% |
| Fannie Origination Fee | 0.80% | 259,000 | 1,947 | 5 | 0.5% |
| Loan Fee/Rate Buy Down (1%) | 2.00% | 645,600 | 4,854 | 14 | 1.1% |
| Lender Required Reserve | | 554,500 | 4,169 | 12 | 1.0% |
| Repair and Maintenance Reserve | | 225,000 | | | |
| Property Insurance | | 85,000 | 639 | 2 | 0.2% |
| Property Taxes | | 43,000 | 323 | 1 | 0.1% |
| First Month Int | | 120,000 | 902 | 3 | 0.2% |
| Utility Deposit Fees | | 10,000 | 75 | 0 | 0.0% |
| Legal Fees- RE Acquisition | | 22,500 | 169 | 0 | 0.0% |
| Legal Fees- Legal and Tax  Opinion | | 15,000 | 113 | 0 | 0.0% |
| Legal Fees- Loan | | 75,000 | 564 | 2 | 0.1% |
| Third Party Property Reports | | 17,000 | 128 | 0 | 0.0% |
| Closing Costs and Title Fees | | 26,000 | 195 | 1 | 0.0% |
| Organization Formation Fees | | 2,500 | 19 | 0 | 0.0% |
| Cash Account Set-Up Fees | | 500 | 3.76 | 0 | 0.0% |
| **Total Real Estate Acquisition Costs** | | **52,946,600** | **396,403** | **1,102** | **93.5%** |
| | | | | | |
| **Syndication Costs** | | | | | |
| Sponsor Acquisition Fee | 2.25% | 1,124,000 | 8,451 | 24 | 2.0% |
| Organziation and Offering Costs | | 95,000 | 714 | 2 | 0.2% |
| Legal Fees-Securities | | 39,000 | 293 | 1 | 0.1% |
| Broker Dealer Commissions and Fees | | 2,167,000 | 16,293 | 45 | 3.8% |
| **Total Syndication Costs** | | **3,425,000** | **25,752** | **72** | **6.1%** |
| Total Uses | | 56,372,000 | 422,155 | 1,174 | 99.6% |

## <u>EXHIBIT G</u>

**INITIAL OPERATING BUDGET**

[Follows this Page.]

APP074

| Property Name | GL Name | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Total | PPM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rental Revenue | $ 299,882 | $ 299,882 | $ 299,882 | $ 299,882 | $ 299,882 | $ 299,882 | $ 299,882 | $ 299,882 | $ 299,882 | $ 299,882 | $ 299,882 | $ 299,882 | $ 3,598,585 | |
| | Other Revenue Total | $ 21,132 | $ 21,132 | $ 21,132 | $ 21,132 | $ 21,132 | $ 21,132 | $ 21,132 | $ 21,132 | $ 21,132 | $ 21,132 | $ 21,132 | $ 21,132 | $ 253,580 | 253,580 |
| | Total Revenue | $ 321,014 | $ 321,014 | $ 321,014 | $ 321,014 | $ 321,014 | $ 321,014 | $ 321,014 | $ 321,014 | $ 321,014 | $ 321,014 | $ 321,014 | $ 321,014 | $ 3,852,165 | 3,852,165 |
| Expenses | | | | | | | | | | | | | | | |
| | Payroll | $ 31,937 | $ 31,937 | $ 28,114 | $ 28,114 | $ 28,114 | $ 28,114 | $ 28,114 | $ 28,114 | $ 28,114 | $ 28,114 | $ 28,114 | $ 31,937 | $ 348,840 | 348,840 |
| | Utilities | $ 10,640 | $ 10,640 | $ 10,640 | $ 10,640 | $ 10,640 | $ 10,640 | $ 10,640 | $ 10,640 | $ 10,640 | $ 10,640 | $ 10,640 | $ 10,640 | $ 127,685 | 127,685 |
| | Contract Services | $ 5,843 | $ 5,843 | $ 5,843 | $ 5,843 | $ 5,843 | $ 5,843 | $ 5,843 | $ 5,843 | $ 5,843 | $ 5,843 | $ 5,843 | $ 5,843 | $ 70,115 | 70,115 |
| | Maintenance & Grounds | $ 5,864 | $ 5,864 | $ 5,864 | $ 5,864 | $ 5,864 | $ 5,864 | $ 5,864 | $ 5,864 | $ 5,864 | $ 5,864 | $ 5,864 | $ 5,864 | $ 70,371 | 70,371 |
| | Repairs | $ 615 | $ 615 | $ 615 | $ 615 | $ 615 | $ 615 | $ 615 | $ 615 | $ 615 | $ 615 | $ 615 | $ 615 | $ 7,381 | 7,381 |
| | Turnover Expenses | $ 4,431 | $ 4,431 | $ 4,431 | $ 4,431 | $ 4,431 | $ 4,431 | $ 4,431 | $ 4,431 | $ 4,431 | $ 4,431 | $ 4,431 | $ 4,431 | $ 53,168 | 53,168 |
| | General & Administrative | $ 3,545 | $ 3,545 | $ 3,545 | $ 3,545 | $ 3,545 | $ 3,545 | $ 3,545 | $ 3,545 | $ 3,545 | $ 3,545 | $ 3,545 | $ 3,545 | $ 42,534 | 42,534 |
| | Advertising & Marketing | $ 5,317 | $ 5,317 | $ 5,317 | $ 5,317 | $ 5,317 | $ 5,317 | $ 5,317 | $ 5,317 | $ 5,317 | $ 5,317 | $ 5,317 | $ 5,317 | $ 63,801 | 63,801 |
| | Taxes & Insurance | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 15,000 | 15,000 |
| | Management Fees | $ 9,630 | $ 9,630 | $ 9,630 | $ 9,630 | $ 9,630 | $ 9,630 | $ 9,630 | $ 9,630 | $ 9,630 | $ 9,630 | $ 9,630 | $ 9,630 | $ 115,565 | 115,565 |
| | Total Expenses | $ 79,072 | $ 79,072 | $ 75,249 | $ 75,249 | $ 75,249 | $ 75,249 | $ 75,249 | $ 75,249 | $ 75,249 | $ 75,249 | $ 75,249 | $ 79,072 | $ 914,460 | 914,460 |
| | Net Operating Income | $ 241,942 | $ 241,942 | $ 245,764 | $ 245,764 | $ 245,764 | $ 245,764 | $ 245,764 | $ 245,764 | $ 245,764 | $ 245,764 | $ 245,764 | $ 241,942 | $ 2,937,705 | 2,937,705 |

At closing, the insurance premium of $54,462.14 will be paid to USI Insurance Services, LLC and Sponsor Member will escrow $14,135.80 in a senior lender controlled tax escrow, and $14,160.15 in a senior lender controlled insurance escrow.  the senior loan agreement requires monthly tax escrow of $3,533.95 and monthly insurance escrow of $4,720.05, resulting in an anticipated annual Tax and Insurance expense total of $99,048.07, or $ 42,407.44 and $56,640.63, respectively.

EXHIBIT G

## <u>EXHIBIT H</u>

## ASSET MANAGEMENT REPORTING FORM

ORIX RE Holdings, LLC

### ASSET MANAGEMENT REPORTING FORM - MULTIFAMILY

The following form summarizes the reporting required by ORIX RE Holdings, LLC ("ORIX"). **Please email all documents listed in the Reporting Documents Checklist (below) and this form, signed, to ORIX within 20 days from calendar month-end.**

Email to:  Jim Lingle at *jim.lingle@orix.com*
*214 - 237-2245*

### *Transaction Data*

| | |
|---|---|
| Borrower Name: | |
| Property Name: | |
| Contact Name/Phone/Email: | |

### *Reporting Dates*

| |
|---|
| Reporting Period: (Insert period, e.g. 7/1/2018 to 6/30/2019) |
| Due Date for Monthly Reports: (Insert date, e.g. 20 days from 6/30/2018) |

### *Reporting Documents Checklist*

| *Document* | *Provided (Y/N)* |
|---|---|
| Rent Roll – monthly, include monthly occupancy and average rent. | |
| Aged Delinquency Report | |
| Income Statement – i) trailing twelve months as of respective month-end and ii) current quarter end vs. last year quarter end. | |
| Balance Sheet | |
| Senior Loan Statement (for each month) | |
| Itemized Calculation/Reconciliation of Monthly Cash Flow showing deduction for all reserves, all management fee subordinations, etc. | |
| Leasing Activity Report | |
| Budget (Annually, by November 1st) – itemized by month and quarter | |
| Local Market Report and brief commentary | |
| Capex Report[1] | |

---

[1]     If property is undergoing any repair/renovation please provide a detailed update in the following page.

*The above financial statements and other reporting documents are certified to be true and correct to the best of my knowledge.*

Signature:_____        Date:_____
Name:    [ADD HERE]

### *Capex Report*

*Scope of repairs:*

*Budget for repairs:*

*Amount spent for repairs as of quarter end:*

*Is Project expected to be on budget and on time? (If No, please provide revised budget & timeline. Please explain the reason of the delay and/or cost overruns.)*

*Percentage of repairs completed as of quarter end: ___%*

*Repairs completed (Please list each separate repair in a bullet point):*
Common Areas
- 

Units
- 

*Repairs to complete (Please list each separate repair in a bullet point, indicating the percentage of completion. For units, please specify the number of units that have been turned if applicable.):*
Common Areas
- 

Units
- 

*ORIX Contacts*
*Jim Lingle*
*jim.lingle.com   214-237-2245*

APP077

## EXHIBIT I

### BI UNIT SALES REPORTING FORM

### CERTIFICATION OF DST INTERESTS

This **CERTIFICATION OF DST INTERESTS** (this "**Certification**") is executed as of _____, 20__, by **NELSON PARTNERS, LLC**, a Utah limited liability company ("**Sponsor**"), having an address at 16B Journey, Aliso Viejo, California, for the benefit of **NB GATHERING IX PREF, LLC**, a Delaware limited liability company (together with its successors and assigns, collectively, "**Preferred Member**"), having an address c/o ORIX RE Holdings, LLC, at 1717 Main Street, Suite 1100, Dallas, TX 75201.

### W I T N E S S E T H :

A.     Preferred Member, and NP Equity, LLC, which entity is owned, directly or indirectly, entirely by Sponsor are parties to that certain Limited Liability Company Agreement of NB Gathering JV, LLC (the "**Company**"), dated as of June 22, 2018 (as the same may be amended, modified, supplemented, replaced or otherwise modified from time to time, the "**Operating Agreement**"). Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Operating Agreement.

B.     Preferred Member made a preferred equity investment in the Company in the amount of $12,500,000 (the "**Investment**").

C.     The Company has agreed to pay to Preferred Member BI Net Sales Proceeds in accordance with the Operating Agreement upon the sales of Beneficial Interest in Property Owner (hereinafter defined), which Property Owner is a subsidiary of the Company.

NOW, THEREFORE, TO INDUCE PREFERRED MEMBER TO MAKE SUCH INVESTMENT AND FOR OTHER CONSIDERATION, THE ADEQUACY AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, SPONSOR CERTIFIES AS FOLLOWS:

1.     Beneficial Interest Certification. At the time of execution of the Operating Agreement and Preferred Member's making the Investment, IB Subsidiary was the owner of 100% of all beneficial interests (the "**Beneficial Interests**") in NB Gathering, DST, a Delaware statutory trust ("**Property Owner**"). As of the date hereof, _____% of all Beneficial Interests have been transferred (the "**Transferred Beneficial Interests**") and are no longer owned by IB Subsidiary; the remaining _____% of all Beneficial Interest are owned by IB Subsidiary (the "**Remaining Beneficial Interests**"). The Remaining Beneficial Interests have not been sold, transferred, pledged, hypothecated, alienated or encumbered in any way except as permitted under the "**Mortgage Loan Documents**" (as defined in the Operating Agreement) and under the Operating Agreement. The gross proceeds of sale of the Remaining Beneficial Interests is set at $_____, which will result in BI Net Sales Proceeds of approximately $_____.

APP078

2.      Reliance by Preferred Member. Sponsor acknowledges that Preferred Member is relying on this Certification to pursuant to the terms of the Operating Agreement.

IN WITNESS WHEREOF, Sponsor has caused its duly authorized officer to execute and deliver this Certification as of the date first above written.

Sponsor:

NELSON PARTNERS, LLC,
a Utah limited liability company


By:_____
Name:_____
Title:_____

I-2

**<u>EXHIBIT J</u>**

**PROPERTY ORGANIZATIONAL CHART**

[Follows this Page.]

Nelson Partners – NB Gathering – Structure Chart*

**NB GATHERING, DST**
900 N. Forest Street
Bellingham, Washington

Investors:

TOTAL

* No individual or entity associated with any of the Investors listed in this box holds a 20% or greater direct or indirect interest in NB GATHERING, DST

NB GATHERING, DST
(Owner and Borrower)

(Trust Agreement)

(Master Lease)

NB GATHERING ST, LLC
(Signatory Trustee)

NB GATHERING IB, LLC
(Initial Beneficiary)**
%
of beneficial interests

NB GATHERING LEASECO, LLC
(Master Tenant)

NB GATHERING IX PREF, LLC, a Delaware limited liability company

NB GATHERING JV, LLC, a Delaware limited liability company

ORIX RE Holdings, LLC

NP EQUITY, LLC, a Delaware limited liability company

Nelson Partners LLC, a Utah limited liability company
(Sole Member)

Patrick Nelson
Manager and Member
(100%)

* All entities are formed in Delaware unless otherwise noted
** To hold any beneficial interests in DST not acquired by Investors

APP081

# EXHIBIT A-2

APP082

## GUARANTY

THIS GUARANTY (this "**Guaranty**") is entered into as of June 22, 2018 by PATRICK NELSON, an individual having an address at 37 Anacapa Lane, Aliso Viejo, California 92656 ( "**Guarantor**"), for the benefit of NB GATHERING IX PREF, LLC, a Delaware limited liability company, having an address at c/o ORIX RE Holdings, 1717 Main Street, Suite 1100, Dallas, TX 75201  (together with its successors and/or assigns, "**Preferred Member**").

## RECITALS

WHEREAS:

A.     NP Equity, LLC, a Delaware limited liability company ("**Sponsor Member**") has requested that Preferred Member join it in entering into that certain Operating Agreement, dated as of the date hereof (as the same may be amended, modified, extended, supplemented, restated or replaced from time to time, the "**Operating Agreement**") of NB Gathering JV, LLC, a Delaware limited liability company, (the "**Company**"), pursuant to which Preferred Member will make an investment (the "**Investment**") in the Company in accordance with certain terms and conditions more fully set forth in the Operating Agreement;

B.     The Company was formed for the purposes of acquiring, owning, financing, refinancing, operating, managing, transferring and otherwise dealing with (i) a one hundred percent (100%) limited liability company membership interest in NB Gathering ST, LLC, a Delaware limited liability company ("**ST Subsidiary**"), (ii) a one hundred percent (100%) limited liability company membership interest in NB Gathering LeaseCo, LLC, a Delaware limited liability company ("**Master Lessee Subsidiary**"), and (iii) a one hundred percent (100%) limited liability company membership interest in NB Gathering IB, LLC, a Delaware limited liability company ("**IB Subsidiary**"), which, as of the date hereof, owns all of the Beneficial Interests in NB Gathering DST, a Delaware statutory trust ("**Property Owner**"; each of ST Subsidiary, Master Lessee Subsidiary, IB Subsidiary and Property Owner, is sometimes individually referred to herein as a "**Subsidiary**" and collectively as the "**Subsidiaries**"), which Property Owner is the owner of certain real property and improvements known as: 910 North Forest Street, Bellingham, Washington 98225 and more fully described in the Operating Agreement (the "**Property**");

C.     The Investment shall be governed by (i) the Operating Agreement, and (ii) that certain Environmental Indemnity Agreement, given by Guarantor and Company in favor of Preferred Member (the "**Environmental Indemnity**") (the Operating Agreement, the Environmental Indemnity, this Guaranty and any other documents executed and delivered by any one or more of the Company, Sponsor Member, Guarantor, any Subsidiary, and/or any Property Owner Controlling Party (as defined in the Operating Agreement) in connection with the Investment, collectively, the "**Transaction Documents**"); and

D.     Guarantor collectively (directly or indirectly) owns 100% of the beneficial interests in Sponsor Member, controls Sponsor Member, and otherwise has a financial interest in Preferred Member's making the Investment in the Company.

NOW, THEREFORE, in order to induce Preferred Member to make the Investment in the Company, and in consideration thereof, Guarantor agrees as follows:

1.      All capitalized terms used, but not otherwise defined, in this Guaranty shall have the meanings ascribed to them in the Operating Agreement.

2.      Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Preferred Member, the full and prompt repayment when due, whether by reason of acceleration or otherwise, and at all times thereafter, of all of the following (collectively, the "**Guaranteed Amount**"):

      (a)      The entire Preferred Member's Unreturned Capital Contribution, together with all other Required PM Payments when due, whether by reason of acceleration or otherwise, and at all times thereafter;

      (b)      All amounts which any one or more of the Company, Sponsor Member, Guarantor and/or any Subsidiary is obligated to pay to the Lender or any third party under the Environmental Indemnity; and

      (c)      All costs and expenses, including, without limitation, reasonable fees, disbursements and out-of-pocket expenses of attorneys and expert witnesses, incurred by Preferred Member in enforcing Preferred Member's rights under this Guaranty.

As a separate and distinct obligation hereunder and not as part of the guaranty hereunder, on June 5, 2019, Guarantor shall pay the Guaranteed Amount to Preferred Member in full immediately upon demand, which shall accrue interest at the Default Rate from the date of such demand until the date paid in the event and to the extent the Guaranteed Amount is not paid pursuant to the Operating Agreement.

3.      The obligations of Guarantor under this Guaranty shall survive any foreclosure proceeding, any foreclosure sale, any delivery of any deed in lieu of foreclosure (or any assignment-in-lieu of foreclosure to Lender of the interests in any Subsidiary), and any release of record of any deed of trust securing the Mortgage Loan, and, in addition, the obligations of Guarantor under Section 2(b) and (c) of this Guaranty shall survive any redemption in full of Preferred Member's Interest in the Company or any payment in full of Preferred Member's Unreturned Capital Contribution and the Required PM Payments. Notwithstanding the foregoing, Guarantor shall not be liable for, and this Guaranty shall not apply to, any actions taken by the Company or Property Owner or any Subsidiary following either (x) Preferred Member's removal and replacement of Sponsor Member as Manager of the Company pursuant to Section 8.3 of the Operating Agreement or (y) redemption in full of Preferred Member's Unreturned Capital Contribution.

4.      Guarantor's obligations under this Guaranty are completely independent of the obligations of the Company and except as may be limited by the express terms of this Guaranty, constitute a direct, unconditional guaranty of payment and not merely a guaranty of collection. The liability of Guarantor hereunder shall not be affected by the acceptance of any settlement or compromise offered by the Company or any Other Guarantor (as hereinafter defined) either in liquidation, readjustment, receivership, bankruptcy or otherwise. Nothing contained herein or

otherwise shall prevent Preferred Member from pursuing, concurrently or successively, all other rights and remedies at law or in equity under the Operating Agreement, the Environmental Indemnity, any Transaction Document or otherwise.

5.     (a)     The obligations of Guarantor under this Guaranty shall be performed without demand by Preferred Member and shall be unconditional, irrespective of the genuineness, validity, regularity or enforceability of the Operating Agreement, the Environmental Indemnity, or any other Transaction Document, and without regard to any other circumstance which might otherwise constitute a legal or equitable discharge of a surety or a guarantor. Guarantor hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives the benefit of (i) all principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms, provisions, covenants or conditions of this Guaranty, (ii) any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of sureties and guarantors thereunder, and (iii) diligence, presentment, demand for payment, protest, all notices which may be required by statute, rule of law or otherwise to preserve Preferred Member's rights against Guarantor under this Guaranty, including, but not limited to, notice of acceptance, notice of any amendment of the Transaction Documents, notice of the occurrence of any default or Event of Default (either under this Guaranty or under the Operating Agreement or any other Transaction Document), notice of intent to accelerate, notice of acceleration, notice of dishonor, notice of foreclosure, notice of protest, and notice of the incurring by the Company or Property Owner of any obligation or indebtedness.

(a)     Guarantor hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives all rights to require Preferred Member to (i) proceed against any of the Company, Sponsor Member, Guarantor, any Property Owner Controlling Party, any Subsidiary or any other guarantor of the Company's payment or performance with respect to any Required PM Payments (each of the aforesaid, an "**Other Guarantor**"), (ii) if the Company or any Other Guarantor is a partnership or limited liability company, proceed against any general partner, manager or managing member (as applicable) of the Company or Other Guarantor, (iii) proceed against or exhaust any collateral held by Preferred Member to secure the payment of any Required PM Payments, or (iv) pursue any other remedy Preferred Member may now or hereafter have against the Company or any Other Guarantor, or, if the Company or any Other Guarantor is a partnership or limited liability company, any general partner or manager or managing member (as applicable) of the Company or any Other Guarantor under any Transaction Document or otherwise.

(b)     Guarantor hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives any and all defenses of any and every kind to any action or proceeding brought to enforce this Guaranty or any part of this Guaranty either at law or in equity, except a single defense based on either (i) Guarantor's or the Company's having actually paid the Guaranteed Amount to Preferred Member or (ii) Guarantor's good faith assertion that the act, omission or condition alleged to have given rise to Guarantor's obligation to make any payment under this Guaranty did not in fact occur.  Without limiting the foregoing in any way but merely by way of illustration, Guarantor hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives (x) any and all technical, dilatory or nonmeritorious defenses and (y) all defenses predicated upon:

(i)      Disability on the part of any of the Company, Sponsor Member, Guarantor, any Subsidiary or any Other Guarantor;

(ii)      Any change, alteration, supplementation, amendment or modification of the Operating Agreement, any Subsidiary Governing Agreement, the Environmental Indemnity, or any of the other Transaction Documents, whether with or without the knowledge or consent of Guarantor or any Other Guarantor;

(iii)      Failure, omission, delay, indulgence or forbearance in the enforcement of any term, provision, covenant or condition of any of the Operating Agreement, the Environmental Indemnity or any of the other Transaction Documents including, without limitation, any term for the payment of any Unpaid Preferred Return, Preferred Member's Unreturned Capital Contribution or any other Required PM Payments;

(iv)      Change of ownership of the Property or any partnership interest or membership interest (as applicable) in any of the Company, Sponsor Member, or any Subsidiary;

(v)      [Intentionally Omitted];

(vi)      Acquisition of any additional security or collateral;

(vii)      Substitution of different security or collateral in exchange or exchanges for part or parts of the original or additional security or collateral;

(viii)      The fact that there may be persons other than Guarantor who are solvent and responsible for the payment of the Required PM Payments (whether or not having assumed such obligation in whole or in part in connection with any transfer of any partnership, membership or beneficial interest (as applicable) in any of the Company, Sponsor Member, any Subsidiary or in title to all or any portion of the Property);

(ix)      Any counterclaim, defense, right of set off, or claim which any of the Company, Sponsor Member, Guarantor, any Property Owner Controlling Party, any Subsidiary or any Other Guarantor may have against Preferred Member or the enforceability of any of the Operating Agreement, the Environmental Indemnity or any of the other Transaction Documents;

(x)      The invalidity, irregularity or unenforceability of any of the Operating Agreement, the Environmental Indemnity or any of the other Transaction Documents;

(xi)      Any voluntary or involuntary liquidation, dissolution, sale of all or substantially all of any property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar application or proceeding affecting any of the Company, Sponsor Member, Guarantor, any Subsidiary and/or any Other Guarantor or any of its, his, her or their assets;

APP086

(xii)     Any sale, transfer or conveyance of (i) any membership interest or any direct or indirect legal or beneficial interests in the Sponsor Member, any Subsidiary or Property Owner, or any other assets or property or any interest in any of the foregoing, to any person or entity, or (ii) any of the legal or beneficial interests in the Property or any portion thereof to any person or entity;

(xiii)    [Intentionally Deleted.];

(xiv)     any release of the Company and/or any Other Guarantors by operation of law or by agreement with Preferred Member, from the payment or performance or observance of any of the terms, provisions, covenants or conditions contained in any of the Operating Agreement, the Environmental Indemnity or any of the other Transaction Documents or elsewhere; and/or

(xv)      Any repayment, satisfaction or forgiveness of the Mortgage Loan or any release of Property Owner by operation of law or by agreement with either Lender or from the performance or observance of any of the terms, provisions, covenants or conditions contained in any of the Mortgage Loan Documents or elsewhere.

6.       At any time or from time to time and any number of times, without notice to Guarantor and without affecting the liability of Guarantor, (a) the time for payment of any Unpaid Preferred Return, Preferred Member's Unreturned Capital Contribution or any of the other Required PM Payments may be extended; (b) the time for the Company's performance of or compliance with any term, provision, covenant or condition contained in the Operating Agreement, the Environmental Indemnity or any other Transaction Document, whether presently existing or hereinafter entered into, may be extended or such performance or compliance may be waived; (c) the due date of any Unpaid Preferred Return, Preferred Member's Unreturned Capital Contribution or any of the Required PM Payments may be accelerated as provided in the Operating Agreement, the Environmental Indemnity or any other Transaction Document; (d) the Operating Agreement, the Environmental Indemnity or any other Transaction Document may be modified, extended or amended in any respect by agreement between or among Preferred Member, on the one hand, and any one or more of the Company, Sponsor Member, Guarantor, any and any Subsidiary, on the other hand, including, but not limited to, to provide for an increase in the Investment; and (e) any security for any of the Required PM Payments may be pledged or mortgaged to secure any of the Required PM Payments.

7.       If more than one person executes this Guaranty, the obligations of those persons under this Guaranty shall be joint and several. Preferred Member, in Preferred Member's sole and absolute discretion, may (a) bring suit against Guarantor, or any one or more of the persons or entities comprising Guarantor, and any Other Guarantor, jointly and severally, or against any one or more of them; (b) compromise or settle with any one or more of the persons or entities comprising Guarantor for such consideration as Preferred Member may deem proper; (c) release one or more of the persons or entities comprising Guarantor, or any Other Guarantor, from liability; and (d) otherwise deal with Guarantor and any Other Guarantor, or any one or more of them, in any manner, and no such action shall impair the rights of Preferred Member to collect from Guarantor any amount guaranteed by Guarantor under this Guaranty. Nothing contained in

this paragraph shall in any way affect or impair the rights or obligations of Guarantor with respect to any Other Guarantor.

8.      (a)      Guarantor shall in the aggregate maintain Unencumbered Liquidity (defined as (i) investments in cash or marketable securities (but not stock options unless the same are exercisable by Guarantor), (ii) assets that can be converted to cash within five (5) Business Days and which are not used as collateral for any other obligation, (iii) governmental obligations or (iv) certificates of deposit) of not less than Three Million Dollars ($3,000,000) (the "**Liquidity Standard**"), which Liquidity Standard shall be confirmed by Preferred Member on the date hereof and on an quarterly basis via submission to Preferred Member of updated bank and/or brokerage statements and Financial Statements, in each case certified by Guarantor as true, correct and complete.

(b)      Guarantor shall in the aggregate maintain a minimum Net Worth (defined as the excess of (i) aggregate total assets (exclusive of Guarantor's investment in the Company and Project) over (ii) aggregate total liabilities, including, without limitation, contingent liabilities and estimated tax liabilities) of not less than Twenty Million Dollars ($20,000,000) (the "**Net Worth Requirement**"), which Net Worth Requirement shall be confirmed by Preferred Member on the date hereof and on an quarterly basis via submission to Preferred Member of updated bank and/or brokerage statements and financial statements, in each case certified by Guarantor as true, correct and complete.

(c)      Guarantor shall deliver to Preferred Member Guarantor's (i) Financial Statements for each calendar quarter within thirty (30) days of the end of each calendar quarter, (ii) Financial Statements  for each calendar year within ninety (90) days of the end of each calendar year, and (iii) income tax returns upon filing but not later than the filing deadline plus five (5) Business Days.  "**Financial Statements**" means a balance sheet, statements of cash flow and amounts and sources of contingent liabilities, sources and uses of cash and liquidity verification, cash flow projections, real estate schedules providing details on each individual real property in Guarantor's portfolio, including, but not limited to raw land, land under development, and unless Preferred Member otherwise consents, financial statements for each entity owned or jointly owned by Guarantor.  Without limiting the foregoing and in addition to any financial reports required under the Loan Agreement, within twenty (20) days after the request of Preferred Member, Guarantor shall deliver to Lender such other financial statements and information as Preferred Member may reasonably request related to Guarantor.

9.      If any payment made by or on behalf of the Company (including any payment under this Guaranty) is held to constitute a preference under the Bankruptcy Code or any applicable bankruptcy, insolvency, or similar laws, or if for any reason Preferred Member is required to refund any sums to any of any of the Company, Sponsor Member, Guarantor, any Subsidiary, or any of their respective Affiliates, such amounts shall not constitute a release of any liability of Guarantor under this Guaranty. It is the intention of Preferred Member and Guarantor that Guarantor's obligations under this Guaranty shall not be discharged except by the performance of such obligations and then only to the extent of such performance.

10.      (a)      Any indebtedness owed to any Person comprising Guarantor by any of the Company, Sponsor Member, any direct or indirect owner of Sponsor Member, Guarantor, or any

Subsidiary ("**Guarantor Indebtedness**") now or in the future is and shall be subordinated to all obligations (including, without limitation, all Required PM Payments) of the Company to Preferred Member. Each Person comprising Guarantor acknowledges and agrees that such Guarantor shall not (i) demand or accept any payment or satisfaction of any such Guarantor Indebtedness, and (ii) claim any offset or other reduction of such Guarantor's obligations hereunder because of any such Guarantor Indebtedness; provided, however, that, if Preferred Member so requests, such Guarantor Indebtedness shall be collected, enforced and received by Guarantor as trustee for Preferred Member and be paid over to Preferred Member on account of the any sums or payments (including, without limitation, any Required PM Payments) owed or payable by the Company to Preferred Member, but without reducing or affecting in any manner the liability of Guarantor under the other terms, provisions, covenants and conditions of this Guaranty.

(b)     Guarantor hereby assigns to Preferred Member all right, title, and interest in any Guarantor Indebtedness, including, without limitation, the right to file proof of claim and to vote thereon in connection with any bankruptcy, insolvency, or reorganization proceeding, and including the right to vote on any plan of arrangement or reorganization. Further, each Person or entity comprising Guarantor hereby agrees that following any Event of Default under the Operating Agreement, the Environmental Indemnity, this Guaranty or any of the other Transaction Documents, (i) such Guarantor shall not accept payment from any Other Guarantor by way of contribution on account of any payment made hereunder by Guarantor to Preferred Member, (ii) such Guarantor shall not take any action to exercise or enforce any rights to such contribution, and (iii) if, notwithstanding the prohibition set forth in Section 10(a) hereof, any individual or party comprising Guarantor should receive any payment, satisfaction or security for any Guarantor Indebtedness or for any contribution by any Other Guarantor for payment made hereunder by such Guarantor to Preferred Member, the same shall be delivered to Preferred Member in the form received, endorsed or assigned as may be appropriate for application on account of or as security for the any obligations (including, without limitation, any Required PM Payments) owed or payable by the Company to Preferred Member and, until so delivered, shall be held in trust for Preferred Member as security for any such obligations owed or payable by the Company and any such Other Guarantor to Preferred Member.

11.     Guarantor shall have no right of, and hereby waives any right or claim for, subrogation or reimbursement against the Company, any Member of the Company or any Subsidiary by reason of any payment by Guarantor under this Guaranty, whether such right or claim arises at law or in equity or under any contract or statute.

12.     The occurrence of any of the following events (each, an "**Event of Default**") shall be an Event of Default under this Guaranty:

(i)     the death or incapacity of any individual comprising Guarantor, unless within thirty (30) days following such death or incapacity, the estate representative of such Guarantor acknowledges the obligation evidenced by this Guaranty, and provides a substitute Guarantor meeting the Net Worth Requirement and Liquidity Standard which is acceptable to Preferred Member in its sole discretion, or assurances acceptable to Preferred Member in its sole discretion that there has occurred no material adverse

change in the ability of Guarantor (or his or her estate) to perform his or her obligations under this Guaranty since the last financial statement provided to Preferred Member;

(ii)  a default in the payment of any sums when due under this Guaranty, provided that Guarantor has received written notice that such payment is due and fails to make such payment within five (5) Business Days; or

(iii)  if there should occur and continue at any time one or more conditions or events which, in the reasonable opinion of Preferred Member, has resulted in a material adverse change in the financial condition of Guarantor which is reasonably likely to impair Guarantor's ability to perform Guarantor's monetary obligations under this Guaranty.

13.   Preferred Member may assign Preferred Member's rights under this Guaranty in whole or in part and upon any such assignment all of the terms, provisions, covenants and conditions of this Guaranty shall inure to the benefit of such assignee to the extent so assigned, provided that Preferred Member agrees to notify Guarantor of any such assignment. The terms used to designate any of the parties herein shall be deemed to include the heirs, legal representatives, successors and assigns of such parties; and the term "**Preferred Member**" shall include, in addition to Preferred Member, any lawful owner, holder or pledgee of this Guaranty.

14.   This Guaranty, the Operating Agreement, the Environmental Indemnity and the other Transaction Documents represent the final agreement among Preferred Member, the Company and Guarantor, as applicable, and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements. There are no unwritten oral agreements between the parties. All prior or contemporaneous agreements, understandings, representations, and statements, oral or written, are merged into this Guaranty, the Operating Agreement, the Environmental Indemnity and the other Transaction Documents, as applicable. Neither this Guaranty nor any of this Guaranty's terms, provisions, covenants or conditions may be waived, modified, amended, discharged, or terminated except by an agreement in writing signed by the party against which the enforcement of the waiver, modification, amendment, discharge, or termination is sought, and then only to the extent set forth in that agreement.

15.   Guarantor shall defend, indemnify and hold Preferred Member and Preferred Member Parties harmless from and against any and all loss, cost, expense, liability or obligation (including, without limitation, reasonable attorneys' fees and disbursements actually incurred) that Preferred Member may incur in connection with or related to (a) any breach by Guarantor (or any person or entity constituting Guarantor) of any of the terms, provisions, covenants or conditions of this Guaranty, or (b) the payment of any tax, fee, assessment or other charge imposed by any governmental authority which is attributable to the execution, delivery or filing of this Guaranty.

16.   (a)   This Guaranty shall be construed in accordance with the laws of the State of New York without reference to principles of conflicts of law. If any part of this Guaranty shall not be valid under the laws of the State of New York or under any other applicable law, such part shall be rendered inoperative, but the remainder of this Guaranty shall be enforceable.

**(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST PREFERRED MEMBER OR GUARANTOR ARISING OUT OF OR RELATING TO THIS GUARANTY MAY AT PREFERRED MEMBER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF DALLAS, TEXAS, AND GUARANTOR WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.**

17.     No delay on the part of Preferred Member in exercising any power or right hereunder or under any of the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any power or right hereunder or under any of the Operating Agreement, the Environmental Indemnity, and the other Transaction Documents or the failure to exercise same in any instance preclude other or further exercise thereof or the exercise of any other power or right; nor shall Preferred Member be liable for exercising or failing to exercise any such power or right; the rights and remedies expressly specified hereunder and under any of the Operating Agreement, the Environmental Indemnity, and the other Transaction Documents are cumulative and not exclusive of any rights or remedies which Preferred Member may or shall otherwise have.

18.     Any notice to be given under this Guaranty shall be made in writing and sent by personal delivery, reputable overnight courier or by e-mail, and if, to Guarantor, to the address hereinabove set forth and

With a copy to:

Nelson Brothers Professional Real Estate, LLC
16B Journey
Aliso Viejo, California 92656
Attention: Legal Department

And with a copy to:

Paul E. Mosley, Esq.
620 Newport Center Drive
Suite 1100
Newport Beach, CA 92660
E-mail: pmosley@mosleyllp.com

If to Preferred Member:

NB Gathering IX Pref, LLC
c/o ORIX RE Holdings, LLC
1717 Main Street, Suite 1100
Dallas, Texas  75201
Attn: Allison Austin

E-Mail: Allison.austin@orix.com

Attn: Stephanie Gause Culpepper

E-mail: Stephanie.culpepper@orix.com

With a copy to:

Ballard Spahr LLP
1735 Market Street, 51 Floor
Philadelphia, PA 19103
Attention: Jere Thompson, Esq.
Telephone No.: (215) 864-8999
E-Mail: thompson@ballardspahr.com

Any such notice shall be deemed to be delivered, given and received for all purposes (i) as of the date delivered (or the date delivery is refused), if delivered by personal delivery or by a nationally recognized overnight delivery service, (ii) if sent by e-mail, as of the date of receipt of electronic confirmation of sending, if such confirmation is received prior to 5:30 p.m. Eastern Time on any Business Day, and if received after 5:30 p.m. or on any day other than a Business Day, then as of the next Business Day immediately following. Any delivery by e-mail shall only be deemed effective if an additional copy of such notice is sent by personal delivery or commercial delivery service on the date of e-mail delivery. Any notice party may change its notice address hereunder by giving notice of such change to the other parties in conformity with this Section 18.

19.     Guarantor shall execute, acknowledge and deliver, at Guarantor's sole cost and expense, all further agreements, documents, acts, conveyances, assignments, transfers and/or assurances as Preferred Member may require from time to time in order to further clarify, assure, grant or convey to Preferred Member the rights intended to be granted, now or in the future, to Preferred Member under this Guaranty.

20.     This Guaranty shall be construed without regard to any presumption or other rule requiring construction against the party causing this Guaranty to be drafted.

21.     This Guaranty may be executed in separate counterparts which, when taken together, shall constitute one fully-executed Guaranty.

22.     Guarantor hereby represents, warrants and covenants that:

(i)     This Guaranty is a legal, valid and binding instrument, enforceable against him in accordance with its terms.

(ii)     The most recent financial statements of Guarantor which have been delivered to Preferred Member are true and correct in all material respects and fairly present the financial condition of Guarantor as of such date, and since the date of such financial statements there have been no material adverse changes in such condition or operations.

10

(iii)    There are no actions, suits or proceedings pending or, to the best of his knowledge, threatened against or affecting Guarantor or the properties of Guarantor before any court, governmental department, commission, board, bureau, agency or instrumentality, which would have a material adverse effect on the financial conditions, properties or operations of Guarantor.

(iv)    Guarantor is not a party to any indenture, loan or credit agreement or any lease or other agreement or instrument or subject to any charter or other restriction which would have a material adverse effect on the ability of Guarantor to carry out his obligation under this Guaranty.

(v)    To the best of its knowledge, no information, exhibit or report furnished by Guarantor to Preferred Member in connection with the negotiation of this Guaranty contained, as of the date thereof, or, if there be no such date, the date of furnishing thereof, any material misstatement of fact or omitted to state a material fact or any fact necessary to make the statements contained therein not misleading.

**23.    GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES (I) TRIAL BY JURY IN ANY ACTION OR PROCEEDING COMMENCED BY PREFERRED MEMBER AGAINST GUARANTOR UNDER THIS GUARANTY AND (II) THE RIGHT, IN ANY SUCH ACTION OR PROCEEDING, TO INTERPOSE DEFENSES, CLAIMS, COUNTERCLAIMS (OTHER THAN COMPULSORY COUNTERCLAIMS) OR SETOFFS OF ANY KIND OR DESCRIPTION.**

24.    With respect to the definition of "Guarantor", except where the context otherwise provides, (i) any representations contained herein of Guarantor shall be applicable to each Guarantor, (ii) any affirmative covenants contained herein shall be deemed to be covenants of each Guarantor and shall require performance by all Guarantors, (iii) any negative covenants contained herein shall be deemed to be covenants of each Guarantor, and shall be breached if any Guarantor fails to comply therewith, (iv) the occurrence of any Event of Default with respect to any Guarantor shall be deemed to be an Event of Default hereunder, and (v) any indebtedness and all other obligations of Guarantor to Preferred Member shall be joint and several and shall be deemed to be the indebtedness and obligations of all Guarantors, or any indebtedness or obligations of any one of them.

25.    Notwithstanding anything contained in this Guaranty, the rights of Preferred Member hereunder are subject and subordinate to the Mortgage Loan, the Mortgage Loan Documents and the rights of the Lender thereunder.

[The Remainder of this Page is Intentionally Left Blank.]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first set forth above.

GUARANTOR:

PATRICK NELSON, an individual

*[Signature Page to Preferred Equity Guaranty]*

# EXHIBIT A-3

APP095

## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT (the "Agreement") is made and entered into effective as of the 29th day of August, 2019 (the "Effective Date"), upon the date of the full execution hereof (the "Execution Date"), by and among NP EQUITY, LLC, a Delaware limited liability company ("Sponsor Member"); PATRICK NELSON, an individual ("Guarantor"), and NB GATHERING IX PREF, LLC, a Delaware limited liability company ("ORIX" or "Preferred Member").

RECITALS:

A.      Preferred Member and Sponsor Member are the sole members of NB GATHERING JV, LLC, a Delaware limited liability company (the "Company"), and parties to that certain Operating Agreement of the Company, dated as of June 22, 2018 (the "Company Operating Agreement"). *Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to such terms in the Company Operating Agreement.*

B.      Pursuant to the terms of the Company Operating Agreement, Preferred Member previously made the Initial PM Capital Contribution to the Company, and Preferred Member is to receive a Preferred Return on its Unreturned Capital Contribution, with a portion of such Preferred Return payable as a Monthly Current Preferred Return and a portion accrued as a Monthly Accrual Preferred Return.  The Required Redemption Date was June 22, 2019, and on the Required Redemption Date, the Company was obligated to pay to Preferred Member all Required PM Payments, which includes the entire outstanding balance of Preferred Member's Unreturned Capital Contribution together with any Unpaid Preferred Return and the Exit Fee.

C.      As an inducement to Preferred Member making the Initial PM Capital Contribution, Guarantor executed and delivered to Preferred Member, that certain Guaranty, dated as of June 22, 2018 (the "Guaranty").  Pursuant to the terms of the Guaranty, Guarantor guaranteed to Preferred Member the full and prompt payment when due of the "Guaranteed Amount" (as defined in the Guaranty) which includes, *inter alia*, the payment of all Required PM Payments when due.  The Guaranty also obligates, as a separate and distinct obligation, Guarantor to pay the Guaranteed Amount to Preferred Member on June 22, 2019.

D.      The Company, Sponsor Member, Guarantor and Preferred Member hereby acknowledge and confirm that payment of the Required PM Payments was due in full on June 22, 2019 pursuant to the terms of the Company Operating Agreement, and payment of the Guaranteed Amount was due in full on June 22, 2019, and further, the Company has failed to pay the Required PM Payments to Preferred Member as due and payable, and Guarantor has failed to pay the Guaranteed Amount to Preferred Member as due and payable.  By letter dated June 26, 2019, Preferred Member notified Sponsor Member and Guarantor of the Company's failure to pay the Required PM Payments on the Required Redemption Date and that such failure constituted a Trigger Event pursuant to Section 7.1 of the Operating Agreement, and the failure of Guarantor to pay the Guaranteed Amount on June 22, 2019, and accordingly, Preferred Member made demand of both Sponsor Member and Guarantor for payment in full of the Required PM Payments and all obligations due pursuant to the Company Operating Agreement and Guaranty.  By letter dated July 25, 2019, Preferred Member notified Sponsor Member and Guarantor that due to the Company's

failure to pay all of the Required PM Payments in full, as and when due, and failure of Guarantor to pay the Guaranteed Amount on June 22, 2019, Preferred Member was reserving any and all of its rights under the Company Operating Agreement and Guaranty. The Company's failure to pay Preferred Member the Required PM Payments on the Required Redemption Date and the failure of Guarantor to pay Preferred Member the Guaranteed Amount on June 22, 2019 are herein collectively referred to as the "Maturity Default".

      E.      As of August 29, 2019, the total amount of the Required PM Payments due and payable was $10,423,509.02, and consisted of the following: (i) Preferred Member's Unreturned Capital Contribution in the amount of $9,251,602.95; (ii) the Unpaid Preferred Return in the amount of $1,060,390.04; (iii) the Exit Fee in the amount of $92,516.03; and (iv) Collection Costs in the amount of $18,000. The Required PM Payments due and payable *plus* other existing and continuing amounts now due and hereafter arising pursuant to the Company Operating Agreement, the Guaranty and this Agreement including, without limitation, attorneys' fees and expenses, Default Interest and other charges and fees are collectively the "Obligations".

      F.      The Company, Sponsor Member and Guarantor have requested that ORIX forbear from exercising its remedies as a result of the Maturity Default occurring under the Company Operating Agreement and Guaranty. ORIX is willing to forbear for a limited time on the terms and conditions set forth herein.

      NOW, THEREFORE, in consideration of the foregoing and the mutual promises, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company, Sponsor Member, Guarantor and ORIX hereby agree as follows:

      1.      Acknowledgments. The parties hereby make the following acknowledgments:

      (a)      The Company, Sponsor Member, Guarantor and ORIX hereby acknowledge the accuracy of the foregoing recitals and such recitals among the parties and are hereby adopted and made a part hereof;

      (b)      The Company, Sponsor Member and ORIX hereby acknowledge that (i) the Company, Sponsor Member and ORIX executed the Company Operating Agreement in the places where their respective names are noted therein, on the dates indicated therein; and (ii) the Company and Sponsor Member are properly obligated under the Company Operating Agreement and the terms of this Agreement and such obligations are not subject to any defenses, setoffs or counterclaims against ORIX;

      (c)      The Guarantor and ORIX hereby acknowledge that (i) the Guarantor executed and provided certain guaranties under the Guaranty delivered in connection with the Company Operating Agreement on the dates indicated therein; and (ii) the Guarantor is properly obligated under the Guaranty and such obligations are not subject to any defenses, setoffs or counterclaims against ORIX;

      (d)      The Company, Sponsor Member, and Guarantor each acknowledge that ORIX has employed outside counsel for advice and other representation and has incurred and will continue to incur legal and/or other costs and expenses in connection with the Company Operating

Agreement and Guaranty and recovery of the Obligations owed to ORIX and that such costs and expenses constitute Obligations of the Company and Guarantor;

(e)     The Company, Sponsor Member, and Guarantor each acknowledge the Maturity Default; and

(f)     The Company, Sponsor Member, and Guarantor each acknowledge that the amount of the Obligations is correct and reflects the proper amounts due to ORIX pursuant to the Company Operating Agreement and Guaranty and such Obligations are not subject to any deductions, defenses, setoffs or counterclaims against ORIX and must be paid in full.

2.     <u>Representations, Warranties and Covenants</u>. The Company, Sponsor Member and Guarantor each hereby represents, warrants and covenants to ORIX as follows:

(a)     After giving effect to this Agreement, all of the representations and warranties of the Company, Sponsor Member and Guarantor in the Company Operating Agreement and Guaranty, as applicable, are true and complete in all material respects with the same force and effect as if made on the Effective Date;

(b)     Except for the Maturity Default, no default, violation or other Trigger Event under the Company Operating Agreement or Guaranty, and no event which, with the passage of time or giving of notice, or both, could constitute any such default, violation or Trigger Event, has occurred and is continuing;

(c)     After giving effect to this Agreement, no representation or warranty by the Company, Sponsor Member and Guarantor contained in this Agreement or any document, agreement or instrument to be executed or delivered herewith contains any untrue statements of material fact or omits to state a material fact necessary to make such representation or warranty not misleading in light of the circumstances under which it was made;

(d)     The execution, delivery and performance of this Agreement, and any document, agreement or instrument to be executed or delivered herewith, by each of the Company, Sponsor Member and Guarantor will not result in the violation of any mortgage, indenture, material contract, instrument, agreement, organizational document, judgment, decree, order, statute, rule or regulation to which the Company, Sponsor Member or Guarantor is subject or by which the Company's, Sponsor Member's, and Guarantor's respective property is bound;

(e)     This Agreement has been, and all documents and instruments which may be executed by the Company, Sponsor Member and Guarantor under the terms and conditions hereof shall be, duly and validly executed by the Company, Sponsor Member and Guarantor, and shall constitute the legal, valid and binding obligations of the Company, Sponsor Member and Guarantor, enforceable against the Company, Sponsor Member and Guarantor in accordance with the applicable terms;

(f)     The Company, Sponsor Member and Guarantor have obtained any necessary consents or approvals and has the individual or corporate power and authority to execute, deliver and carryout the terms and provisions of this Agreement and the transactions contemplated

APP098

hereby and has taken or caused to be taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(g) The Company Operating Agreement and Guaranty, except as, and solely to the extent that the same may be, modified by this Agreement, remain in full force and effect and remain the valid and binding obligations of the Company, Sponsor Member and Guarantor, as applicable, enforceable against the Company, Sponsor Member and Guarantor in accordance with the applicable terms;

(h) Except as otherwise specifically provided herein, the execution, delivery, performance, and effectiveness of this Agreement shall not operate nor be deemed to be or construed as a waiver (i) of any right, power or remedy of ORIX under the Company Operating Agreement or Guaranty, or (ii) of any term, provision, representation, warranty or covenant contained in the Company Operating Agreement or Guaranty. Further, none of the provisions of this Agreement shall constitute, be deemed to be, or construed as, a waiver of any default, or Trigger Event under either the Company Operating Agreement or Guaranty, whether occurring before or after the date hereof;

(i) The Company Operating Agreement and Guaranty, and the obligations set forth therein, shall be subject to the terms of this Agreement and shall be further altered only to the extent a modification is reduced to a written agreement and signed by each party; and

(j) ORIX is under no duty or obligation of any kind or nature to grant the Company, Sponsor Member or Guarantor any additional period of forbearance beyond the Forbearance Period (hereafter defined).

The Company, Sponsor Member, and Guarantor hereby expressly acknowledge and confirm that the foregoing representations and warranties are being specifically relied upon by ORIX as a material inducement to ORIX to enter into this Agreement and to forbear from exercising ORIX's rights and remedies, other than its right to seek payment in accordance with the terms of this Agreement and certain out-of-pocket expenses, and the rights and remedies described herein, with respect to the Maturity Default. The foregoing representations and warranties shall survive the execution and delivery of this Agreement and the documents, agreements and instruments to be executed or delivered herewith.

3. Conditions Precedent to Effectiveness of Agreement. In addition to all other conditions and agreements set forth herein, this Agreement shall not be effective until it is fully executed and delivered and all of the following have occurred:

(a) The Company, Sponsor Member and Guarantor shall have paid to ORIX, in immediately available funds, an extension fee in the amount of $50,773.10 (.50% of the Required PM Payments as of the Effective Date) (the "Extension Fee"), due upon the full execution of the Agreement on the Execution Date, which Extension Fee shall be non-refundable and fully earned when paid;

(b) The Company, Sponsor Member and Guarantor shall have paid to ORIX, in immediately available funds, all moneys currently held by the Company (the "Existing Funds") together with a full accounting and detailed back up information in form and content satisfactory

to ORIX, which, among other things, identified the sources of the Existing Funds. ORIX shall apply the Existing Funds against the Obligations, but such payment shall not be credited against any payments due under Section 4(b) of this Agreement.

        (c)     The Company, Sponsor Member and Guarantor shall have paid certain legal fees and expenses of ORIX incurred in respect of the Maturity Default, through the Effective Date in the amount of $18,000.00, with any remaining and ongoing amounts paid subsequently (the "Due and Payable Legal Fees"). The Company, Sponsor Member and Guarantor shall remain liable for all fees, expenses and other obligations becoming due after the Effective Date pursuant to the Company Operating Agreement and Guaranty, as applicable; and

        (d)     The Company shall deliver to ORIX in accordance with the terms of Section 11.2 of the Company Operating Agreement the monthly BI Unit Sales Certifications for the months of July and August, 2019, and shall continue to deliver to ORIX the BI Unit Sales Certifications for all future months until all the Obligations are satisfied in full; and

        (e)     The Company, Sponsor Member and Guarantor shall have executed and delivered this Agreement to ORIX, together with any and all documents necessary to satisfy the terms and conditions of the Agreement.

        4.     Forbearance of ORIX/Required Payments. ORIX shall forbear from the exercise of its rights and remedies pursuant to the Company Operating Agreement or Guaranty subject to the terms of this Agreement for the period (the "Forbearance Period") from and after the Effective Date through November 22, 2019 (which date shall herein be referred to as the "Extended Required Redemption Date"), as subject to termination pursuant to Section 6 below, solely in accordance with the following terms and subject to the following conditions:

        (a)     The Company, Sponsor Member and Guarantor shall remain current on the payment to ORIX of the Monthly Current Preferred Return as and when due under the Company Operating Agreement and the performance of required obligations pursuant to the Company Operating Agreement, the Guaranty and this Agreement, including, without limitation, the delivery of all reports required to be delivered to ORIX in accordance with Section 11.2 of the Company Operating Agreement, from and after the Effective Date;

        (b)     On September 23, 2019 and October 22, 2019 (each a "Mandatory Paydown Date"), the Company, Sponsor Member and Guarantor shall cause to be paid to ORIX, a sum of money which, when added to the BI Net Sales Proceeds paid by Company to ORIX in the interim period between the preceding Mandatory Paydown Date and the current Mandatory Paydown Date, shall equal the minimum sum of Three Million Dollars ($3,000,000) (each a "Minimum Paydown Amount"), and on the Extended Required Redemption Date, the Company, Sponsor Member and Guarantor shall cause to be paid to ORIX all remaining amounts of the Obligations due and payable to ORIX in accordance with the terms of this Agreement (the "Final Payment Amount"). If required to pay the Minimum Paydown Amount, the Company, Sponsor Member and or Guarantor shall make an additional Capital Contribution to the Company to provide sufficient sums for the Company to be able to make the Minimum Paydown Amount on each Mandatory Paydown Date. The BI Net Sales Proceeds paid by the Company to ORIX shall

correspond to and be consistent with the report of sales set forth on the Monthly BI Unit Sales Certifications.

(c)    If however, the Company, Sponsor Member or Guarantor fails to pay any of the Minimum Paydown Amounts on a Mandatory Paydown Date as and when required in Section 4(b) above, the Preferred Return payable to ORIX under the Company Operating Agreement, and guaranteed by Guarantor under the Guaranty, shall automatically increase as of such Mandatory Paydown Date by an amount equal to one percent (1%) (100 basis points), and such increase to the Preferred Return shall remain in effect from such Mandatory Paydown Date through and including the earlier of the Extended Required Redemption Date or the payment of all Required PM payments in full;

(d)    Attorneys' fees and any other professional fees as well as all expenses, costs, charges and other fees incurred by counsel, other professionals, and ORIX in connection with the Company Operating Agreement, Guaranty or this Agreement and the recovery of amounts owed from the Company, Sponsor Member and Guarantor, shall be payable, jointly and severally, on demand, by the Company, Sponsor Member and Guarantor to ORIX; and

(e)    The Company, Sponsor Member and Guarantor shall comply with all of the terms and conditions of this Agreement. Except as otherwise specifically provided herein, the Company, Sponsor Member and Guarantor shall comply with all of the terms and conditions of the Company Operating Agreement, Guaranty and this Agreement. The Company shall remain liable for all fees, expenses and other obligations pursuant to the Company Operating Agreement.

5.    Application of Company Operating Agreement and Guaranty. Upon satisfaction of the conditions precedent hereto and full execution hereof, the Company, Sponsor Member, Guarantor and ORIX agree that *during the Forbearance Period only*, the parties shall proceed as if either the Required Redemption Date had not occurred or Guarantor's obligation to pay the Guaranteed Obligations on June 22, 2019, and all Default Interest relating thereto, had not yet occurred. Other payments, charges and obligations due pursuant to the Company Operating Agreement and Guaranty shall continue to apply and be due and payable and accrue without waiver of the Maturity Default. The Company Operating Agreement and Guaranty shall be subject to the terms and conditions of this Agreement, and are deemed amended and modified as of the Effective Date as necessary to effect the terms and conditions of this Agreement.

6.    Termination of Forbearance/Default.

(a)    ORIX shall forbear from the exercise of its rights and remedies (in accordance with the provisions of Section 4 hereof) until the expiration of the Forbearance Period (which expires November 22, 2019), upon which ORIX may pursue all available rights and remedies) or the occurrence of any of the following:

(i)    any default or Trigger Event arising under either the Company Operating Agreement or Guaranty after the date hereof (without notice or cure periods);

(ii)    default in performance by the Company, Sponsor Member or Guarantor under any provisions of this Agreement (without notice or cure periods);

(iii)   any default in making *any* payment due to the ORIX (without notice or cure periods) under this Agreement or the Company Operating Agreement or Guaranty;

(iv)   any warranty, representation, statement, report, financial statement or certificate, made or furnished to ORIX by or on behalf of the Company, Sponsor Member or Guarantor proves to have been false or knowingly inaccurate in any respect when made or furnished; or

(v)   any default in any other non-payment or non-performance obligation due hereunder after written notice from ORIX to the Company, Sponsor Member and Guarantor, and the expiration of ten (10) days following the date of mailing of such notice without the Company, Sponsor Member or Guarantor having effected a cure thereof.

(b)   Upon the expiration of the Forbearance Period or the termination of the Forbearance Period and the applicable forbearance of ORIX resulting from an occurrence set forth in Section 6(a) above, ORIX may exercise all or any one of the rights, powers, privileges and other remedies available to ORIX against the Company, Sponsor Member or Guarantor under the Company Operating Agreement, Guaranty and this Agreement or at law or in equity at any time and from time to time thereafter whether or not ORIX shall have commenced any collection action, or other litigation for enforcement of its rights and remedies under the Company Operating Agreement or Guaranty. The parties hereto agree that in the event of an occurrence set forth in Section 6(a) above, this Agreement does not, in any manner, limit any rights which ORIX had, or now has, to institute legal proceedings or take any other action against the Company, Sponsor Member and Guarantor for the purpose of (i) obtaining copies of all past and present reports required to be delivered to ORIX in accordance with the terms of Section11.2 of the Company Operating Agreement, including, without limitation, the monthly BI Unit Sales Certifications, or (ii) collecting the Obligations and any additional obligations owed to ORIX.

7.   Release.   EACH OF THE COMPANY, SPONSOR MEMBER AND GUARANTOR HEREBY REPRESENT AND WARRANT TO ORIX, AND AGREE WITH ORIX, THAT THEY HAVE NO CLAIM OR OFFSET AGAINST, OR DEFENSE OR COUNTERCLAIM TO, ANY OF THE OBLIGATIONS TO ORIX AND, IN CONSIDERATION OF THIS AGREEMENT, EACH THE COMPANY, SPONSOR MEMBER AND GUARANTOR, ON THEIR OWN BEHALF OF AND ON BEHALF OF THEIR PARTNERS, AFFILIATES, SUBSIDIARIES, OFFICERS, DIRECTORS, AGENTS, TRUSTEES, SUCCESSORS, PREDECESSORS, MEMBERS, ATTORNEYS, HEIRS AND ASSIGNS (COLLECTIVELY FOR THE PURPOSES OF THIS SECTION 7, THE "RELEASORS"), DO HEREBY RELEASE, CANCEL, FORGIVE AND FOREVER DISCHARGE ORIX, EACH OF ITS PREDECESSORS, PARENT CORPORATIONS, HOLDING COMPANIES, SUBSIDIARIES, AFFILIATES, DIVISIONS, SUCCESSORS AND ASSIGNS, AND ALL OFFICERS, DIRECTORS, EMPLOYEES, REPRESENTATIVES, ATTORNEYS, AGENTS AND SHAREHOLDERS THEREOF (COLLECTIVELY FOR THE PURPOSES OF THIS SECTION 7, THE "RELEASED PARTIES"), FROM ANY AND ALL ACTIONS, CAUSES OF ACTION, JUDGMENTS, DEBTS, CLAIMS, DEMANDS, DAMAGES, LOSSES, EXPENSES, OBLIGATIONS, LIABILITIES, CONTROVERSIES AND EXECUTIONS, OF ANY KIND OR

APP102

NATURE WHATSOEVER, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR NOT, DIRECT OR INDIRECT, AT LAW OR IN EQUITY, ARISING OUT OF OR BY REASON OF OR RELATED TO THE OBLIGATIONS, THE COMPANY OPERATING AGREEMENT OR GUARANTY (INCLUDING THIS AGREEMENT IN ALL REFERENCES THERETO) AND FURTHER INCLUDING, BUT NOT LIMITED TO, THOSE MATTERS RELATED TO THE OBLIGATIONS, THE PREFERRED MEMBER'S CAPITAL CONTRIBUTION, THE COMPANY OPERATING AGREEMENT AND/OR THE GUARANTY, WHICH PERTAIN TO ANY MATTER OR THINGS DONE, OMITTED, OR SUFFERED TO BE DONE BY ANY OF THE RELEASED PARTIES, OR WHICH HAVE ARISEN, OR MAY HAVE ARISEN, OR SHALL HEREAFTER ARISE BY REASON OF ANY MATTER, CAUSE OR THING WHATSOEVER, FROM THE FIRST DAY OF THE WORLD, TO AND INCLUDING THE LATER OF THE EXECUTION DATE OR THE EFFECTIVE DATE, AND EACH OF THE RELEASORS DOES SPECIFICALLY WAIVE ANY CLAIM OR RIGHT TO ASSERT ANY CAUSE OF ACTION OR ALLEGED CAUSE OF ACTION OR CLAIM OR DEMAND AGAINST THE RELEASED PARTIES WHICH HAS, THROUGH OVERSIGHT OR ERROR, INTENTIONALLY OR UNINTENTIONALLY, OR THROUGH A MUTUAL MISTAKE, BEEN OMITTED FROM THIS AGREEMENT, BUT IS RELATED TO THE SUBJECT MATTER HEREOF. The Company, Sponsor Member or Guarantor each hereby confirm that they have all right, power and authority to grant the releases to the Released Parties as provided in this Section 7, and that the Company, Sponsor Member or Guarantor have not transferred, assigned or conveyed any right, title or interest to the matters subject to release hereby to any other person. ORIX would not agree to enter into this Agreement but for the provisions set forth in this Section 7. The Company, Sponsor Member or Guarantor confirm that they have agreed to the provisions of this Section 7 of their own volition, with full knowledge of the extent and effect of the various releases and waivers granted by this Section and of the importance to ORIX of these waivers and releases and after having had the opportunity to discuss this matter with counsel of their choice. **The foregoing release shall be effective immediately upon execution of this Agreement and shall remain in full force and effect notwithstanding the unfullfillment of the conditions precedent contained in Section 3 or other conditions contained elsewhere in this Agreement or the later termination of this Agreement for any reason.**

8.    Confirmation and Waiver of Guarantor.  Guarantor, as guarantor and in any other capacities, by executing this Agreement, hereby assents to the terms and conditions of this Agreement and ratifies and reaffirms the terms and conditions of the Guaranty, which Guaranty shall remain in full force and effect subject to the terms of this Agreement.  Guarantor hereby waives any defense to his obligations under the Guaranty based upon or arising out of (i) any modifications to the Company Agreement or the Require PM Payments as provided herein, and (ii) any act or omission of ORIX or its agents occurring prior to and including the later of the Execution Date or the Effective Date.  Notwithstanding any language contained in the Guaranty, Guarantor, as guarantor and in any other capacities, to the extent permitted by law, waives any claim or other right which Guarantor might now have or hereafter may acquire against any the Company or Sponsor Member, or any other obligor of the Obligations, which arises from the existence or performance of each Guarantor's liability or other obligations under the Guaranty, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution, indemnification, and any right to participate in any claim or remedy of ORIX against any the Company or Sponsor Member, whether or not such claim, remedy, or right arises in equity, or under contract, statute, or common law.

9.     No Additional Funding/Forbearance Period.  ORIX shall not make any additional Capital Contribution to the Company, whether pursuant to the Company Operating Agreement, this Agreement or on any other basis.  ORIX is under no duty or obligation of any kind or nature to grant the Company, Sponsor Member or Guarantor any additional period of forbearance beyond the Forbearance Period.

10.     Power of Attorney.  The Company, Sponsor Member and Guarantor each hereby irrevocably constitutes and appoints ORIX as the true and lawful attorney-in-fact for said parties in each of the Company's, Sponsor Member's or Guarantor's name, place and stead, with full power of delegation and substitution, to make execute, and deliver any and all instruments, papers and documents, which shall become necessary, proper, convenient or desirable to effectuate ORIX's rights and remedies.

11.     Hold Harmless/Indemnification.  In addition to any other obligations of indemnification, the Company, Sponsor Member and Guarantor each hereby assume responsibility and liability for, and hereby agree to hold harmless and indemnify ORIX from and against, any and all, by way of example but without limitation, liabilities, demands, obligations, injuries, costs, damages (direct, indirect or consequential), awards, loss of interest, principal or any portion of the Obligations, charges, expenses, payments of money and attorneys' fees, incurred or suffered, directly or indirectly, by ORIX and/or asserted against ORIX, by any person or entity whatsoever, including the Company, Sponsor Member or Guarantor, without limitation, arising out of or related to the Company Operating Agreement, the Guaranty, this Agreement or any document executed in connection herewith, or the relationship between or among the parties hereto, or the exercise of any right or remedy for which ORIX may be liable, for any reason whatsoever except for ORIX's own acts of gross negligence or willful misconduct.  **The foregoing hold harmless and indemnification obligations shall be effective immediately upon execution of this Agreement and shall remain in full force and effect notwithstanding the unfullfillment of the conditions precedent contained in Section 3 or other conditions contained elsewhere in this Agreement or the later termination of this Agreement for any reason.**

12.     Lender Costs/Attorneys' Fees.  The Company, Sponsor Member and Guarantor shall pay to ORIX prior to the Effective Date of this Agreement the Due and Payable Legal Fees. Following such Effective Date, the Company, Sponsor Member and Guarantor shall reimburse ORIX promptly upon demand for all costs and expenses, expended or incurred by ORIX after the Effective Date in connection with: (a) the negotiation and preparation or enforcement of this Agreement and the Company Operating Agreement and Guaranty, including without limitation, during any workout, attempted workout, and/or in connection with the rendering of legal advice as to ORIX's rights, remedies and obligations under this Agreement or the Company Operating Agreement and Guaranty, whether or not any form of legal proceeding has commenced, (b) collecting any sum which becomes due to ORIX under this Agreement or the Company Operating Agreement and Guaranty, (c) any proceeding for declaratory relief, any counterclaim to any proceeding, or any appeal, (d) the protection, preservation or enforcement of any rights or remedies of ORIX, whether or not any form of legal proceeding is commenced, (e) any action necessary to defend, protect, assert, or preserve any of ORIX's rights or remedies as a result of or related to any case or proceeding under Chapter 11 of the United States Code, as amended, or any similar law of any jurisdiction, and (f) all other matters as provided pursuant to the terms and conditions of the Company Operating Agreement and Guaranty.  All of such costs and expenses shall bear interest

from the time of demand at the highest rate then in effect under the Company Operating Agreement, Guaranty or this Agreement, and shall be considered part of the Obligations, as that term is defined in this Agreement.

13.     Effect of Bankruptcy. ORIX shall further have no on-going obligation to forbear from exercising its rights and remedies in the event that at any time, either of the Company, Sponsor Member and Guarantor: (i) voluntarily or involuntarily is adjudicated as bankrupt or insolvent, (ii) procures, permits or suffers the voluntary or involuntary appointment of a receiver, trustee or liquidator for itself or for all or any part of its property, (iii) files petitions or other proceedings seeking relief under the bankruptcy, rearrangement, reorganization or other debt or relief laws of the United States, any state thereof, or any competent jurisdiction, (iv) makes a general assignment for the benefit of its creditors, (v) admits in writing its inability to pay its debts as such debts mature, or (vi) fails to contest any involuntary proceedings described in the foregoing subsections (i) through (v) within thirty (30) days after the filing thereof if involuntarily filed.

14.     Consent to Relief from Automatic Stay. The Company, Sponsor Member and Guarantor each agree that if any of them shall: (a) file with any bankruptcy court of competent jurisdiction or be the subject of any petition under Title 11 of the United States Code, as amended, (b) be the subject of any order for relief issued under such Title 11 of the United States Code, as amended, (c) file or be the subject of any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, (d) seek consent to or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator, (e) be the subject of any order, judgment or decree entered by any court of competent jurisdiction approving a petition filed against him, her or it for any reorganization, arrangement, composition, readjustment, liquidation, disillusionment, or similar relief under any present or future federal or state act or law relating to bankruptcy and insolvency, or relief for the debtors, ORIX shall thereupon be entitled to relief from any automatic stay imposed by Section 362 of Title 11 of the United States Code, as amended, or from any other stay or suspension of remedies imposed in any other manner with respect to the exercise of the rights and remedies otherwise available to ORIX under the terms of this Agreement, the Company Operating Agreement and Guaranty, and the Company, Sponsor Member and Guarantor shall consent to, and otherwise not oppose, any such relief sought by ORIX.

15.     Expenses. The Company, Sponsor Member and Guarantor shall each be responsible for their own expenses, as well as those of ORIX, related to this Agreement.

16.     Voluntary Agreement. In the negotiations leading up to this Agreement, the Company, Sponsor Member and Guarantor have each had sufficient time to consider all terms of this Agreement and the alternatives hereto, during which time they have had the benefit of, or opportunity to consult with, counsel, and each is fully prepared and willing to sign this Agreement and be legally bound thereby. The Company, Sponsor Member and Guarantor each freely and thoroughly considered all options, and enter into this Agreement knowingly and voluntarily. The Company, Sponsor Member and Guarantor each acknowledge that they have not signed this Agreement under duress or coercion, and that other alternatives exist which they have considered and rejected. Each party has had equal opportunity to negotiate the terms of this Agreement, and

counsel for ORIX has prepared the draft merely for the convenience of the parties. The identity of the party preparing this Agreement shall have no effect on the interpretation hereof.

17.    Effect and Construction of Agreement.  Except as expressly provided herein, the Company Operating Agreement and Guaranty shall remain in full force and effect in accordance with their respective terms, and this Agreement shall not be construed to: (a) waive or impair any rights, powers or remedies of ORIX under the Company Operating Agreement or Guaranty upon termination of the Forbearance Period, (c) constitute an agreement by ORIX or require ORIX to extend the Forbearance Period, or grant additional forbearance periods, or extend the time for payment of any of the Obligations, or (d) make any additional Capital Contribution or other extensions of credit to the Company after termination of the Forbearance Period. The execution of this Agreement shall not constitute a novation of any of the Company Operating Agreement or Guaranty, or of the Obligations or any other indebtedness owing to ORIX. In the event of any inconsistency between the terms of this Agreement and either the Company Operating Agreement or Guaranty, this Agreement shall govern. The Company, Sponsor Member and Guarantor each acknowledge that they have consulted with counsel and with such other experts and advisors as they have deemed necessary in connection with the negotiation, execution, and delivery of this Agreement.  This Agreement shall be construed without regard to any presumption or rule requiring that the Agreement be construed against the party causing this Agreement or any part hereof to be drafted.

18.    Subordination.  The Company, Sponsor Member and Guarantor each fully subordinate and any all indebtedness between and among them, to the Obligations owed to ORIX, and otherwise acknowledge more specifically as follows:

(a)    The Company's, Sponsor Member's and Guarantor's rights in and related to the Subordinated Indebtedness (defined below) are expressly, completely, and absolutely subject and fully subordinate to the rights of ORIX in and related to the Obligations pursuant to the Company Operating Agreement and Guaranty;

(b)    Without the express written consent of ORIX, neither the Company, Sponsor Member nor Guarantor shall: (i) pursue any remedies available at law or by agreement against any of the Company, Sponsor Member or Guarantor; (ii) join with any creditor (unless ORIX shall so join) in pursuing any remedies against any of the Company, Sponsor Member or Guarantor; (iii) exercise or enforce any right or remedy available to any of the Company, Sponsor Member and Guarantor, unless and until all the Obligations have been paid in full, without further advance;

(c)    Until the Obligations have been paid in full, neither the Company, Sponsor Member nor Guarantor shall, without ORIX's prior written consent, demand, receive or accept any payment (whether of principal, interest or otherwise) from the Company, Sponsor Member or Guarantor in respect of the Subordinated Indebtedness, or exercise any right of or permit any setoff in respect of the Subordinated Indebtedness. If the Company, Sponsor Member or Guarantor receives any payment on the Subordinated Indebtedness that the Company, Sponsor Member or Guarantor are not entitled to receive under the provisions of this Agreement, then the Company, Sponsor Member and Guarantor shall hold any amounts so received in trust for ORIX and shall immediately turn over such payment to ORIX in the form received (except for supplying the

endorsement of the Company, Sponsor Member and/or Guarantor where necessary) for application to then existing Obligations (whether or not due), in such manner of application as ORIX may deem appropriate. If the Company, Sponsor Member or Guarantor exercises any right of setoff which such party is not permitted to exercise under the provisions of this Agreement, then the Company, Sponsor Member or Guarantor, as applicable, shall promptly pay over to ORIX, in immediately available funds, an amount equal to the amount of the claims or obligations offset; and

(d)     As used herein, "Subordinated Indebtedness" means each and every debt, liability and obligation of every type, description and kind which the Company, Sponsor Member or Guarantor may now or at any time hereafter owe to the Company, Sponsor Member or Guarantor, whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several, or joint and several.

19.     No Third Party Beneficiaries.  Except as otherwise specifically provided herein, this Agreement is not intended to benefit any third parties including, without limitation, such parties that may have claims against the Company, Sponsor Member or Guarantor.

20.     Waiver of Right to Jury Trial.  THE COMPANY, SPONSOR MEMBER, GUARANTOR AND ORIX EACH HEREBY VOLUNTARILY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN ORIX AND ANY OTHER PARTY HERETO ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN ORIX AND ANY OR ALL OF THE COMPANY, SPONSOR MEMBER, AND/OR GUARANTOR IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, THE COMPNAY OPERATING AGREEMENT, GUARANTY OR ANY OTHER AGREEMENT OR DOCUMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.  THIS PROVISION IS A MATERIAL INDUCEMENT TO ORIX TO ENTER INTO THIS AGREEMENT.

21.     Notice.  Any notice required or permitted to be given hereunder shall be in writing, shall be delivered to the other party personally; or by certified mail, return receipt requested, postage prepaid; or by overnight mail; or by first-class mail with proof of mailing; or by electronic mail; and shall be effective on:  (i) the date of personal delivery; (ii) the date upon which notice by certified delivery is certified to have been delivered; (iii) the date of receipt for any notice sent by overnight mail; (iv) three days after the date of mailing for any notice sent by first-class mail with proof of mailing; and (v) the next business day for any notices sent by electronic mail, provided the notice is also sent by one other method of approved delivery as noted herein to ensure receipt.  All notices shall be addressed as follows:

> If to ORIX/Preferred     ORIX RE Holdings, LLC
> Member:                  1717 Main Street, Suite 900
>                          Dallas, Texas 75201
>                          Attention:  Jim Lingle
>                          Email: jim.lingle@orix.com

| | |
|---|---|
| with a copy to: | ORIX RE Holdings, LLC<br>1717 Main Street, Suite 1100<br>Dallas, Texas 75201<br>Attention:  Stephanie Culpepper<br>Email: stephanie.culpepper@orix.com |
| with a copy to: | Ballard Spahr LLP<br>300 East Lombard Street, 18th Floor<br>Baltimore, Maryland 21202<br>Attention:  Thomas A. Hauser, Esq.<br>Email:  hausera@ballardspahr.com |
| If to the Company: | NB Gathering JV, LLC<br>c/o Nelson Partners, LLC<br>16B Journey<br>Aliso Viejo, California 92656<br>Attention: Patrick Nelson<br>E-Mail: Patrick@nelsonpartners.com |
| with a copy to: | Nelson Partners, LLC<br>16B Journey<br>Aliso Viejo, California 92656<br>Attention: Patrick Nelson<br>E-Mail: Patrick@nelsonpartners.com |
| And with a copy to: | General Counsel<br>Nelson Partners, LLC<br>16B Journey<br>Aliso Viejo, CA 92656<br>E-mail:<br>generalcounsel@nelsonpartners.com |
| If to Sponsor Member: | NB Equity, LLC<br>c/o Nelson Partners, LLC<br>16B Journey<br>Aliso Viejo, California 92656<br>Attention: Patrick Nelson<br>E-Mail: Patrick@nelsonpartners.com |
| with a copy to: | Nelson Partners, LLC<br>16B Journey<br>Aliso Viejo, California 92656<br>Attention: Patrick Nelson<br>E-Mail: Patrick@nelsonpartners.com |

APP108

| And with a copy to: | General Counsel |
| | Nelson Partners, LLC |
| | 16B Journey |
| | Aliso Viejo, CA 92656 |
| | E-mail: |
| | generalcounsel@nelsonpartners.com |

| If to Guarantor: | Patrick Nelson |
| | 37 Anacapa Lane, |
| | Aliso Viejo, California 92656 |
| | E-Mail: Patrick@nelsonpartners.com |

| With a copy to: | Nelson Brothers Professional Real Estate, |
| | LLC |
| | 16B Journey |
| | Aliso Viejo, California 92656 |
| | Attention: Patrick Nelson |
| | E-Mail: Patrick@nelsonpartners.com |

| And with a copy to: | General Counsel |
| | Nelson Partners, LLC |
| | 16B Journey |
| | Aliso Viejo, CA 92656 |
| | E-mail: |
| | generalcounsel@nelsonpartners.com |

Any party to this Agreement may, upon advance written notice, inform the others of a new or changed address or addressee(s) to which notices hereunder should be sent.

22.    Entire Agreement.    This Agreement, and any agreements, documents and instruments executed and delivered pursuant hereto or in connection herewith, or incorporated herein by reference, constitutes the entire agreement among the parties pertaining to the subject matter hereof and, except as otherwise provided herein, supersedes all prior contemporaneous agreements, understandings, negotiations, and discussions whether oral or written.

23.    Assignment.   With respect to the obligations of the Company, Sponsor Member and Guarantor hereunder, this Agreement is personal, being entered into in reliance upon and in consideration of the singular personal skill and qualifications of the Company, Sponsor Member and Guarantor, and the trust and confidentiality reposed in the Company, Sponsor Member and Guarantor by ORIX. Neither the Company, Sponsor Member nor Guarantor shall assign its rights, or delegate any of its duties hereunder without the express written consent of ORIX.

24.    Amendments.   This Agreement may not be amended or modified except by written instrument executed by the parties.

25.    Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original for all purposes, but all of which shall constitute one and the same instrument.

26.    Severability. All clauses of this Agreement are distinct and severable and if any clause shall be held to be invalid or illegal, that shall not affect the validity or legality of the remainder of the Agreement. The parties hereto further agree that any such unenforceable clause shall be deemed modified so that it shall be enforced to the greatest extent permissible under law. Except as otherwise specifically provided herein, all obligations, liabilities and responsibilities of the Company, Sponsor Member and Guarantor shall survive the consummation of the transactions set forth herein.

27.    Further Assurances. The parties each covenant and agree to execute and deliver to the other parties all such further instruments, agreements and other writings as any party may reasonably request of such other parties to effectuate the purpose of this Agreement or to confirm the availability of the Collateral to secure the Obligations. This Agreement is not intended to, nor will it, establish any course of dealing between the Company, Sponsor Member and Guarantor and ORIX that is inconsistent with the express terms of the Company Operating Agreement and Guaranty, and the Company, Sponsor Member and Guarantor hereby certify and agree to be bound by this Agreement and the Company Operating Agreement and Guaranty and any document executed in connection therewith. The Company, Sponsor Member and Guarantor each agree to execute and deliver to ORIX such other and further documents and instruments as ORIX may from time to time reasonably request to implement the provisions of this Agreement.

28.    Enforceability. Each of the parties hereto represents and declares that the person executing this Agreement on behalf of such party is duly empowered and authorized to do so and that this Agreement is a legal, valid and binding obligation of such party, enforceable against it in accordance with the terms hereof.

29.    Governing Law. This Agreement is made and entered into, and shall be governed by and construed in accordance with, the laws of the State of Delaware.

30.    Successor and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

31.    Survival. Any provision of this Agreement which imposes an obligation following the termination or expiration hereof shall survive such termination or expiration and shall continue to be binding upon the parties hereto.

32.    Headings. Paragraph and section headings are not to be considered part of this Agreement; they are included solely for convenience and are not intended to be full or accurate descriptions of the contents herein.

33.    Waiver. No waiver by ORIX of any breach of this Agreement shall be a waiver of any proceeding or succeeding breach. No waiver by ORIX of any right under this Agreement shall be construed as a waiver of any other right. ORIX shall not be required to give notice to enforce strict adherence to all terms of this Agreement and the Company Operating Agreement and Guaranty. Other than expressly provided in this Agreement, nothing contained in this Agreement

shall be construed to restrict the exercise of any of the rights or remedies granted to ORIX under either the Company Operating Agreement or Guaranty. No failure by ORIX to exercise any rights under the Company Operating Agreement, Guaranty or this Agreement shall be construed as a waiver of the right to exercise the same or any other right at any time or from time to time hereafter.

34.     True and Complete Statements.  The Company, Sponsor Member and Guarantor represent and warrant that all of the statements contained in this Agreement, the Company Operating Agreement, Guaranty and in any other documents previously, concurrently, or hereafter delivered by the Company, Sponsor Member and Guarantor to ORIX are and shall be true, complete, and correct and that the Company, Sponsor Member and Guarantor have not omitted any facts which are necessary to keep the statements made or delivered by the Company, Sponsor Member and Guarantor from being misleading.

35.     Time is of the Essence.  TIME IS OF THE ESSENCE FOR ALL PURPOSES OF THIS AGREEMENT INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO REQUIRED PAYMENTS AND THE SATISFACTION OF CONDITIONS ON THE DATES SET FORTH HEREIN AND IN THE COMPANY OPERATING AGREEMENT AND GUARANTY.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –
SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Effective Date on the dates indicated adjacent to their respective signatures below.

## THE COMPANY:

**NB GATHERING JV, LLC,**
a Delaware limited liability company

By:     **NP EQUITY, LLC,**
a Delaware limited liability company,
its manager

By:     Nelson Partners, LLC,
a Utah limited liability company,
its sole member

By: _____
Name:   Patrick Nelson
Title:   Manager

## CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT

Civil Code 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this Certificate is attached, and not the truthfulness, accuracy or validity of that document.

State of California
County of Orange

On _____ before me, _____ personally appeared Patrick Nelson  who proved to me on the basis of satisfactory evidence to be the person whose named is subscribed in the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

I certify under **PENALTY OF PERJURY** under the laws of the State of California that the foregoing paragraph is true and correct.
Witness my hand and official seal.

Signature of Notary Public: _____

Print Name: _____

Place Notary Seal and/or Stamp Above                     See Attached Certificate

**CALIFORNIA ACKNOWLEDGMENT**                                    CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Orange_

On _September 5, 2019_ before me, _Elizabeth Carbello_,
　　　　*Date*　　　　　　　　　　　*Here Insert Name and Title of the Officer*

personally appeared _Patrick Nelson_
　　　　　　　　　　　　　　*Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

ELIZABETH CARBELLO
Notary Public - California
Orange County
Commission # 2253957
My Comm. Expires Aug 13, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

*Place Notary Seal and/or Stamp Above*　　　　　　*Signature of Notary Public*

───────────────────── OPTIONAL ─────────────────────

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: _____ | Signer's Name: _____ |
| □ Corporate Officer – Title(s): _____ | □ Corporate Officer – Title(s): _____ |
| □ Partner – □ Limited □ General | □ Partner – □ Limited □ General |
| □ Individual  □ Attorney in Fact | □ Individual  □ Attorney in Fact |
| □ Trustee  □ Guardian or Conservator | □ Trustee  □ Guardian or Conservator |
| □ Other: _____ | □ Other: _____ |
| Signer is Representing: _____ | Signer is Representing: _____ |

©2018 National Notary Association

**SPONSOR MEMBER:**

**NP EQUITY, LLC,**
a Delaware limited liability company

By:     Nelson Partners, LLC,
        a Utah limited liability company,
        its sole member

By: _____
        Name: Patrick Nelson
        Title: Manager

CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT

Civil Code 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this Certificate is attached, and not the truthfulness, accuracy or validity of that document.

State of California
County of Orange

On _____ before me, _____ personally appeared Patrick Nelson  who proved to me on the basis of satisfactory evidence to be the person whose named is subscribed in the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

I certify under **PENALTY OF PERJURY** under the laws of the State of California that the foregoing paragraph is true and correct.
Witness my hand and official seal.

Signature of Notary Public:

Print Name: _____

Place Notary Seal and/or Stamp Above

**See Attached Certificate**

**CALIFORNIA ACKNOWLEDGMENT**

CIVIL CODE § 1189

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Orange_

On _September 5, 2019_ before me, _Elizabeth Carbello_
   Date                              Here Insert Name and Title of the Officer

personally appeared _Patrick Nelson_
                     Name(s) of Signer(s)

---

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

ELIZABETH CARBELLO
Notary Public · California
Orange County
Commission # 2253957
My Comm. Expires Aug 13, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                Signature of Notary Public

*Place Notary Seal and/or Stamp Above*

---------- OPTIONAL ----------

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____  Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: _____ | Signer's Name: _____ |
| □ Corporate Officer – Title(s): ____ | □ Corporate Officer – Title(s): ____ |
| □ Partner – □ Limited □ General | □ Partner – □ Limited □ General |
| □ Individual   □ Attorney in Fact | □ Individual   □ Attorney in Fact |
| □ Trustee   □ Guardian or Conservator | □ Trustee   □ Guardian or Conservator |
| □ Other: _____ | □ Other: _____ |
| Signer is Representing: _____ | Signer is Representing: _____ |

©2018 National Notary Association

**GUARANTOR:**

PATRICK NELSON:

CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT

Civil Code 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this Certificate is attached, and not the truthfulness, accuracy or validity of that document.

State of California
County of Orange

On _____ before me, _____ personally appeared Patrick Nelson who proved to me on the basis of satisfactory evidence to be the person whose named is subscribed in the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

I certify under **PENALTY OF PERJURY** under the laws of the State of California that the foregoing paragraph is true and correct.
Witness my hand and official seal.

Signature of Notary Public:

Print Name: _____

Place Notary Seal and/or Stamp Above

See Attached Certificate

**CALIFORNIA ACKNOWLEDGMENT**

CIVIL CODE § 1189

ᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦ

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of Orange

On September 5, 2019 before me, Elizabeth Carbello,
     Date                         Here Insert Name and Title of the Officer

personally appeared Patrick Nelson
                               Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.



ELIZABETH CARBELLO
Notary Public - California
Orange County
Commission # 2253957
My Comm. Expires Aug 13, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

*Place Notary Seal and/or Stamp Above*
                             *Signature of Notary Public*

——————————— **OPTIONAL** ———————————

*Completing this information can deter alteration of the document or
fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
□ Corporate Officer – Title(s): _____
□ Partner – □ Limited □ General
□ Individual     □ Attorney in Fact
□ Trustee     □ Guardian or Conservator
□ Other: _____
Signer is Representing: _____

Signer's Name: _____
□ Corporate Officer – Title(s): _____
□ Partner – □ Limited □ General
□ Individual     □ Attorney in Fact
□ Trustee     □ Guardian or Conservator
□ Other: _____
Signer is Representing: _____

ᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦᴦ

©2018 National Notary Association

**PREFERRED MEMBER:**

**NB GATHERING IX PREF, LLC**,
a Delaware limited liability company

By:   ORIX RE Holdings, LLC,
      a Delaware limited liability company,
      its sole member

By:

Name: _Jim Dunn_
Title: _President_

STATE OF _Texas_ )
                )
COUNTY OF _Dallas_ )

The foregoing instrument was acknowledged before me this _6th_ day of September, 2019, by _James Dunn_, as _President_ of ORIX RE Holdings, LLC, a liability company and the sole member of NB Gathering IX Pref, LLC, a Delaware limited liability company, on behalf of the limited liability companies. He either [X] is personally known to me or [ ] has produced _____ as identification.

SHARON LEIGH TAYLOR
Notary ID #3287151
My Commission Expires
July 21, 2021

_____
Notary Public in and for
the State of _Texas_

My Commission Expires:

_July 21, 2021_

# EXHIBIT A-4

## AMENDED FORBEARANCE AGREEMENT

THIS AMENDED FORBEARANCE AGREEMENT (the "Amendment") is made and entered into effective as of the _____ day of December, 2019 (the "Effective Date"), upon the date of the full execution hereof (the "Execution Date"), by and among NP EQUITY, LLC, a Delaware limited liability company ("Sponsor Member"); PATRICK NELSON, an individual ("Guarantor"), and NB GATHERING IX PREF, LLC, a Delaware limited liability company ("ORIX" or "Preferred Member").

R E C I T A L S:

A.     Preferred Member and Sponsor Member are the sole members of NB GATHERING JV, LLC, a Delaware limited liability company (the "Company"), and parties to that certain Operating Agreement of the Company, dated as of June 22, 2018 (the "Company Operating Agreement") and that certain forbearance agreement dated August 29, 2019 (the "Forbearance Agreement"). *Unless otherwise defined herein, all capitalized terms used herein shall have the meanings ascribed to such terms in the Company Operating Agreement and Forbearance Agreement.*

B.     The Company, Sponsor Member and Guarantor requested that ORIX forbear from exercising its remedies as a result of the Maturity Default occurring under the Company Operating Agreement and Guaranty as described in the Forbearance Agreement.

C.     The Company, Sponsor Member and Guarantor failed to fulfill their obligations under the Forbearance Agreement and have requested that ORIX continue to forbear from exercising its remedies and enter into this Amended Forbearance Agreement. ORIX is willing to forbear for a limited time on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company, Sponsor Member, Guarantor and ORIX hereby agree as follows:

1.     The recitals set forth above are hereby incorporated as a substantive part of this Amendment.

2.     The Parties agree that Paragraph 4 of the Forbearance Agreement shall be amended as follows:

(a)     The Forbearance Period and Extended Required Redemption Date are extended through March 6, 2020 provided the payments listed below are made timely, time being of the essence;

(b)     Paragraphs 4(a) and 4(b) of the Forbearance Agreement are replaced by the following schedule of Minimum Paydown Amounts and Final Payment Amount:

-     December 31, 2019 - $1,000,000 (which will be applied first to out of pocket fees incurred by ORIX as a result of default)

1

APP120

- January 15, 2020 – $2,000,000

- February 6, 2020 - $2,000,000

- March 6, 2020 – Final Payment Amount (remaining balance of Obligations)

3. The parties agree that the first sentence of Paragraph 5 of the Forbearance Agreement is deleted. For purposes of clarity, the parties agree that Default Interest is due and continues to accrue during the Forbearance Period.

4. Each of the Company, Sponsor Member and Guarantor reaffirm and restate the Release contained in Paragraph 7 of the Forbearance Agreement effective as of the date of this Amendment.

5. Guarantor, as guarantor and in any other capacities, reaffirms and restates the Confirmation and Waiver contained in Paragraph 8 of the Forbearance Agreement effective as of the date of this Amendment.

6. Each of the Company, Sponsor Member and Guarantor further waive any right to notice or demand in the event it fails to make any of the payments required herein.

7. Except as modified by this Amendment, the Forbearance Agreement remains unmodified and in full force and effect.

8. This Amendment may be executed in multiple counterparts, each of which shall be deemed to be an original for all purposes, but all of which shall constitute one and the same instrument.

9. Each of the parties hereto represents and declares that the person executing this Amendment on behalf of such party is duly empowered and authorized to do so and that this Amendment is a legal, valid and binding obligation of such party, enforceable against it in accordance with the terms hereof.

10. TIME IS OF THE ESSENCE FOR ALL PURPOSES OF THIS AMENDMENT INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO REQUIRED PAYMENTS AND THE SATISFACTION OF CONDITIONS ON THE DATES SET FORTH HEREIN AND IN THE COMPANY OPERATING AGREEMENT AND GUARANTY.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK –
SIGNATURE PAGES FOLLOW]

APP121

IN WITNESS WHEREOF, the parties have executed this Amendment effective as of the Effective Date on the dates indicated adjacent to their respective signatures below.

**THE COMPANY:**

**NB GATHERING JV, LLC,**
a Delaware limited liability company

By:     **NP EQUITY, LLC,**
a Delaware limited liability company,
its manager

By:     Nelson Partners, LLC,
a Utah limited liability company,
its sole member

By:     _____
Name: _____
Title: _____

CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT

Civil Code 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this Certificate is attached, and not the truthfulness, accuracy or validity of that document.

State of California
County of Orange

On _____before me, _____ personally appeared Patrick Nelson  who proved to me on the basis of satisfactory evidence to be the person whose named is subscribed in the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

I certify under **PENALTY OF PERJURY** under the laws of the State of California that the foregoing paragraph is true and correct.
Witness my hand and official seal.

Signature of Notary Public: _____

Print Name: _____

Place Notary Seal and/or Stamp Above

**CALIFORNIA ACKNOWLEDGMENT**

**CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Orange_ }

On _January 20, 2020_ before me, _Elizabeth Carbello_,
          Date                                    *Here Insert Name and Title of the Officer*

personally appeared _Patrick Nelson_

*Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

> ELIZABETH CARBELLO
> Notary Public - California
> Orange County
> Commission # 2253957
> My Comm. Expires Aug 13, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
          *Signature of Notary Public*

*Place Notary Seal and/or Stamp Above*

─────── **OPTIONAL** ───────

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: _____ | Signer's Name: _____ |
| ☐ Corporate Officer – Title(s): _____ | ☐ Corporate Officer – Title(s): _____ |
| ☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General |
| ☐ Individual   ☐ Attorney in Fact | ☐ Individual   ☐ Attorney in Fact |
| ☐ Trustee   ☑ Guardian or Conservator | ☐ Trustee   ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer is Representing: _____ | Signer is Representing: _____ |

©2018 National Notary Association

**SPONSOR MEMBER:**

**NP EQUITY, LLC,**
a Delaware limited liability company

By:    Nelson Partners, LLC,
        a Utah limited liability company,
        its sole member

By:    _____
        Name: Patrick Nelson
        Title: Manager

CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT

Civil Code 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this Certificate is attached, and not the truthfulness, accuracy or validity of that document.

State of California
County of Orange

On _____before me, _____ personally appeared Patrick Nelson  who proved to me on the basis of satisfactory evidence to be the person whose named is subscribed in the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

I certify under **PENALTY OF PERJURY** under the laws of the State of California that the foregoing paragraph is true and correct.
Witness my hand and official seal.

Signature of Notary Public: _____

           Print Name: _____

Place Notary Seal and/or Stamp Above

**CALIFORNIA ACKNOWLEDGMENT**                                      CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Orange_ }

On _January 20, 2020_ before me, _Elizabeth Carballo_,
_____Date_____     Here Insert Name and Title of the Officer

personally appeared _Patrick Nelson_
_____Name(s) of Signer(s)_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

ELIZABETH CARBELLO
Notary Public - California
Orange County
Commission # 2253957
My Comm. Expires Aug 13, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Elizabeth Carballo_
Signature of Notary Public

*Place Notary Seal and/or Stamp Above*

—————— **OPTIONAL** ——————

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: _____ | Signer's Name: _____ |
| □ Corporate Officer – Title(s): ____ | □ Corporate Officer – Title(s): ____ |
| □ Partner – □ Limited □ General | □ Partner – □ Limited □ General |
| □ Individual   □ Attorney in Fact | □ Individual   □ Attorney in Fact |
| □ Trustee  □ Guardian or Conservator | □ Trustee  □ Guardian or Conservator |
| □ Other: _____ | □ Other: _____ |
| Signer is Representing: _____ | Signer is Representing: _____ |

©2018 National Notary Association

APP125

**GUARANTOR:**

_____
PATRICK NELSON:


CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT

Civil Code 1189

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this Certificate is attached, and not the truthfulness, accuracy or validity of that document. |
| --- |

State of California
County of Orange

On _____ before me, _____ personally appeared
Patrick Nelson  who proved to me on the basis of satisfactory evidence to be the person whose named is subscribed
in the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by
his signature on the instrument the person or the entity upon behalf of which the person acted, executed the
instrument.

I certify under **PENALTY OF PERJURY** under the laws of the State of California that the foregoing paragraph is
true and correct.
Witness my hand and official seal.

Signature of Notary Public: _____

_____
Print Name: _____

Place Notary Seal and/or Stamp Above

**CALIFORNIA ACKNOWLEDGMENT**                                    **CIVIL CODE § 1189**

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Orange_ }

On _January 20, 2020_ before me, _Elizabeth Carbello_,
      Date                                    Here Insert Name and Title of the Officer

personally appeared _Patrick Nelson_
                                      Name(s) of Signer(s)

---

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

ELIZABETH CARBELLO
Notary Public - California
Orange County
Commission # 2253957
My Comm. Expires Aug 13, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                    Signature of Notary Public

*Place Notary Seal and/or Stamp Above*

---------------------- **OPTIONAL** ----------------------

*Completing this information can deter alteration of the document or*
*fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
□ Corporate Officer – Title(s): _____
□ Partner – □ Limited □ General
□ Individual        □ Attorney in Fact
□ Trustee           □ Guardian or Conservator
□ Other: _____
Signer is Representing: _____

Signer's Name: _____
□ Corporate Officer – Title(s): _____
□ Partner – □ Limited □ General
□ Individual        □ Attorney in Fact
□ Trustee           □ Guardian or Conservator
□ Other: _____
Signer is Representing: _____

©2018 National Notary Association

**PREFERRED MEMBER:**

**NB GATHERING IX PREF, LLC,**
a Delaware limited liability company

By:     ORIX RE Holdings, LLC,
          a Delaware limited liability company,
          its sole member

          By:
                  Name: James Dunn
                  Title: President

STATE OF TEXAS )
                              )
COUNTY OF DALLAS )

          The foregoing instrument was acknowledged before me this 3rd day of ~~July, 2019~~, by January 2020 James Dunn as President of ORIX RE Holdings, LLC, a liability company and the sole member of NB Gathering IX Pref, LLC, a Delaware limited liability company, on behalf of the limited liability companies.  He either [X] is personally known to me or [  ] has produced _____ as identification.

SHARON LEIGH TAYLOR
Notary ID #3287151
My Commission Expires
July 21, 2021

Notary Public in and for
the State of TEXAS

My Commission Expires:

July 21, 2021

**OREH**
**Limited Partnership Investment**
**NB Gathering JV, LLC**

Current Preferred Return - LIBOR + 6%
6%
1%
Floor 1.90%    Forbearance Agreement

Last update 8/19/2021

**OREH**
**Limited Partnership Investment**
**NB Gathering JV, LLC**

Accrual Preferred Return
7%

Last update 8/19/2021

| Date | Accrual Basis/ Investment | LIBOR | Payment of Pref. Distribution | Payment of Retained Capital | Additional Profit Distribution | Accrual | Forbearance Interest | Ending Accrual Basis/ Investment | Interest Payments Received | Income/(Expense) Adjustments to Interest | Total Receivable | Accrual Basis/ Investment | Payment of Pref. Distribution | Payment of Retained Capital | Additional Profit Distribution | Accrual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Apr-18 | | | | | | - | | | | | | | | | | - |
| May-18 | | | | | | - | | | | | | | | | | - |
| Jun-18 | 12,500,000.00 | 8.00000% | | | | 25,000.00 | | | 25,000.00 | | | 12,500,000.00 | | | | 21,875.00 |
| Jul-18 | 12,521,875.00 | 8.09025% | | | | 87,234.95 | | | 84,420.92 | 2,814.03 | | 12,521,875.00 | | | | 75,479.08 |
| Aug-18 | 12,597,354.08 | 8.08213% | | | | 87,672.70 | | | 87,655.75 | 2,830.98 | | 12,597,354.08 | | | | 75,934.05 |
| Sep-18 | 12,673,288.13 | 8.11375% | | | | 85,689.91 | | | 85,673.35 | 2,847.54 | | 12,673,288.13 | | | | 73,927.51 |
| Oct-18 | 12,747,215.64 | 8.26513% | | | | 90,724.42 | | | 90,706.89 | 2,865.07 | | 12,747,215.64 | | | | 76,837.38 |
| Nov-18 | 12,824,053.03 | 8.31356% | | | | 88,844.61 | | | 88,675.93 | 3,033.76 | | 12,824,053.03 | | | | 74,806.98 |
| Dec-18 | 12,898,860.00 | 8.34694% | | | | 92,712.40 | | | 95,746.15 | 0.00 | | 12,898,860.00 | | | | 77,751.46 |
| Jan-19 | 12,976,611.47 | 8.50269% | | | | 95,011.65 | | | 95,011.65 | (0.00) | | 12,976,611.47 | | | | 78,220.13 |
| Feb-19 | 13,054,831.60 | 8.51400% | | | | 86,449.09 | | | 86,449.09 | 0.00 | | 13,054,831.60 | | | | 71,076.31 |
| Mar-19 | 13,125,907.90 | 8.48188% | | | | 95,869.55 | | | 95,869.55 | | | 13,125,907.90 | | | | 79,120.06 |
| **2019 Total** | | | - | | - | 835,209.27 | | | 835,209.27 | | - | | - | - | - | 705,027.96 |
| Apr-19 | 13,205,027.96 | 8.49338% | | | | 93,462.77 | | | 93,462.77 | (0.00) | | 13,205,027.96 | | | | 77,029.33 |
| May-19 | 12,277,150.10 | 8.48325% | (1,004,907.19) | | | 94,529.88 | | | 89,703.59 | 4,826.28 | | 12,277,150.10 | | | | 78,001.84 |
| Jun-19 | 11,744,184.06 | 8.43050% | (610,967.88) | | | 85,769.36 | | | 82,479.70 | 8,115.95 | | 11,744,184.06 | | | | 71,215.89 |
| Jul-19 | 10,182,877.97 | 8.38775% | (1,632,521.98) | | | 81,868.11 | | | 81,868.11 | 8,115.94 | | 10,182,877.97 | | | | 68,323.06 |
| Aug-19 | 10,251,201.03 | 8.24413% | | | | 72,774.42 | | | 72,774.42 | 8,115.94 | | 10,251,201.03 | | | | 61,791.96 |
| Sep-19 | 6,572,349.42 | 8.08900% | (3,740,643.56) | | | 61,853.81 | 1,708.05 | 63,561.85 | 63,561.85 | 8,115.94 | | 6,572,349.42 | | | | 53,526.60 |
| Oct-19 | 6,625,876.02 | 8.00088% | | | | 45,707.00 | 7,546.14 | 53,253.14 | 53,253.14 | 8,115.94 | | 6,625,876.02 | | | | 39,939.31 |
| Nov-19 | 6,665,815.33 | 7.90000% | | | | 43,883.28 | 11,109.69 | 54,992.98 | 54,992.98 | 8,115.94 | | 6,665,815.33 | | | | 38,883.92 |
| Dec-19 | 5,885,646.16 | 7.90000% | (819,053.09) | | | 44,532.16 | 11,273.96 | 55,806.12 | 55,806.13 | 8,115.94 | | 5,885,646.16 | | | | 39,458.88 |
| Jan-20 | 5,168,453.34 | 7.90000% | (756,651.70) | | | 39,011.52 | 9,876.33 | 48,887.86 | 55,806.13 | 48,887.86 | 33,412.89 | 5,168,453.34 | | | | 34,567.17 |
| Feb-20 | 4,063,305.51 | 7.90000% | (1,139,714.99) | | | 26,662.81 | 6,750.08 | 33,412.89 | 48,887.86 | 33,412.89 | 23,625.28 | 4,063,305.51 | | | | 23,625.28 |
| Mar-20 | 4,086,930.79 | 7.90000% | | | | 27,802.48 | 7,038.60 | 34,841.08 | 68,253.98 | | 24,635.11 | 4,086,930.79 | | | | 24,635.11 |
| **2020 Total** | | | (9,704,460.40) | | - | 717,857.60 | 55,302.86 | | 704,906.48 | | - | | - | - | - | 610,998.34 |
| Apr-20 | 4,111,565.90 | 7.90000% | | | | 27,067.81 | 6,852.61 | 33,920.42 | | | 102,174.40 | 4,111,565.90 | | | | 23,984.13 |
| May-20 | 4,135,550.04 | 7.90000% | | | | 28,133.23 | 7,163.64 | 35,296.87 | | | 137,471.27 | 4,135,550.04 | | | | 23,928.18 |
| Jun-20 | 4,160,478.21 | 7.90000% | | | | 27,389.81 | 6,934.13 | 34,323.95 | | | 171,795.21 | 4,160,478.21 | | | | 24,269.46 |
| Jul-20 | 4,184,747.67 | 7.90000% | | | | 28,467.91 | 7,207.07 | 35,674.97 | | | 207,470.19 | 4,184,747.67 | | | | 25,224.73 |
| Aug-20 | 4,209,972.40 | 7.90000% | | | | 28,639.51 | 7,250.51 | 35,890.01 | | | 243,360.20 | 4,209,972.40 | | | | 25,376.78 |
| Sep-20 | 4,235,349.18 | 7.90000% | | | | 27,882.72 | 7,058.92 | 34,941.63 | | | 278,301.83 | 4,235,349.18 | | | | 24,706.20 |
| Oct-20 | 4,260,055.38 | 7.90000% | | | | 28,980.21 | 7,336.76 | 36,316.97 | | | 314,618.80 | 4,260,055.38 | | | | 25,678.67 |
| Nov-20 | 4,285,734.05 | 7.90000% | | | | 28,214.42 | 7,142.89 | 35,357.31 | | | 349,076.11 | 4,285,734.05 | | | | 25,000.12 |
| Dec-20 | 4,310,734.16 | 7.90000% | | | | 29,324.97 | 7,424.04 | 36,749.01 | | | 386,725.12 | 4,310,734.16 | | | | 25,984.15 |
| Jan-21 | 4,336,718.31 | 7.90000% | | | | 29,501.73 | 7,468.79 | 36,970.52 | | | 423,695.64 | 4,336,718.31 | | | | 26,140.77 |
| Feb-21 | 4,362,859.08 | 7.90000% | | | | 26,807.35 | 6,786.67 | 33,594.01 | | | 457,289.66 | 4,362,859.08 | | | | 23,753.34 |
| Mar-21 | 4,386,612.43 | 7.90000% | | | | 29,841.15 | 7,554.72 | 37,395.87 | | | 494,685.53 | 4,386,612.43 | | | | 26,441.52 |
| **2020 Total** | | | - | | - | 340,250.80 | 86,180.75 | | | | - | | - | - | - | 301,488.05 |
| Apr-21 | 4,413,053.95 | 7.90000% | | | | 29,052.61 | 7,355.09 | 36,407.70 | | | 531,093.22 | 4,413,053.95 | | | | 25,742.81 |
| May-21 | 4,438,796.77 | 7.90000% | | | | 30,196.15 | 7,644.59 | 37,840.74 | | | 568,933.96 | 4,438,796.77 | | | | 26,756.08 |
| Jun-21 | 4,465,552.85 | 7.90000% | | | | 29,398.22 | 7,442.59 | 36,840.81 | | | 605,774.78 | 4,465,552.85 | | | | 26,049.06 |
| Jul-21 | 4,491,601.91 | 7.90000% | | | | 30,555.37 | 7,735.54 | 38,290.91 | | | 644,065.68 | 4,491,601.91 | | | | 27,074.38 |
| Aug-21 | 4,518,676.28 | 7.90000% | | | | 21,815.16 | 5,522.83 | 27,337.99 | | | 671,403.67 | 4,518,676.28 | | | | 19,329.89 |
| Sep-21 | | | | | | | | | | | | | | | | |
| Oct-21 | | | | | | | | | | | | | | | | |
| Nov-21 | | | | | | | | | | | | | | | | |
| Dec-21 | | | | | | | | | | | | | | | | |
| Jan-22 | | | | | | | | | | | | | | | | |
| Feb-22 | | | | | | | | | | | | | | | | |
| Mar-22 | | | | | | | | | | | | | | | | |
| **2021 Total** | | | - | | - | 141,017.51 | 35,700.64 | | | | - | | - | - | - | 124,952.22 |

EXHIBIT A-5

Cash Activity

| Date received | Amount XIRR | Exit Fee % of deal | Exit Fee Total Fee | Principal Paydown |
|---|---|---|---|---|
| | **-8.50%** | 1% | 125,000.00 | |
| 6/22/2018 | (12,500,000.00) | | | |
| 11/15/2018 | 373,456.90 | | | |
| 1/15/2019 | 88,675.93 | | | |
| 2/11/2019 | 95,746.15 | | | |
| 2/15/2019 | 95,011.65 | | | |
| 3/15/2019 | 86,449.09 | | | |
| 4/15/2019 | 95,869.55 | | | |
| 5/17/2019 | 691,600.00 | 5/17/2019 | 6,847.52 | 684,752.48 |
| 5/31/2019 | 323,356.26 | 5/31/2019 | 3,201.55 | 320,154.71 |
| 5/15/2019 | 93,462.77 | | | |
| 6/18/2019 | 89,703.59 | | | |
| 6/20/2019 | 282,446.90 | 6/20/2019 | 2,796.50 | 279,650.40 |
| 6/27/2019 | 334,630.66 | 6/27/2019 | 3,313.17 | 331,317.49 |
| 7/19/2019 | 736,799.70 | | | |
| 7/26/2019 | 912,047.50 | 7/19/2019 | 7,295.05 | 729,504.65 |
| 9/6/2019 | 848,167.54 | 7/26/2019 | 9,030.17 | 903,017.33 |
| 9/19/2019 | 72,774.42 | | | |
| 9/26/2019 | 3,000,000.00 | 9/6/2019 | 7,703.47 | 770,346.53 |
| 12/26/2019 | 1,000,000.00 | 9/26/2019 | 29,702.97 | 2,970,297.03 |
| 1/17/2020 | 300,000.00 | 12/26/2019 | 8,190.53 | 819,053.09 |
| 1/28/2020 | 500,000.00 | 1/17/2019 | 2,616.02 | 261,602.20 |
| 2/3/2020 | 500,000.00 | 1/28/2020 | 4,950.50 | 495,049.50 |
| 2/5/2020 | 700,000.00 | 2/3/2020 | 4,466.46 | 446,645.69 |
| | | 2/5/2020 | 6,930.69 | 693,069.31 |

| | Remaining amount | 27,955.40 |
|---|---|---|

EXHIBIT A-5

**OREH**
**Limited Partnership Investment**
**NB Gathering JV, LLC**

**OREH**
**Limited Partnership Investment**
**NB Gathering JV, LLC**

**Note 1:**  Effective 8/29/19, a Forbearance Agreement was executed extending the redemption date to 11/22/19.

|  |  |  |
|---|---|---|
| Redemption Date | 11/22/2019 | |
| Mandatory Paydown Dates ($3MM) | 9/23/2019 | |
| | 10/22/2019 | |
| Extension Fee  $ | 52,117.00 | |
| Legal Fees      $ | 18,000.00 | |

**Note 2:**  Effective 1/3/20, an Amended Forbearance Agreement was executed extending the redemption date to 3/6/20.

| | | |
|---|---|---|
| Out of pocket expenses paid  $ | 10,299.50 | 61,369.10 |

| Payoff as of August 23, 2021 | |
|---|---|
| Principal Balance | 2,795,539.60 |
| Total Deferred Interest | 1,742,466.58 |
| Total Current plus default Inte | 671,403.67 |
| Remaining Exit Fee | 27,955.40 |
| | |
| Total Payoff | 5,237,365.25 |
| **Per Diem Interest** | |
| Daily Current Interest | 991.60 |
| Daily Current Default Intere | 251.04 |
| Daily Deferred Interest | 878.63 |

EXHIBIT A-5

APP131